**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

EQUAL MEANS EQUAL,
THE YELLOW ROSES
KATHERINE WEITBRECHT

               Plaintiffs,

v.

DAVID S. FERRIERO, in his official
Capacity as Archivist of the United States,
               Defendant.

**AMENDED COMPLAINT FOR
EQUITABLE AND INJUNCTIVE
RELIEF AND FOR RELIEF UNDER
THE ALL WRITS ACT**

Civil Action No. 20-cv-10015

Equal Means Equal, The Yellow Roses, and Katherine Weitbrecht bring this action for equitable and injunctive relief and relief under the All Writs Act.

**INTRODUCTION**

1.  This action concerns the recent ratification of the Equal Rights Amendment ("ERA") and raises novel questions of public importance. Review by this Court will offer significant pragmatic benefits and provide needed guidance to the litigants, as well as to government officials responsible for complying with the ERA.

2.  Thirty-eight states (three-fourths) are needed to ratify a constitutional amendment. Nevada and Illinois became the 36th and 37th States to ratify the ERA in 2017 and 2018, respectively. Virginia became the 38th State to ratify the ERA on January 27, 2020.

3.  On December 16, 2019, Attorneys General from Alabama, Louisiana and South Dakota ("Alabama Plaintiffs") preemptively filed suit in Alabama federal court suit against the United States Archivist, seeking to block ratification of the ERA when Virginia ratified. *Alabama et al. v. Ferriero*, N.D. Alabama, No. 7:2019cv02032. The Alabama Plaintiffs seek

declaratory and injunctive remedies, including preliminary and permanent injunctions, directing the Archivist not to record Virginia's ratification, and to remove the already-recorded ratifications of Nebraska, Idaho, Tennessee, Kentucky, and South Dakota.

4.   On December 19, 2019, just days after the Alabama lawsuit was filed, Defendant Archivist (National Archives and Records Administration) issued a statement declaring that it "does not intend to take any action regarding the ERA until, at a minimum, it receives the guidance it previously requested [from the Justice Department's Office of Legal Counsel] and in no event before February 15, 2020." *U.S. National Archives and Records Administration, Press Release*, December 19, 2019.

5.   On January 8, 2020, the day after this action was filed, the Department of Justice Office of Legal Counsel released to the public a formal legal opinion (slip opinion) dated January 6, 2020, stating, *inter alia,* "...even if one or more state legislatures were to ratify..." the Equal Rights Amendment, "...it would not become part of the Constitution, and the Archivist could not certify its adoption under 1 U.S.C. § 106b." *Ratification of the Equal Rights Amendment, Memorandum Opinion for the General Counsel National Archives and records Administration*, https://www.justice.gov/olc/file/1235176/download.

6.   On January 8, 2020, citing the Office of Legal Counsel's opinion, the Defendant Archivist of the United States released an official statement declaring he would not certify adoption of the Equal Rights Amendment, and citing, *inter alia*, this litigation, would "...abide by the OLC opinion, unless otherwise directed by a final court order." *NARA Press Statement on the Equal Rights Amendment,* https://www.archives.gov/press/press-releases-4

7. By its terms, the ERA becomes enforceable two years after ratification. This two-year period is designed to give state and federal officials time to examine and repair laws, regulations, and policies, to remove all sex discriminatory features. Plaintiffs have an interest in ensuring that state officials begin taking these steps now that Virginia has ratified.

8. Plaintiffs filed this action to ensure the proper recording of Virginia's ratification, and the ERA's ratification. Plaintiffs also seek to prevent the Archivist from improperly removing prior ratifications by any state. Plaintiffs, therefore, seek by this complaint all appropriate writs, injunctions, judgments and orders to ensure the ERA is recorded as the duly ratified 28th Amendment to the U.S. Constitution.

## PARTIES

9.  Defendant, David S. Ferriero, is the Archivist of the United States. The Archivist directs and supervises the National Archives and Records Administration and is responsible for administering the process of recording states' ratifications of constitutional amendments, and for recording the amendments. *See* 1. U.S.C. §106b. The Archivist is sued in his official capacity.

10. Plaintiff Equal Means Equal is a national 501(c)(4) organization whose sole purpose is to advocate for women's equality and ratification of the ERA and equal rights for women and girls.

11.  Plaintiff The Yellow Roses is an organization of Massachusetts high school students, founded in 2016 for the sole purpose of advocating for ratification of the ERA.

12. Plaintiff Katherine Weitbrecht is a female resident of Plymouth County Massachusetts.

## JURISDICTION

13. This Court has subject-matter jurisdiction under 28 U.S.C. §1331, 28 U.S.C.

§1361 and 28 U.S.C. § 1651, because this case seeks equitable relief, a Writ of Mandamus, and relief under the All Writs Act, and arises under the Constitution and laws of the United States.

14. Venue is proper under 28 U.S.C. §1391(e) because Defendant is an officer of the United States sued in his official capacity, this case does not involve real property, and Plaintiff The Yellow Roses and Plaintiff Katherine Weitbrecht reside in Massachusetts.

## FACTS

15. In 1972, Congress proposed the Equal Rights Amendment as an amendment to the United States Constitution, and sent it to the states for ratification. The ERA states, "[e]quality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex." As the same time, however, Congress enacted a separate provision as a preamble to the ERA, purporting to give the States only seven years to ratify (by March 22, 1979). This separate deadline, as a preamble provision and not part of the ERA itself, thus was not subject to approval by the States. Indeed, only some of the states that voted to ratify mentioned the deadline.

16. The extra-textual deadline is unconstitutional as it imposes unlawful constraints on the States to elect a schedule of *their* choosing on which to consider and ratify - or decline to ratify - a proposed constitutional amendment.

17. The first sixteen amendments to the U.S. Constitution had no ratification deadlines. The first time Congress imposed a deadline was relatively recently, with the Eighteenth Amendment (prohibition) in 1917. Notably, the deadline for ratification of the Eighteenth Amendment was not extra-textual; it was included *in the text* of the proposed amendment itself.

18. In 1978, as the extra-textual deadline approached, Congress passed a joint resolution

by simple majority of both houses, extending the ERA's extra-textual deadline to June 30, 1982. Like the extra-textual deadline, the extension bill was enacted separately from the ERA itself and was not sent to the states for approval. That the extra-textual deadline was extended by routine statutory process without congressional action on the ERA itself, and was passed by a simple majority in both houses rather than the two-thirds required for amendments, illustrates not only its extra-textual nature, but also that Congress perceived the deadline to be untethered to the ERA. When the extra-textual deadline expired in 1979, 35 states, including Massachusetts, had ratified the ERA. No additional states ratified between 1979 and 1982.

19. When the ERA extension bill deadline expired in 1982, women's rights groups continued to work toward ratification, especially after 1992, when the 27th Amendment ("Madison Amendment") was ratified 203 years after it passed Congress. Proponents of the ERA were incredulous that a congressional pay-raise amendment was ratified centuries after Congress dispatched it to the States, while a proposed constitutional amendment granting equality of citizenship to women was given only ten years. The ERA's proponents were also aware that the Madison Amendment was ratified and approved by Congress despite the fact that the United States Supreme Court had ruled, in *Dillon v. Gloss*, 256 U.S. 368, 376 (1921), that the Madison Amendment was already too old in 1921 to ratify.

20. Despite expiration of the extra-textual deadline and its subsequent extension, women's rights groups and others have worked continuously to ratify the ERA, succeeding in Nevada in 2017, and Illinois in 2018. The Archivist recorded both ratifications.

21. Now that Virginia has become the thirty-eighth state to ratify, the ERA is a valid amendment to the Constitution despite the extra-textual deadline because the deadline is a constitutional nullity.

22. Article V of the U.S. Constitution, which sets out the process for ratification, nowhere grants Congress the power to restrict States' rights concerning ratification by enacting a separate provision to limit the time period within which the States must ratify. Article V only gives Congress authority to "propose amendments" and to "propose" whether they may be ratified "by state legislature or constitutional convention…" These allocations of proposal power in Article V neither require nor permit - nor warrant - a grant of implied power to Congress to use an extra-textual statute to impose a deadline on ratification.

23. The Tenth Amendment limits the power of the federal government to constrain legislatively the States' power to ratify proposed amendments: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people."

24. If Congress may impose deadlines on ratification of amendments, it must do so in a constitutional manner, by placing the deadline within the text of a proposed amendment itself, as happened with the 20th, 21st, and 22nd Amendments. This at least allows the States to decide for themselves, as a matter of process and substance, whether they want to ratify an amendment on a proposed schedule. Congress may not, as occurred with the ERA, enact a provision separately from the ERA itself that substantively - and, therefore, unconstitutionally - constrained the States' ratification powers and subverted the plain language of Article V by limiting the States' sovereign rights. It would be equally inappropriate for the States to impose a deadline on the Congress in circumstances where the States initiated an amendatory process through Convention. The extra-textual deadline, therefore, offends the constitutional allocation of *equal* amendatory power between the federal and state governments established by the Framers in Article V, and required by the Tenth Amendment.

25. After a state has ratified a proposed amendment, nothing in Article V or United States Supreme Court precedent permits it to rescind its ratification. Indeed, the Fourteenth Amendment was successfully ratified despite rescissions by two states, at a time when, had those rescissions counted, the Fourteenth Amendment could not have been added to the Constitution. The text of the Constitution allows nullification of amendments only by subsequent repealing of amendments, as was the fate of the Eighteenth Amendment. Further, nothing in Article V allows some states to nullify the value of other states' ratifications, which is inevitable if states are permitted to rescind.

26. The only court to pass on the issue of whether states may rescind was a single District Court judge in Idaho. *Idaho v. Freeman,* 529 F. Supp. 1107, 1128 (D. Idaho 1981). The District Court ruled that states may rescind their ERA ratifications, but the ruling was appealed to the 9th Circuit, and a certiorari petition was filed with the United States Supreme Court. The Supreme Court granted pre-judgment certiorari and stayed the judgment of the District Court. When the 1982 ERA deadline extension expired, the case was dismissed as moot. *N.O.W. v. Idaho*, 459 U.S. 809 (1982). Thus, there is no case law from any federal court addressing whether a state may rescind its ratification of an amendment and recent attempts by several states to rescind their ratifications are without legal support.

27. Whether an amendment becomes part of the Constitution is determined solely by the state-ratification process: an amendment "...shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three-fourths of the several states, or by conventions in three-fourths thereof..." Nothing more is needed than the vote of three-fourths of the states, by legislature or by convention. Once that happens, the amendment becomes law and the Archivist of the United States performs the purely ministerial task of recording the last state's

ratification decision, followed by a recording of the ratified amendment itself. *Dillon* at 376 (The Eighteenth Amendment "was consummated January 16, 1919. That the Secretary of State [now the Archivist] did not proclaim its ratification until January 29, 1919, is not material, for the date of its consummation, and not that on which it is proclaimed, controls.)

28. The Archivist has properly recorded ratification documents from thirty-seven states, including recent post-deadline ratifications by Nevada (2017) and Illinois (2018). The Archivist has no obligation, duty or authority to record unlawful attempts to rescind ratifications, or to decline to record Virginia's ratification or ratification by any additional state. Nor may the Archivist decline to record an amendment once the requisite three-fourths of the States have ratified.

29. The Archivist acted legally in recording ratifications of thirty-seven states. His actions respect the Constitution, the plain language of Article V, and the Tenth Amendment.

30. Notwithstanding the Archivist's compliance with the law thus far, the Alabama Plaintiffs allege that the Archivist acted illegally by recording the ratifications of Nevada and Illinois, and by not recording attempted rescissions of prior ratifications by five states.

31. Plaintiffs here, like the Alabama Plaintiffs, seek to ensure that the Archivist performs his duties. But unlike the Alabama Plaintiffs, Plaintiffs seek to ensure that the Archivist performs his duties lawfully, so that the Constitution formally recognizes women's equality of citizenship for the first time in history.

32. Article V clearly gives Congress and the States separate, co-*equal* and distinct roles in the amendatory process. *See* The Federalist No. 43 (Hamilton) (explaining that Article V "equally enables the general and the States governments"). This balance was by design, as it makes the amendment process "neither wholly national nor wholly federal." The Federalist No.

39 (Madison). Article V accomplishes this balance by giving Congress and the States "carefully balanced and approximately equally distributed" powers. *Idaho v. Freeman,* 529 F. Supp. at 1128.

33. Although Article V states that Congress has the power to control the "mode of ratification," *see United States v. Sprague*, 282 U.S. 716, 732 (1931), this refers solely to the choice between ratification by convention or by state legislatures.

34. The United States Supreme Court has said that Congress may set "reasonable" time limits on ratification, *Dillon v. Gloss,* 256 U.S. 368, 376 (1921). However, the Amendment at issue in that case - the Eighteenth - expressly included a deadline within the text of the amendment itself. (*See* Section 3 of the Eighteenth Amendment: "This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several states, as provided in the Constitution, within seven years from the date of the submission hereof to the states by the Congress.") Thus, *Dillon* is authority for at, at most, the proposition that an amendment may include a deadline - or anything else - in its text.

35. Further, it is arguable that *Dillon* is no longer good law as the underlying basis for *Dillon* no longer applies. The United States is a much more complex nation today than it was when *Dillon* was decided in 1921. In *Dillon*, the Court was primarily concerned with ensuring national consensus for proposed amendments. It ruled that substantial contemporaneity between the date when Congress proposes an amendment, and the date when the last of three-fourths of the States ratifies would demonstrate consensus. Contemporanaeity, however, is no longer necessary to show consensus. Indeed, recent rigorous survey research demonstrates overwhelming national support for the ERA. *CISION*, PR Newswire.com, *Americans – by 94% - Overwhelmingly Support the Equal Rights Amendment,* June 17, 2016. Indeed, imposing a short

ratification deadline can undermine consensus, as occurred with Prohibition. The seven-year deadline put artificial pressure on the states to ratify quickly, without giving sufficient attention to the consequences of ratification, a reality that quickly became clear when prohibition was repealed soon after it became law.

36. *Dillon's* viability is questionable not only because its underlying premise about demonstrating consensus through contemporaneity is anachronistic, but also because it was effectively voided when Congress disregarded the decision by validating the Madison Amendment in 1992 after it languished with insufficient numbers of ratifying states since its original proposal in 1789. Congressional approval of the Madison Amendment's ratification in 1992 ignored the *Dillon* court's admonition that the Amendment was already too old, in 1921, to ratify. *Dillon* at 375 ("proposal and ratification ... are not to be widely separated in time.")

37. The States have exclusive authority over the ratification process, an authority that cannot be mitigated by ratification deadlines enacted by Congress outside the scope of its power to propose amendments. Congress exceeded its Article V authority by enacting an extra-textual deadline, thus denying the States their right to exercise exclusive control over the ratification process. *Dyer v. Blair*, 390 F. Supp. 1291, 1307 (N.D. Ill. 1975) (Stevens, J.) ("[Article V's] failure to prescribe any particular ratification procedure, or required vote to effectuate a ratification, is certainly consistent with the basic understanding the state legislature should have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government.")

38. Since Congress began imposing deadlines in the early 1900s, it has done so inconsistently, adding deadlines for some amendments, but not all. For example, a deadline was imposed on the Eighteenth but not the Nineteenth Amendment. And even when imposing

deadlines, Congress has done so capriciously by placing some deadlines in the text of proposed amendments (Eighteenth, Twentieth, Twenty-First, and Twenty-Second) and in separate provisions for others (Twenty-Third, Twenty-Fourth, Twenty-Fifth and Twenty-Sixth Amendments). The constitutionality of extra-textual statutory deadlines has never been addressed by any court, but it should be obvious that amending the Constitution is not run-of-the-mill lawmaking. The process should be consistent, predictable, and strictly obedient to the Constitution.

39. Congress' inconsistent handling of ratification deadlines and disregard for *Dillon* support Plaintiffs' request that this Court declare the extra-textual ERA deadline a constitutional nullity.

40. This Court should also prohibit the Archivist from recording any state's attempt to rescind a prior ratification of the ERA.

41. After Virginia ratified, the Archivist refused to record Virginia's ratification. In turn, the Archivist violated his duty to "cause the [ERA] to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1 U.S.C. §106b.

42. The Archivist's duties are narrow in scope and purely ministerial in function because the date when an amendment becomes law is the date when the last state ratifies. *Dillon* at 376. The Alabama Plaintiffs seek to disrupt a constitutionally valid process by obtaining a court order nullifying existing ratifications of the ERA, and forbidding the Archivist to recognize the ERA itself as duly ratified. Plaintiffs here seek a remedy from this Court to ensure that the Archivist is

not unlawfully prohibited from performing his ministerial duties, and recording the ERA as duly ratified.

43. The ERA is critically important to American Democracy; it guarantees women full equality of citizenship. Presently, women enjoy less than full citizenship. For example, the United States Supreme Court has held that the Fourteenth Amendment's Equal Protection Clause prohibits sex discrimination less effectively than it prohibits other forms of discrimination because the applicable legal standard denies women the strictest level of legal scrutiny, thus permitting more sex discrimination than is legally tolerated against other social classes. *See, e.g., United States v. Virginia,* 518 U.S. 515, 532 (1996).

44. The issues presented here are justiciable, non-political questions. "[G]ving plenary power to Congress to control the amendment process runs completely counter to the intentions of the founding fathers." *Freeman*, 529 F. Supp. at 1126. Because Article V "split[s]" the amending power "between Congress and the states," "it is evident … that the framers did not intend either of those two parties to be the final arbiter of the process"; rather, "the courts, as a neutral third party … [would] decide … questions raised under article V." *Id*. at 1134. Courts are "not … free" to dismiss challenges to the ratification process as political questions, as then-Judge Stevens explained, because "the [Supreme] Court has on several occasions decided questions arising under article V, even in the face of 'political questions' contentions." *Dyer,* 390 F. Supp. at 1300; *accord Freeman*, 529 F. Supp. at 1122-23 (collecting cases).

45. Plaintiffs have standing to seek a remedy because government officials are refusing to identify and repair sex discriminatory provisions in laws, regulations and policies based on the Archivist's refusal to recognize the ERA as a duly ratified amendment, thus exposing them to an unnecessary risk of harm, and denying them their legal interest in having government officials

begin said repair work. *See Buckley v. Valeo,* 424 U.S. 1, 117 (1976) (per curiam) ("Party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights"). *See also, N.O.W. v. Idaho*, *supra* (National Organization for Women granted standing as intervenor-Defendant to address constitutionality of ERA rescissions and deadline extension).

46. Plaintiff Katherine Weitbrecht, The Yellow Roses, and all women in Massachusetts are experiencing an increased risk of harm because of the Defendants' actions and inactions because women as a class are currently excluded from protection under the state's hate-crime statute, Mass.G.L.c.265, §39, which means they are being denied equal protection from sex/gender-based hate-crimes and associated deterrence of gender-based hate-crimes ensuing from their enforcement. The Massachusetts hate crime statute is facially discriminatory, thus causing injury to all Plaintiffs because unequal treatment is a cognizable legal injury. The Massachusetts hate crime statute should be repaired so that it is no longer discriminatory based on sex, but lawmakers and other government officials will not take steps to fix the hate crime statute so long as the Archivist refuses to record the ERA as a valid constitutional amendment.

47. Relief from this Court will protect Plaintiffs and all women, as well as the States, from suffering irreparable injury. *See Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")

48. Precluding the enforcement of the Constitution, like "the threat of enforcement of [an unconstitutional law,] is an Article III injury in fact." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 16 (2014).

49. Plaintiffs seek to vindicate their rights, and the rights of the States to exercise fully

their co-equal constitutional role in the amendatory process, on par with the national government, by respecting the plain language of Article V, and the Tenth Amendment.

50. Thus, Plaintiffs ask this Court to issue any and all appropriate writs, orders, and judgments to ensure proper recording of the ERA as the duly enacted twenty-eighth Amendment to the U.S. Constitution.

## FACTS REGARDING THE CLASS OF PEOPLE AFFECTED

51. Violence against women is the product of women's inequality and is reinforced by discriminatory laws and exclusionary social norms.[1]

52. Nearly 1 in 2 women experiences some form of sexual violence in their lifetime, 37% between the ages of 18-24.[2] Females are 5 to 8 times more likely than men to be victimized by an intimate partner and they suffer disproportionately high rates of domestic and dating violence,[3] sexual assault,[4] and stalking.[5] Only a small percentage of victims report sexual assaults to

[1]  U.N. General Assembly, 2006, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General.* A/61/122/Add.1; United Nations, New York, http://www.un.org/womenwatch/daw/vaw/v-sg-study.htm, February 2010; D. Rhode, Speaking of Sex, 1997, the Denial of Gender Inequality.

[2]  *Rape Prevention and Education Program,* Centers for Disease Control and Prevention, 2013. http://www.cdc.gov/violenceprevention/rpe/>.

[3]  U.S. DEPARTMENT OF JUSTICE, *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends,* (March 1998) (violence by an intimate partner accounts for about 21% of violent crime experienced by women and about 2% of the violence experienced by men.) 92% of all domestic violence incidents are committed by men against women; accord, U.S. DEPARTMENT OF JUSTICE, *Violence Against Women, Bureau of Justice Statistics,* January, 1994; and Koss, M.P. (1988), *Hidden Rape: Incidence, Prevalence and Descriptive Characteristics of Sexual Aggression and Victimization in a National Sample of College Students.* In Burgess, A.W. (ed.) Sexual Assault. Vol. II. New York: Garland Pub. (84% of raped women know their assailants and 57% of rapes occur on a date.)

[4]  U.S. DEPARTMENT OF JUSTICE, *2003 National Crime Victimization Survey* (nine out of ten rape victims are female); Koss, M.P., id, (women aged 16-24 are four times more likely to be raped than any other population group.)

[5]  8% of women and 2% of men in the United States have been stalked at some time in their life. 78% of stalking victims identified in a survey were women, and 22 percent were men. Thus, four out of five stalking victims are women.  By comparison, 94 percent of the stalkers identified by

government officials because, inter alia, they expect the government not to provide effective redress, and they fear the legal system will cause additional harm.[6]

53. 9% of all rapists are prosecuted, 5% lead to conviction, and less than 3% spend even one day behind bars.[7]

54. Offenders' sense of entitlement, caused in part by women's constitutional inequality, fosters rape-supportive attitudes and behaviors, which is correlated with sexual aggression.[8]

55. One in three to one in four women is victimized by sexual assault during college.[9] Given that approximately 916,000 women graduated from post-secondary schools in 2009,[10] this means over 200,000 women are victimized by sexual assault during college. Some studies find as few as 5% of college victims file reports.[11]

56. Female students in the United States endure pervasive unequal treatment, harassment

---

female victims and 60 percent of the stalkers identified by male victims were male. Overall, 87 percent of the stalkers identified by the victims were male. NATIONAL INSTITUTE OF JUSTICE *Stalking in America: Findings from the National Violence Against Women Survey*, 1998.

[6]  D. Kilpatrick et al., Drug-facilitated, incapacitated, and Forcible Rape: A National Study, 2007; U.S. Bureau of justice Statistics, M. Planty and L. Langton, Female Victims of Sexual Violence, 1994-2010," 2010.

[7]  Probability Statistics Calculated by the Rape, Abuse and Incest National Network, "Reporting Rats," 2013.

[8]  L. Bouffard, *Exploring the Utility of Entitlement in Understanding Sexual Aggression*, 38 Journal of Criminal Justice, pp.870-879 (2010).

[9]  https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf, pp. xii-xiii and 2-1 (2007); U.S. Department of Justice Office of Community Oriented Policing Services, Acquaintance Rape of College Students, March 28, 2002, http://www.cops.usdoj.gov/pdf/e03021472.pdf; https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf; Freyd, J. Rosenthal, M. & Smith, C., Preliminary Results from the University of Oregon Sexual Violence and Institutional Behavior Campus Survey, 2014, http://dynamic.uoregon.edu/jjf/campus/UO-campus- results-30Sept14.pdf.

[10]  http://www.census.gov/prod/2012pubs/p20-566.pdf.

[11]  B. Fischer, et al., *Sexual Victimization of College Women*, National Institute of Justice, (2000), http://www.nij.gov/publications/pages/publication-detail.aspx?ncjnumber=182369 (5%).

and violence, on the basis of sex, throughout all levels of education.[12] Women also suffer

disproportionately high rates of domestic and dating violence,[13] sexual assault[14] and stalking.[15]

57. Because women do not enjoy full constitutional equality, they suffer

disproportionately higher rates of violence, and offenders of violence against women are less

likely to be held responsible compared to offenders of other types of violence.

58.   The relief sought here is, therefore, necessary to protect the rights of the Plaintiffs

and similarly situated others.

## PLAINTIFF EQUAL MEANS EQUAL

59. Equal Means Equal (EME) is a national 501(c)(4) non-profit organization whose

sole mission and purpose is to eradicate sex/gender inequality and advocate for sex/gender

equality and fully equal rights for women and men.

---

[12]  Sadker, & Zittleman, *Still Failing at Fairness, How Gender Bias Cheats Girls and Boys in School and What We Can Do About It*, Scribner Press 2009; www.hks.harvard.edu/centers/carr/research-publications/carr-center-working-papers-series/caplan-and-ford-%22the-voices-of-diversity-%22.

[13]  Women are less likely than men to be victims of violent crimes overall, but women are 5 to 8 times more likely than men to be victimized by an intimate partner. *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends*, U.S. Department of Justice, March, 1998; violence by an intimate partner accounts for about 21% of violent crime experienced by women and about 2% of the violence experienced by men. *Id*. 92% of all domestic violence incidents are committed by men against women. *Violence Against Women, Bureau of Justice Statistics*, U.S. Department of Justice, January, 1994; 84% of raped women know their assailants and 57% of rapes occur on a date. Koss, M.P. (1988). *Hidden Rape: Incidence, Prevalence and descriptive Characteristics of Sexual Aggression and Victimization in a National Sample of College Students*. In Burgess, A.W. (ed.) Sexual Assault. Vol. II. New York: Garland Pub.

[14]  Nine out of ten rape victims are female, U.S. Department of Justice, *2003 National Crime Victimization Survey. 2003*; Women aged 16-24 are four times more likely to be raped than any other population group.  Koss, M.P., *id*.

[15]  8% of women and 2% of men in the United States have been stalked at some time in their life. 78% of stalking victims identified in a survey were women, and 22 percent were men. Thus, four out of five stalking victims are women. By comparison, 94 percent of the stalkers identified by female victims and 60 percent of the stalkers identified by male victims were male. Overall, 87 percent of the stalkers identified by the victims were male. National Institute of Justice 1998. *Stalking in America: Findings from the National Violence Against Women Survey*).

60. In 2016, EME released an award-winning film entitled *Equal Means Equal*. This documentary film, a decade in the making, examined the status of American women in over two dozen areas where women experienced sex discrimination, and analyzed whether ratification of the ERA would mitigate this overall pattern of discrimination in American society.

61. Along with producing the film, EME has been instrumental in raising awareness about the ERA and helping to pass ERA ratification bills in Nevada, Illinois, and Virginia. EME's executive director, Kamala Lopez, testified in front of the Illinois legislature in support of the ERA. EME has engaged in direct political action and educational campaigns in many states, related to ratification of the ERA, including Virginia, Arizona, North Carolina, South Carolina, Missouri, Nevada, Illinois, Utah, Georgia, Louisiana, Florida, and Oklahoma. EME engages with its member/supporters who donate funds and volunteer their services, which enable EME to carry out its mission.

62. Since Virginia became the thirty-eighth state to ratify the ERA in January 2020, EME has been frustrated in its mission because of the Archivist's refusal to recognize Virginia's ratification, and record the ERA as the validly enacted twenty-eighth Amendment to the United States Constitution. EME has been advocating for state and federal officials to begin the process of examining their laws and regulations, and to take steps to repair all sex discriminatory provisions, but officials have declined, citing the Archivist's refusal to recognize the ERA as ratified. This has frustrated EME's mission because it is unable to advocate at all for the repair work that should already be underway, and would already be underway, if the Archivist had not stated his refusal to recognize the ERA as a valid amendment to the United States Constitution.

63. Because the Archivist has refused to recognize the ERA as ratified, victims of sex discrimination represented by EME have been unable to assert their rights under the ERA with

regard to insisting that government officials begin the task of examining and repairing sex discriminatory provisions. EME has personally witnessed reluctance on the part of women, attorneys, and other advocates to demand that such repair work begin because of the Archivist's refusal to record the ERA as a validly enacted amendment to the United States Constitution. In turn, EME has had to divert resources to educate and inform its member/supporters and the general public about why the ERA is duly ratified despite the Archivist's opinion to the contrary, why the Archivist's view is incorrect as a matter of law, and why government officials should already be taking steps to repair sex discriminatory laws, regulations, and policies. EME has also had to divert significant time and resources to advocating for government officials to accept that the ERA is a validly enacted amendment, and that they are legally obligated to begin the process of identifying and repairing sex discriminatory laws, regulations and policies. This diversion of resources has reduced the amount of resources available to EME that they would otherwise be using to assist in said repair work in anticipation of the ERA taking effect in January 2022.

64. EME's involvement in this litigation is intended to represent EME's own interersts, as well as the interests of its members/supporters, and women everywhere who have suffered and are at increased risk of suffering harm *because they are female* and do not enjoy equal protection of law. Because the ERA is a validly enacted amendment to the United States Constitution, EME and all women have a protectable legal interest in having all government officials, state and federal, immediately begin the process of repairing all sex discriminatory laws, regulations and policies, before the ERA becomes enforceable in January 2022. EME as an organization, and all women, also have a protectable legal interest in ensuring that sex discriminatory laws, regulations and policies are repaired as quickly as possible because if government officials do nothing until January 2022 out of deference to the Archivist's unlawful refusal to record the

ERA as duly ratified, then women, EME and other advocacy groups will be forced to expend significant resources filing lawsuits against government officials to repair such laws, regulations and policies simply because government officials did nothing to repair them during the two-year repair period provided in the ERA itself.

65. EME has over twenty-thousand active supporters including members of the entertainment and media community. The organization is well known as a leader in the modern strategy for ratification of the ERA and has worked in collaboration with major labor unions such as the Teamsters, Screen Actors Guild, American Federation of Radio and Television Artists, the United Nations (UN Women), the National Women's Political Caucus, the YWCA, the AAUW, the ACLU, the League of Women Voters, Yale Women, the National Association of Women's Commissions, Veteran Feminists of America, Women Matter, the National Black Women's Caucus, Black Voters Matter, Common Cause, Indivisible, Women Occupy Hollywood, NOW Hollywood, Hispanics Organized for Political Equality (HOPE), the Latino Legislative Caucus of the State of California, among others. Since 2009, the ERA Education Project and EME have actively engaged in advocacy and educational services, including working directly with government officials to address discriminatory laws, regulations, and policies related to women's equality and the ERA. They have received many commendations for their work in the service of advancing women's equality and ensuring ratification of the ERA.

## PLAINTIFF THE YELLOW ROSES

66. Plaintiff The Yellow Roses is a volunteer student organization, founded in Quincy, Massachusetts in 2016 by a group of middle school girls who were surprised to learn in school that women were not yet equal citizens under the U.S. Constitution. The organization's sole mission is to advocate for and raise public awareness about ratification of the ERA.

67. The Yellow Roses has engaged in numerous activities, including circulating a Petition for the ratification of the ERA; interviewing and being interviewed by local and national publications; meeting with state and federal officials to advocate for the equal treatment of women and ratification of the ERA; collaborating with activists such as Gloria Steinem, and making public appearances to advocate for and teach young people to be activists in their communities.

68.  The Yellow Roses have been subjected to a needless increased risk of violence because they are female, and government officials are not currently undertaking any steps to identify and repair sex discriminatory laws, regulations and policies. They have a protectable legal interest in ensuring that government officials regard the ERA as a validly enacted amendment to the United States Constitution, and begin the process of examining and repairing sex discriminatory laws, regulations and policies, including the Massachusetts hate crime statute, which currently excludes females from its protection.

69. The mission of the Yellow Roses is impaired by the refusal of government officials to begin the process of examining and repairing sex discriminatory laws, regulations, and policies because they cannot effectively advocate on behalf of the ERA so long as the ERA is perceived by government officials as not validly enacted based on the Archivist's refusal to record it.

## THE INDIVIDUAL PLAINTIFF

70. Plaintiff Katherine Weitbrecht is a resident of and a college sophomore in Norfolk County, Massachusetts.

71. Ms. Weitbrecht personally suffered a violent act because she is female when

she was strangled in Massachusetts by a man who mocked her for wearing a rape whistle on campus late at night. The man had a history of making discriminatory and derogatory comments about females.

72. Ms. Weitbrecht reported the strangulation incident to law enforcement, but no hate crime charges could be filed because, as a female, she is not protected under the Massachusetts hate crime statute, Mass.G.L.c.265, §39. Had she suffered the exact same crime based on a different protected class category, such as ethnicity or religion, a hate crime charge could have been filed.

73. Although Ms. Weitbrecht was strangled, the offender was charged only with a single misdemeanor count of assault and battery.  The offender's case was continued without a finding; he suffered no serious consequences.

74. Because of her experience, Ms. Weitbrecht is now reluctant to report any sex-based criminal activity she may endure. As a college student, Ms. Weitbrecht faces a disproportionately high risk of harm because she is female. Ms. Weitbrecht fears that reporting crimes committed against her because she is female will lead to inadequate charges and unjust treatment by law enforcement and the legal system.

75. Ms. Weitbrecht's rights and well-being are threatened and violated by her lack of full Constitutional equality because she is not equally protected by the United States Constitution, or Massachusetts law.

76. When the ERA becomes law, Massachusetts officials will be required to repair the hate crime statute to ensure the equal protection of Ms. Weitbrecht and all females.

77.  Ms. Weitbrecht has been subjected to a needless increased risk of

violence because she is female, and not currently equally protected by law. She has a protectable

legal interest in ensuring that government officials regard the ERA as a validly enacted

amendment to the United States Constitution, and begin the process of examining and repairing

sex discriminatory laws, regulations and policies, including the Massachusetts hate crime statute,

which currently excludes females from its protection.

### COUNT I
### (Article V of the U.S. Constitution)

78. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

79. Congress cannot limit the amount of time that States have to ratify a constitutional

amendment because Article V of the United States Constitution nowhere grants Congress the

power to impose deadlines. Under Article V, an amendment becomes valid when three-fourths of

the states ratify it.

80. When Congress proposed the ERA in 1972, it imposed a seven-year ratification

deadline on the states by enacting a separate deadline provision. In 1978, Congress enacted

another statute, extending the deadline to 1982. As Congress had no authority to impose an

extra-textual ratification deadline on the states, the ERA ratification deadline is null and void and

without any legal effect.

81. If Congress has authority to impose ratification deadlines on the States, it must do so

in a constitutional manner. By enacting the ERA deadline as an extra-textual provision, separate

from the text of the ERA itself, Congress violated Article V and the ERA deadline is null and

void and without any legal effect.

82. The Archivist has recorded thirty-seven states' ratifications, including from Nevada

in 2017 and Illinois in 2018, which occurred after the expiration of the ERA deadline. The

Archivist refused to record Virginia's ratification in 2020.

83. The Archivist's recordings of 37 ERA ratifications to date were legal and are consistent with the clear text of Article V. The Archivist's refusal to record Virginia's ratification, and refusal to record ratification of the ERA itself, is illegal and not consistent with the clear text of Article V.

## COUNT II
### (Tenth Amendment to the U.S. Constitution)

84. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

85. Congress cannot limit the amount of time that States have to ratify a constitutional amendment because the Tenth Amendment to the United States Constitution provides that all rights not specifically granted to the federal government are reserved to the States, and the United States Constitution nowhere grants to Congress the power to impose extra-textual statutory deadlines on the States. Under the Tenth Amendment, and in light of Article V which states that an amendment becomes valid when three-fourths of the states ratify, the States have authority to ratify, or not, unrestrained by the federal government.

86. When Congress proposed the ERA in 1972, it imposed a seven-year ratification deadline on the states by enacting a separate provision that was not part of the ERA itself. In 1978, Congress enacted another law, extending the deadline to 1982. The extra-textual ERA deadline encroached unconstitutionally on the States' Article V right to ratify. Thus, the ERA deadline is null and void and without any legal effect.

87. If Congress has authority to impose ratification deadlines on the States, it must do so in a constitutional manner. By enacting the ERA deadline as an extra-textual provision, separate from the text of the ERA itself, Congress violated Article V and the ERA deadline is null and void and without any legal effect.

88. The Archivist has recorded thirty-seven states' ratifications, including from Nevada

in 2017 and Illinois in 2018. The Archivist refused to record Virginia's ratification in 2020, and refused to record the ERA itself as a duly ratified amendment to the U.S. Constitution.

89. The Archivist's recordings of 37 ERA ratifications thus far were legal and consistent with the clear text of Article V and the Tenth Amendment.

## COUNT III
### (Article V of the U.S. Constitution)

90. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

91. A State cannot rescind its ratification of a constitutional amendment. Any attempt to do so is null and void.

92. Five States—Nebraska, Idaho, Tennessee, Kentucky, and South Dakota—have voted to rescind their prior ratifications of the ERA. These efforts have no legal effect and are null and void.

93. The Archivist correctly refused to record any rescissions of prior ratifications because That would not be consistent with the plain language of Article V, or Supreme Court precedent.

94. The Archivist's actions to date are constitutional and consistent with the clear text of Article V.

## COUNT IV
### (All Writs Act)

95. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

96. The Archivist is mandated to perform the ministerial task of recording state ratifications of, and ratified amendments to, the U.S. Constitution.

97. The Archivist is mandated to record Virginia's ratification of the ERA.

98. The Archivist currently faces legal action in federal court in Alabama to prevent him

Case 1:20-cv-10015-DJC   Document 5   Filed 02/29/20   Page 25 of 26

from recording Virginia's ratification, require him to remove prior ratifications by other states, and prevent him from recording the ERA as a duly ratified amendment to the U.S. Constitution.

99. Plaintiffs have no plain, speedy, and adequate remedy at law, other than the remedies requested by this action.

100. Failure to record the ERA as a duly ratified amendment threatens to cause harm, and will continue to cause harm to Plaintiffs' rights, and the rights of similarly situated others, and is unlawful, unreasonable and exceptional.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and provide the following relief:

i.    A declaratory judgment that the ERA is the duly ratified twenty-eighth Amendment to the U.S. Constitution;

ii.    A declaratory judgment that the extra-textual ERA ratification deadline is a constitutional nullity;

iii.    A declaratory judgment that Nebraska, Idaho, Tennessee, Kentucky, and South Dakota did not and may not validly rescind their prior ratifications of the ERA because such rescissions are not permitted under the Constitution;

iv.    A writ requiring the Archivist to record all states' decisions to ratify the ERA, irrespective of the deadline;

v.    A writ prohibiting the Archivist from removing previously recorded ratifications of the ERA;

vi.    A writ requiring the Archivist to record Virginia's ratification of the ERA;

vii.    A permanent injunction precluding the Archivist from removing previously recorded ratifications, or from recording rescissions from Nebraska, Idaho, Tennessee, Kentucky, and South Dakota;

viii.    A preliminary injunction granting the above relief during the pendency of this action;

ix.    Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

x.    All other relief to which Plaintiffs might be entitled.

Respectfully submitted,

WENDY MURPHY

*/s/ Wendy J. Murphy*

New England Law|Boston
154 Stuart Street
Boston, MA 02116
617-422-7410
wmurphy@nesl.edu

Dated:  February 29, 2020

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by the ECF filing system.

/s/Wendy J. Murphy

Wendy J. Murphy

Dated: February 29, 2020