**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

EQUAL MEANS EQUAL, *et al.*,

       Plaintiffs,

   v.

DAVID S. FERRIERO, in his official capacity as
Archivist of the United States,

       Defendant.

C.A. No. 20-cv-10015-DJC

---

## DEFENDANT'S MEMORANDUM OF REASONS IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# Table of Contents

**Introduction**................................................................................................................. 1

**Background and Procedural History** .......................................................................... 2

I.     Article V and the Modern History of Ratifications ......................................... 2

II.    The Equal Rights Amendment................................................................ 3

III.   Procedural Background........................................................................... 6

**Legal Standards** .......................................................................................................... 7

**Argument** ................................................................................................................... 7

I.     Plaintiffs Lack Article III Standing.......................................................... 7

       A.     The plaintiff organizations have not alleged an imminent injury in fact that is traceable to the actions of the Archivist......................................... 7

             i.       EME and the Yellow Roses have not alleged facts demonstrating organizational standing. ............................................................. 8

             ii.      EME and Yellow Roses have not alleged facts establishing standing to sue on behalf of their members. ..................................................... 11

       B.     The individual plaintiff has not alleged an imminent injury in fact that is traceable to the actions of the Archivist. ............................................ 15

       C.     Whether States may validly rescind their ratifications is not ripe for review, and plaintiffs' demand for the Archivist to record Virginia's ratification is moot...... 17

II.    Plaintiffs' claims and requested relief would require this Court to decide issues that are non-justiciable political questions..................................................................... 19

III.   The Amended Complaint should be dismissed in its entirety for failure to state a claim. 22

       A.     The Supreme Court has upheld the authority of Congress to impose deadlines on the States to ratify a proposed constitutional amendment. .................................. 22

       B.     The Tenth Amendment provides no authority for States to ignore Congress's ratification deadline for the ERA. ......................................................... 28

       C.     Plaintiffs plead no plausible claim for relief regarding how the Archivist has treated State rescissions of their ERA ratifications.............................................. 29

D.    Plaintiffs have no basis to seek the extraordinary relief provided in the All Writs Act or the mandamus statute. .................................................................................. 30

**Conclusion** ..................................................................................................................... **33**

## Table of Authorities

**Cases**

*Allen v. Wright,*

   468 U.S. 737 (1984).............................................................................................. 12, 13

*Am. Civil Liberties Union of Mass. v. U.S. Conf. of Catholic Bishops*,

   705 F.3d 44 (1st Cir. 2013)........................................................................................ 19

*Am. Hosp. Ass'n v. Burwell*,

   812 F.3d 183 (D.C. Cir. 2016).................................................................................... 30

*Am. Waterways Operators v. U.S. Coast Guard*,

   --- F. Supp. 3d ---, --- 2020 WL 360493 (D. Mass. Jan. 22, 2020).................................... 11, 14

*Asociacion De Periodistas De P.R. v. Mueller*,

   680 F.3d 70 (1st Cir. 2012)........................................................................................ 16

*Babbitt v. United Farm Workers Nat'l Union*,

   442 U.S. 289 (1979)................................................................................................. 18

*Baker v. Carr*,

   369 U.S. 186 (1962)................................................................................................. 19

*Biszko v. RIHT Financial Corp.*,

   758 F.2d 769 (1st Cir. 1985)...................................................................................... 15

*Blum v. Holder*,

   744 F.3d 790 (1st Cir. 2014)........................................................................................ 8

*Blunt v. Lower Merion Sch. Dist.*,

   767 F.3d 247 (3d Cir. 2014)....................................................................................... 10

*Boston's Children First v. Boston Sch. Comm.*,

  183 F. Supp. 2d 382 (D. Mass. 2002) ..................................................................... 10

*Cheney, v. U.S. Court for D.C.,*

  542 U.S. 367 (2004) ............................................................................................ 31, 32

*Church of Scientology of Cal. v. United States*,

  506 U.S. 9 (1992) ..................................................................................................... 19

*City of Fall River, Mass. v. FERC*,

  507 F.3d 1 (1st Cir. 2007) ........................................................................................ 18

*City of Los Angeles v. Lyons*,

  461 U.S. 95 (1983) ........................................................................................ 13, 15, 16

*Clapper v. Amnesty Int'l USA*,

  568 U.S. 398 (2013) ......................................................................................... 8, 13, 15

*Clinton v. Goldsmith*,

  526 U.S. 529 (1999) ................................................................................................. 32

*Coleman v. Miller*,

  307 U.S. 433 (1939) ........................................................................................... passim

*Commonwealth v. King*,

  374 Mass. 5 (1977) ................................................................................................... 14

*Craig v. Boren*,

  429 U.S. 190 (1976) .................................................................................................. 14

*Ctr. For Law and Educ. v. Dep't of Educ.*,

  396 F.3d 1152 (D.C. Cir. 2005) ................................................................................. 9

*Ctr. For Law and Educ. v. U.S. Dep't of Educ.*,

    315 F. Supp. 2d 15 (D.D.C. 2004) ......................................................................... 10

*Davis Assocs., Inc. v. Sec'y, Dep't of Hous. & Urban Dev.*,

    498 F.2d 385 (1st Cir. 1974) ................................................................................. 30

*Dillon v. Gloss*,

    256 U.S. 368 (1921) ...................................................................................... passim

*Draper v. Healey*,

    827 F.3d 1 (1st Cir. 2016) ..................................................................................... 11

*Equal Means Equal v. Dep't of Educ.*,

    --- F. Supp. 3d ---,---, 2020 WL 1284149 (D. Mass. Mar. 18, 2020) ............................... passim

*Fair Elections Ohio v. Husted*,

    770 F.3d 456 (6th Cir. 2014) ................................................................................. 10

*Fairchild v. Hughes*,

    258 U.S. 126 (1922) ............................................................................................... 1

*Food & Water Watch, Inc. v. Vilsack*,

    808 F.3d 905 (D.C. Cir. 2015) ................................................................................ 9

*Guckenberger v. Boston Univ.*,

    957 F. Supp. 306 (D. Mass. 1997) .................................................................... 10, 11

*Havens Realty Corp. v. Coleman*,

    455 U.S. 363 (1982) ............................................................................................... 8

*Hochendoner v. Genzyme Corp.*,

    823 F.3d 724 (1st Cir. 2016) ................................................................................... 7

*Hoever v. Dep't of Homeland Sec.*,

    637 F. App'x 565 (11th Cir. 2016) ........................................................ 31

*Hunt v. Wash. State Apple Advert. Comm'n*,

    432 U.S. 333 (1977)............................................................................... 12

*Idaho v. Freeman*,

    529 F. Supp. 1107 (D. Idaho 1981) .................................................. 4, 27

*In re City of Fall River, Mass.*,

    470 F.3d 30 (1st Cir. 2006)................................................................... 31

*In re Kellogg Brown & Root, Inc.*,

    796 F.3d 137 (D.C. Cir. 2015) ........................................................ 31, 33

*In re Recticel Foam Corp.*,

    859 F.2d 1000 (1st Cir. 1988)............................................................... 31

*Katz v. Pershing*, LLC,

    672 F.3d 64 (1st Cir. 2012)................................................. 7, 11, 14, 18

*Keep Chi. Livable v. City of Chi.*,

    913 F.3d 618 (7th Cir. 2019) ................................................................. 9

*Kendall v. United States ex rel. Stokes*,

    37 U.S. (12 Pet.) 524 (1838) ................................................................ 32

*Kerin v. Titeflex Corp.*,

    770 F.3d 978 (1st Cir. 2014)................................................................. 13

*Kerr v. U.S. Dist. Court for N. Dist. of Cal.*,

    426 U.S. 394 (1976)......................................................................... 31, 32

*Laird v. Tatum*,

    408 U.S. 1 (1972) .................................................................................................... 17

*Leonhard v. Mitchell*,

    473 F.2d 709 (2d Cir. 1973) ................................................................................... 32

*Leser v. Garnett*,

    258 U.S. 130 (1922) ............................................................................................... 29

*Linda R.S. v. Richard D.*,

    410 U.S. 614 (1973) ............................................................................................... 15

*Lyman v. Baker*,

    --- F.3d ---, 2020 WL 1527758 (1st Cir. Mar. 31, 2020) .......................................... 7

*Magee v. United States*,

    93 F. Supp. 2d 161 (D.R.I. 2000) .......................................................................... 18

*Munoz-Mendoza v. Pierce*,

    711 F.2d 421 (1st Cir. 1983) .................................................................................... 8

*N.H. Right to Life Political Action Comm. v. Gardner*,

    99 F.3d 8 (1st Cir. 1996) ........................................................................................ 17

*Nat'l Org. for Marriage v. McKee*,

    649 F.3d 34 (1st Cir. 2011) .................................................................................... 17

*Nat'l Org. for Women v. Idaho*,

    459 U.S. 809 (1982) ....................................................................................... 4, 27, 32

*Nat'l Org. for Women, Inc. v. Idaho*,

    455 U.S. 918 (1982) ................................................................................................. 4

*Neitzke v. Williams,*

490 U.S. 319 (1989) ......................................................................................... 7

*NetCoalition v. SEC.,*

715 F.3d 342 (D.C. Cir. 2013) ......................................................................... 32

*New York v. United States,*

505 U.S. 144 (1992) ........................................................................................ 28

*Ocasio-Hernandez v. Fortuno-Burset,*

640 F.3d 1 (1st Cir. 2011) ............................................................................... 29

*Pa. Bureau of Corr. v. U.S. Marshals Serv.,*

474 U.S. 34 (1985) .......................................................................................... 31

*Perez-Kudzma v. United States,*

940 F.3d 142 (1st Cir. 2019) ........................................................................... 16

*PETA v. U.S. Dep't of Agric.,*

797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 9

*Reddy v. Foster,*

845 F.3d 493 (1st Cir. 2017) ....................................................................... 8, 17

*Republic of Venezuela v. Philip Morris Inc.,*

287 F.3d 192 (D.C. Cir. 2002) ........................................................................ 32

*Rucho v. Common Cause,*

139 S. Ct. 2484 (2019) ............................................................................... 19, 20

*Sierra Club v. Morton,*

405 U.S. 727 (1972) .................................................................................... 8, 10

*Simmat v. U.S. Bureau of Prisons,*

    413 F.3d 1225 (10th Cir. 2005) ........................................................... 32

*Simon v. E. Ky. Welfare Rights Org.,*

    426 U.S. 26 (1976) ........................................................................... 14

*Summers v. Earth Island Inst.,*

    555 U.S. 488 (2009) .......................................................................... 11

*Susan B. Anthony List v. Driehaus,*

    573 U.S. 149 (2014) ........................................................................... 8

*Town of Norwood v. FERC,*

    202 F.3d 392 (1st Cir. 2000) ............................................................... 11

*Trenkler v. United States,*

    536 F.3d 85 (1st Cir. 2008) ................................................................ 30

*U.S. Term Limits, Inc. v. Thornton,*

    514 U.S. 779 (1995) .......................................................................... 28

*United Presbyterian Church in the U.S.A. v. Reagan,*

    738 F.2d 1375 (D.C. Cir. 1984) ........................................................... 17

*United States v. AVX Corp.,*

    962 F.2d 108 (1st Cir. 1992) ............................................................... 10

*United States v. Ivery,*

    427 F.3d 69 (1st Cir. 2005) ................................................................ 25

*United States v. Sprague,*

    282 U.S. 716 (1931) ..................................................................... 24, 29

*United States v. Virginia*,

    518 U.S. 515 (1996) ............................................................................................. 14

*Valentin v. Hosp. Bella Vista*,

    254 F.3d 358 (1st Cir. 2001) ................................................................................ 7

*White v. Hart*,

    80 U.S. 646 (1871) ........................................................................................ 17, 21

**Statutes**

1 U.S.C. § 106b ..................................................................................... 5, 6, 19

5 U.S.C. § 706(1) ...................................................................................... 31

28 U.S.C. § 1331 ...................................................................................... 32

28 U.S.C. § 1361 .............................................................................. 30, 31, 32

28 U.S.C. § 1651 ............................................................................. 7, 30, 31

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ............................................................ 2, 7

Federal Rule of Civil Procedure 12(b)(6) ............................................................ 2

**Other Authorities**

*Constitutional Choices: Legal Feminism and the Historical Dynamics of Change*,

    92 Calif. L. Rev. 755 (2004) ............................................................................. 14

H.J. Res. 208, 86 Stat. 1523 (1972) ........................................................................ 3

*Ratification of the Equal Rights Amendment*,

    U.S. Dep't of Justice, Office of Legal Counsel, 44 Op. O.L.C. __ ........................................ 3, 4

*Ratification of the Equal Rights Amendment: A Question of Time*,

   57 Tex. L. Rev. 919 (1979)..................................................................................... 3

S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018)...................................... 4

S.J. Res. 2, 54th Leg. (S.D. 1979).............................................................................. 27

S.J. Res. 2, 79th Leg. (Nev. 2017) ............................................................................... 4

## INTRODUCTION

Nearly one hundred years ago, the Supreme Court held that Congress may establish a deadline for the ratification of constitutional amendments so that "the expression of the approbation of the people" is "sufficiently contemporaneous" in the ratifying States "to reflect the will of the people in all sections at relatively the same period." *Dillon v. Gloss*, 256 U.S. 368, 375 (1921). And since Congress proposed the Twentieth Amendment in 1932, Congress has adhered to that practice, giving the States a deadline for ratification of each proposed amendment to ensure an orderly and contemporaneous process.

The Equal Rights Amendment ("ERA") followed this well-tread path. When it proposed the ERA, Congress included a ratification deadline of March 22, 1979, which it later extended by three years and three months. As the Department of Justice's ("DOJ") Office of Legal Counsel ("OLC") has explained, this deadline, like those for many other proposed amendments, precludes ratification of the ERA based upon votes that occurred after the deadline. The Archivist of the United States ("Archivist"), who is tasked by statute with certifying constitutional amendments, "defers to DOJ on this issue and will abide by the OLC opinion." NARA Press Statement on the Equal Rights Amendment (Jan. 8, 2020), https://www.archives.gov/press/press-releases-4.

Plaintiffs, two organizations and an individual, ask this Court to mandate that the Archivist certify the ERA. But that request is contrary to Supreme Court precedent prohibiting courts from second-guessing the legislature's inclusion of a deadline for ratification. *Coleman v. Miller*, 307 U.S. 433, 454 (1939); *Dillon*, 256 U.S. at 375–76. Moreover, even if there were a role for a court to play in the ratification process, it would not be here, in a case brought by plaintiffs who have no role in the process and no standing under Article III. *Fairchild v. Hughes*, 258 U.S. 126, 130 (1922).

In recognition of the limited role for the courts in this political dispute, this Court should dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1). Should the Court instead proceed to the merits of the purely legal challenges asserted by plaintiffs, it should hold that plaintiffs fail to state a claim under Federal Rule of Civil Procedure 12(b)(6) in light of the Archivist's well-supported decision not to certify adoption of the ERA.

## BACKGROUND AND PROCEDURAL HISTORY

### I.        Article V and the Modern History of Ratifications

Article V establishes "[t]he power to amend the Constitution and the mode of exerting it." *Dillon*, 256 U.S. at 371. This article permits Congress to propose amendments "whenever two thirds of both houses shall deem it necessary" and declares an amendment to be "valid to all intents and purposes, as part of this Constitution when ratified by" three-fourths of the States by state legislatures or state conventions, "as the one or the other mode of ratification may be proposed by the Congress." U.S. Const. art. V. As the Supreme Court has recognized, "[w]hether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification." *Dillon*, 256 U.S. at 376.

Congress has exercised its authority to impose a ratification deadline numerous times over more than one hundred years. Although it considered using a ratification deadline in 1866, *see* 39 Cong. Globe 2771 (May 23, 1866) (remarks of Sen. Buckalew), Congress first imposed one in 1917, when it included a seven-year ratification deadline in the text of the Eighteenth Amendment.

*See* U.S. Const. amend. XVIII, § 3. Since 1924, each amendment proposed by Congress has included a seven-year ratification deadline.[1]

Before 1960, the deadline was included in the text of the amendment itself. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. But since then, Congress has included the deadline in the resolution proposing the amendment. *See* 74 Stat. 1057 (1960) (23rd amend.); 76 Stat. 1259 (1962) (24th amend.); 79 Stat. 1327 (1965) (25th amend.); 85 Stat. 825 (1971) (26th amend.); 86 Stat. 1523 (1972) (proposed ERA); 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).[2] This was "largely to avoid 'cluttering up' the Constitution with vestigial provisions serving no function once an amendment was ratified." Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 923 (1979) (citation omitted). *See also Ratification of the Equal Rights Amendment*, U.S. Dep't of Justice, Office of Legal Counsel, 44 Op. O.L.C. __, at *18–21 (Jan. 6, 2020) ("*Ratification of the ERA*"), available at https://www.justice.gov/olc/opinions.

## II.     The Equal Rights Amendment

On March 22, 1972, Congress approved the ERA by a supermajority of each House and submitted it for ratification to the State legislatures. H.J. Res. 208, 86 Stat. 1523 (1972). Consistent with the last seven amendments proposed before 1972, Congress conditioned ratification on a seven-year deadline. *Id*. At the end of the seven-year period, thirty-five of the necessary thirty-

---

[1] In 1919, Congress submitted the Nineteenth Amendment to the States without including a ratification deadline. *See* 41 Stat. 362 (1919). And in 1924, Congress proposed an amendment empowering the federal government to limit, regulate, and prohibit child labor without a ratification deadline. *See* 43 Stat. 670 (1924).

[2] Congress placed the deadline for the proposed D.C. Congressional Representation Amendment in both the proposing clause and the proposed amendment's text of the resolution proposing the amendment. *See* 92 Stat. 3795.

eight State legislatures had ratified the ERA, though five of those legislatures has also passed resolutions seeking to rescind their prior ratifications. *Ratification of the Equal Rights Amendment*, 44 O.L.C. at \*7 & n.8.

In 1978, Congress passed a joint resolution to extend the time for consideration of the amendment until 1982. H.R.J. Res. 638, 95th Cong., 2d Sess., 92. Stat. 3799 (1978). This action by a subsequent Congress to extend the time to vote on a constitutional amendment was novel and controversial, and it led to a lawsuit by two States. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1146–50, 1111 (D. Idaho 1981). Those States sought to prevent the ERA's ratification during the extended ratification period and, assuming the validity of the extension, to have the Court recognize that one State had rescinded its prior ratification. *See id*. The district court held that the extension of time for the ratification of the amendment was unconstitutional, and that States may effectively rescind a ratification. *Id*. at 1146–54. The Supreme Court granted certiorari before judgment in the court of appeals and stayed the district court's judgment. *See Nat'l Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982). But because the 1982 deadline expired without any further ratification actions before the Supreme Court could address the merits, the Court, at the federal government's request, vacated the district court's judgment and remanded the case with instructions to dismiss the complaint as moot. *See Nat'l Org. for Women v. Idaho*, 459 U.S. 809 (1982).

Although the ERA was not ratified by the deadline originally established by Congress, or even by the extended deadline, the proposed amendment has recently reemerged as a political issue. This political attention culminated in the passage of resolutions by Nevada (2017) and Illinois (2018) purporting to ratify the ERA. *See* S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018); S.J. Res. 2, 79th Leg. (Nev. 2017). Because as many as thirty-seven States

had purported to ratify the amendment by 2018—if one includes the States that voted to rescind

their ratifications—certain Members of Congress asked the Archivist "to inform them as to what

actions he would take in the event that a 38th state ratifies" the ERA. Letter from Gary M. Stern,

General Counsel, Nat'l Archives and Records Admin., to Steven A. Engel, Assistant Attorney

General, Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018),

https://www.archives.gov/files/press/press-releases/2020/olc-letter-re-era-ratification-12-12-

2018.pdf (hereinafter "Letter").

 The Archivist is tasked by statute with certifying the passage of constitutional amendments

as follows:

> Whenever official notice is received at the National Archives and Records
> Administration that any amendment proposed to the Constitution of the United
> States has been adopted, according to the provisions of the Constitution, the
> Archivist of the United States shall forthwith cause the amendment to be published,
> with his certificate, specifying the States by which the same may have been
> adopted, and that the same has become valid, to all intents and purposes, as part of
> the Constitution of the United States.

1 U.S.C. § 106b. "Section 106b and its antecedents have long been understood as imposing a

ministerial, 'record-keeping' duty upon the executive branch." *Congressional Pay Amendment*,

U.S. Dep't of Justice, Office of Legal Counsel, 16 Op. O.L.C. 85, 98 (1992). "The Archivist may

not refuse to certify a valid amendment." *Id.* "Nonetheless, section 106b clearly requires that,

before performing this ministerial function, the Archivist must determine whether he has received

'official notice' that an amendment has been adopted 'according to the provisions of the

Constitution.'" *Id*. at 99. "This is a question of law that the Archivist may properly submit to the

Attorney General for resolution." *Id*.

 On December 12, 2018, the Archivist requested a legal opinion from OLC determine

whether the ERA could be validly adopted. Letter, *supra*. On January 6, 2020, OLC issued a

memorandum opinion concluding "that the deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress's authority to set a deadline on ratification" and, "whether the effective deadline was in 1979 or 1982, that time has come and gone." *Ratification of the ERA*, 44 Op. O.L.C. at *12, *24. OLC therefore concluded that "the ERA's adoption could not be certified under 1 U.S.C. § 106b." *Id*. at *37. On January 8, 2020, the Archivist issued a statement explaining that he would "abide by the OLC opinion." NARA Press Statement, *supra*. One week later, the Virginia General Assembly passed a joint resolution purporting to ratify the ERA. Am. Compl. ¶ 2.

### III.    Procedural Background

Plaintiffs, a coalition of two organizations and one individual—Equal Means Equal, the Yellow Roses, and Katherine Weitbrecht—filed an Amended Complaint seeking equitable relief against the Archivist. Am. Compl., ECF No. 5. Plaintiffs argue that the Archivist must certify that the Constitution has been amended after "Virginia became the 38th State to ratify the ERA" in January. *Id*. ¶ 2. Specifically, they argue that the ERA's ratification deadline "is unconstitutional as it imposes unlawful constraints on the States to elect a schedule of *their* choosing on which to consider and ratify—or decline to ratify—a proposed constitutional amendment." *Id*. ¶ 16 (emphasis in original). At the same time, they contend, the "attempts by several states to rescind their ratifications are without legal support." *Id.* ¶ 26.

Plaintiffs assert four claims: (1) "the Archivist's refusal to record Virginia's ratification, and refusal to record ratification of the ERA itself," violates Article V, *id.* ¶ 83; (2) "[u]nder the Tenth Amendment, and in light of Article V which states that an amendment becomes valid when three-fourths of the States ratify, the States have authority to ratify, or not, unrestrained by the federal government," *id.* ¶ 85; (3) "[t]he Archivist correctly refused to record any rescissions of

prior ratifications because [t]hat would not be consistent with the plain language of Article V, or Supreme Court precedent," *id.*¶ 93; and (4) plaintiffs are entitled to a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651, to compel the Archivist to record Virginia's ratification and "the ERA as duly ratified," *id.* ¶¶ 98, 100.

## LEGAL STANDARDS

"The proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001). And "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

"[T]he plaintiff bears the burden of plausibly alleging a viable cause of action" and "pleading facts necessary to demonstrate standing." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). "[A]t the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action. Neither conclusory assertions nor unfounded speculation can supply the necessary heft." *Id.* at 731. "Although . . . dismissal under Rules 12(b)(1) and 12(b)(6) are 'conceptually different,' . . . 'the same basic principles apply in both situations.'" *Lyman v. Baker*, --- F.3d ---, ---, 2020 WL 1527758, at *5 (1st Cir. Mar. 31, 2020) (quoting *Hochendoner¸* 823 F.3d at 730–31).

## ARGUMENT

### I.   Plaintiffs Lack Article III Standing.

#### A.   *The plaintiff organizations have not alleged an imminent injury in fact that is traceable to the actions of the Archivist.*

To demonstrate standing, "a plaintiff must establish each part of a familiar triad: injury, causation, and redressability." *Katz v. Pershing*, LLC, 672 F.3d 64, 71 (1st Cir. 2012). As to the

first prong, "the injury 'must be concrete and particularized' and 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158.

"Where 'injury' and 'cause' are not obvious, the plaintiff must plead their existence in [her] complaint with a fair degree of specificity." *Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983). The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

> **i. *EME and the Yellow Roses have not alleged facts demonstrating organizational standing.***

An organization does not have standing to sue based on "a mere 'interest in a problem,' no matter how longstanding the interest and . . . how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). An organization has standing to sue in its own right—"organizational standing"—only if it "has been frustrated by defendants' . . . practices in its efforts to [provide] . . . services" and has experienced a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *see also Equal Means Equal v. Dep't of Educ.*, --- F. Supp. 3d ---,---, 2020 WL 1284149, at *5 (D. Mass. Mar. 18, 2020) (applying *Havens* test). Under this test, it is no easier for an organization to establish standing than it is for an individual. *See Havens*, 455 U.S. at 378 (organizational standing involves "the same inquiry as the case of an individual").

As to the first prong of organizational standing, both organizational plaintiffs allege as

injury to their missions their purported inability to use the ratification of the ERA as a tool to lobby state legislatures. EME alleges that it "has been frustrated in its mission because of the Archivist's refusal to recognize Virginia's ratification." Am. Compl. ¶ 62. Specifically, EME states that "it is unable to advocate at all for" legislative bodies to change laws to comply with the ERA, "work that should already be underway, and would already be underway, if the Archivist had not stated his refusal to recognize the ERA as a valid amendment to the United States Constitution." *Id.* Yellow Roses, which like EME is an advocacy organization, *see id.* ¶ 67, similarly alleges that its "mission . . . is impaired by the refusal of government officials to begin the process of examining and repairing sex discriminatory laws, regulations, and policies because [it] cannot effectively advocate on behalf of the ERA as long as the ERA is perceived by government officials as not validly enacted based on the Archivist's refusal to record it." *Id.* ¶ 69.

Organizations, however, cannot establish standing when their "only 'injury' arises from the effect of [a challenged action] on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities)." *Ctr. For Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005); *see Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019) ("contention of injury" that organization finds "it difficult to advocate and educate on home-sharing in Chicago before a court rules on . . . [its] challenges to the constitutionality of [challenged] Ordinance" is "little more than a 'mere interest in a problem.'"); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury"); *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093–94 (D.C. Cir. 2015) (no standing "when the service impaired is pure issue-advocacy") (quotations and citations omitted). That is because "a mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute

for an actual injury." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 320 (D. Mass. 1997) (quoting *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992)); *see Sierra Club*, 405 U.S. at 738–41 (holding that an organization lacked standing to challenge a proposed development in a national forest despite its interest in advocating for conservation); *Equal Means Equal*, 2020 WL 1284149 at \*5 (holding that organization lacked standing to challenge federal guidance regarding campus sexual misconduct proceedings despite its "strong interest in the rules and procedures that universities follow when considering sexual harassment claims").

Plaintiffs likewise fail to satisfy the second prong of the organizational standing test, under which they must show that they have expended resources to counteract the frustration of their mission. Plaintiffs do not allege that Yellow Roses has experienced a consequent drain on its resources stemming from the Archivist's actions at all. Plaintiffs allege that EME has expended "resources to educate and inform its member/supporters and the general public about why the ERA is duly ratified." Am. Compl. ¶ 63. But resources spent on such advocacy and education efforts do not give rise to Article III standing. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) (organization may not establish "Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law."); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 288 (3d Cir. 2014) (quoting *Ctr. For Law and Educ. v. U.S. Dep't of Educ.*, 315 F. Supp. 2d 15, 24–25 (D.D.C. 2004)) ("An organization's expenses in the pursuit of its agenda are self-effectuating and claiming them as injury-in-fact would allow any advocacy group to manufacture standing by choosing to expend resources to advocate against policy decisions made by the federal government."); *Boston's Children First v. Boston Sch. Comm.*, 183 F. Supp. 2d 382, 403 (D. Mass. 2002) (rejecting standing "argu[ment] that [plaintiff] has 'expended considerable resources in providing counseling and

information to its members and the general public about the challenged . . . policy'"); *Guckenberger*, 957 F. Supp. at 320 (rejecting "argument that [defendant university's] discrimination against learning-disabled students causes [plaintiff organizations] to spend money and thus gives them standing to sue in their own right").

Moreover, even if alleged harms to the organizational plaintiffs' advocacy or educational interests were sufficient injuries, the Amended Complaint fails to explain how the Archivist's actions (or lack thereof) have interfered with these interests. *See Katz v. Pershing, LLC*, 672 F.3d 64, 76-77 (1st Cir. 2012). Plaintiffs merely provide a single conclusory sentence stating that unnamed "officials" from unidentified States have declined to take certain actions while "citing the Archivist's refusal to recognize the ERA as ratified." Am. Compl. ¶ 62. That conclusory allegation describes the independent action of some third party not before the court and is insufficient to establish standing consistent with the limitations of Article III. *Equal Means Equal*, 2020 WL 1284149 at \*6; *Am. Waterways Operators v. U.S. Coast Guard*, --- F. Supp. 3d ---, --- 2020 WL 360493, at \*4 (D. Mass. Jan. 22, 2020).

### ii. *EME and Yellow Roses have not alleged facts establishing standing to sue on behalf of their members.*

Neither EME nor Yellow Roses has established standing to sue on behalf of its members. "[A]n . . . organization may have standing if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the organization, and relief does not require the presence of the members in the suit." *Town of Norwood v. FERC*, 202 F.3d 392, 405–06 (1st Cir. 2000). "To satisfy this requirement, the association must, at the very least, 'identify a member who has suffered the requisite harm.'" *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

Here, the Amended Complaint identifies no particular member of either group, so the Court

11

can do no more than speculate about whether organization members (if they have any)[3] suffer a concrete and particularized injury. The only individual named in the lawsuit is Katherine Weitbrecht, who has appeared in the suit independently and does not claim to be a member of either organization. *See generally* Am. Compl. In any event, as discussed below, the speculative and generalized nature of the injuries allegedly suffered by plaintiffs' members do not establish standing to sue. Both plaintiff organizations allege that they, and all women, have suffered harm from the risk of violence against women and unequal treatment under the law. EME alleges that its "involvement in this litigation is intended to represent EME's own interests, as well as the interests of its members/supporters, and women everywhere who have suffered and are at risk of suffering harm *because they are female* and do not enjoy equal protection of the law." Am. Compl. ¶ 64 (emphasis in original). Similarly, Yellow Roses alleges that the group has "been subjected to a needless risk of violence because they are female, and government officials are not currently [taking] any steps to identify and repair sex discriminatory laws, regulations and policies." *Id.* ¶ 68; *see also id.* ¶ 46 (Plaintiffs "and all women in Massachusetts" are experiencing undifferentiated risk of harm). Finally, Plaintiffs allege harms regarding "the class of people affected," Am. Compl. at 14, listing statistics about violence against women in general, *id.* ¶¶ 51–58.

These concerns, however real, do not establish standing because they constitute generalized concerns about discriminatory conduct. *See Allen v. Wright,* 468 U.S. 737, 755-56 (1984) ("If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the

---

[3] It is unclear whether EME has plausibly alleged that it has "members" at all. *See Equal Means Equal v. Dep't of Educ.*, --- F. Supp. 3d ---, --- , 2020 WL 1284149, at *4 (D. Mass. Mar. 18, 2020) (EME "allege[d] they have supporters who 'voluntarily associate themselves with EME,' but that is not sufficient to support standing."). Nowhere does the Amended Complaint plausibly allege facts indicating that EME is an organization with members "possess[ing] all of the indicia of membership in an organization." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

particular racial groups against which the Government was alleged to be discriminating."). Recognition of standing for the plaintiff organizations on the basis of their concern for women generally "would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Id*. at 756.

To the extent plaintiffs are alleging an increased risk of harm to women, such allegations "require greater caution and scrutiny because the assessment of risk is both less certain, and whether the risk constitutes injury is likely to be more controversial." *Kerin v. Titeflex Corp.*, 770 F.3d 978, 982 (1st Cir. 2014). And here, plaintiffs' allegations have failed to establish that any such risk of future injury is "certainly impending." *Clapper*, 568 U.S. at 410; *see also Kerin*, 770 F.3d at 983. Their descriptions of harm are entirely generalized and conclusory, insufficient to make any assumption about whether the risk of violence has increased as a result of the Archivist's actions. If the conclusion were different, then any complaint alleging a generalized threat of harm from discriminatory conduct would establish standing to sue, contrary to established precedent. *Allen,* 468 U.S. at 755; *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Even if plaintiffs' generalized allegations about threats of violence were sufficient injuries, the Amended Complaint fails to connect that injury to the Archivist's conduct. *Kerin*, 770 F.3d at 982. Most obviously, any violence that plaintiffs' members may suffer would be at the hands of individual perpetrators of violence, not the Archivist. Plaintiffs allege that violence in Massachusetts is facilitated, or at least not adequately addressed, by the State's hate-crime statute because it does not include crimes motivated by sex discrimination, *see* Am. Compl. ¶ 46, and that the "Massachusetts hate crime statute should be repaired so that it is no longer discriminatory based on sex, but lawmakers and other government officials will not take steps to fix the hate crime statute so long as the Archivist refuses to record the ERA as a valid constitutional amendment."

*Id.* ¶ 46. But Massachusetts is free to modify its hate-crime statute in accordance with its state constitution, which already subjects sex-based classification to strict scrutiny, *see Commonwealth v. King*, 374 Mass. 5, 21 (1977). Indeed the State already extends its hate-crimes statute to address conduct motivated by traits not specifically protected by a federal constitutional amendment. *See* Mass.G.L. c. 265, § 39 (imposing additional penalties for certain crimes motivated by "race, color, religion, national origin, sexual orientation, gender identity, or disability").

Because any risk of harm from the Massachusetts hate-crime statute is an injury that "stems from the independent action of a third party"—the Massachusetts Legislature—it is not fairly traceable to the Archivist. Plaintiffs therefore lack standing to challenge the Archivist's action on this basis. *Katz*, 672 F.3d at 71–72 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)); *Am. Waterways*, 2020 WL 360493, at *4.

What is more, plaintiffs' theory of injury relies entirely on predictions about the effect the ERA would have on state laws. But whatever practical effect the ERA's ambiguous text might have if the ERA were to become law is pure speculation at this juncture. Justice Ginsburg, for example, claimed that "[t]here is no practical difference between [the evolution of existing law] and the E.R.A." Jeffrey Rosen, *The New Look of Liberalism on the Court*, N.Y. Times Mag., Oct. 1, 1997, at 60; *see also United States v. Virginia*¸ 518 U.S. 515, 533 (1996); *Craig v. Boren*, 429 U.S. 190, 197 (1976). This view comports with the movement to pass the ERA in the 1970s as part of a dual strategy where activists sought to address sex discrimination under the law both by advocating for the ERA and by arguing that the Equal Protection Clause of the existing Fourteenth Amendment subjects sex discrimination to heightened scrutiny. *See* Serena Mayeri, *Constitutional Choices: Legal Feminism and the Historical Dynamics of Change*, 92 Calif. L. Rev. 755, 758 (2004). Thus, it is far from clear what impact the ERA's certification by the Archivist would have

on States, let alone on plaintiffs. *See Clapper*, 568 U.S. at 413 (plaintiffs lack standing when they "can only speculate as to whether [a] court will" make a particular decision); *see also Biszko v. RIHT Financial Corp.*, 758 F.2d 769, 773 (1st Cir. 1985) ("The 'injury' that appellants suggest they have suffered is no more than the preclusion of a benefit that they might gain were the Rhode Island legislature to react in a certain way to a decision by this court. Such injury is not merely speculative—it is positively chimerical.").

Furthermore, even if the ERA prompted or required the Massachusetts Legislature to revise its criminal code, and even if the Massachusetts Legislature decided to expand coverage of the hate-crimes statute rather than eliminate it, it is speculative to assume that a third-party intent on committing an act of violence would refrain from doing so as a result. *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (no standing where "appellant has made an insufficient showing of a direct nexus between the vindication of her interest [in support of her child] and the enforcement of a State's criminal laws" against child's father). Ultimately, plaintiffs' theory of standing would require this Court to assume that the Archivist's actions would cause the Massachusetts legislature (and indeed legislatures throughout the United States) to amend their laws to provide increased protections for women, and that individuals intent on committing sexually motivated violence would be deterred by these new legal protections. This wholly speculative chain of events, dependent upon the responses of multiple third parties not presently before this Court, cannot provide a basis for jurisdiction consistent with Article III. *See, e.g.*, *Lyons*, 461 U.S. at 98, 105 (standing cannot rest on speculation about future violence).

### B.  The individual plaintiff has not alleged an imminent injury in fact that is traceable to the actions of the Archivist.

Like the purported members of EME and Yellow Roses, the Amended Complaint alleges that the individual plaintiff, Katherine Weitbrecht, has standing based on allegations that she faces

a future threat of violence and suffers from unequal treatment under the law. For example, the Amended Complaint alleges that Ms. "Weitbrecht faces a disproportionately high risk of harm because she is female," *id.* ¶ 74, and that her "rights and well-being are threatened and violated by her lack of full Constitutional equality because she is not equally protected by the United States Constitution or Massachusetts law," *id.* ¶ 77; s*ee also id.* ¶ 75 ("Ms. Weitbrecht's rights and well-being are threatened and violated by her lack of full Constitutional equality . . . ."). For the same reasons these general and uncertain allegations do not establish standing for the purported organizational members, they do not establish standing for Ms. Weitbrecht. *See supra* at 12–15; *see also Perez-Kudzma v. United States*, 940 F.3d 142, 146 (1st Cir. 2019) (allegations setting forth "only a diffuse description of the asserted injuries" are insufficient).

The one distinctive allegation regarding Ms. Weitbrecht concerns a harrowing act of violence that she suffered in the past. Am. Compl. ¶ 71. But that act was committed by a third party not present in this case and was presumably illegal under existing criminal statutes. It also predated Virginia's purported ratification of the ERA and the Archivist's actions in this case. And, in any event, it is black-letter law that the fact that an individual suffered violence in the past does not alone establish a "real and immediate threat that" she would suffer the same or similar conduct in the future. *Asociacion De Periodistas De P.R. v. Mueller*, 680 F.3d 70, 84–85 (1st Cir. 2012) (quoting *Lyons*, 461 U.S. at 105); *Equal Means Equal*, 2020 WL 1284149 at *6.

To the extent that Ms. Weitbrecht separately alleges a reluctance to report "any sex-based criminal activity she may endure" due to fear "that reporting crimes committed against her because she is female will lead to inadequate charges and unjust treatment by law enforcement and the legal system," Am. Compl. ¶ 74, that injury, and its connection to the Archivist's action, is likewise too speculative to establish jurisdiction. *See Equal Means Equal¸* 2020 WL 1284149 at *6

(analyzing similar alleged injury). "[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *see Reddy*, 845 F.3d at 503; *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 47 (1st Cir. 2011); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1379 (D.C. Cir. 1984).[4] Accordingly, because Ms. Weitbecht, like the organizational plaintiffs, has failed to allege a cognizable injury in fact that is traceable to the actions of the Archivist, the Amended Complaint must be dismissed.

### C. Whether States may validly rescind their ratifications is not ripe for review, and plaintiffs' demand for the Archivist to record Virginia's ratification is moot.

Even if plaintiffs could establish an injury that is traceable to the actions of the Archivist, portions of the Amended Complaint would still fail to satisfy Article III. First, plaintiffs' request that this Court decide whether states validly rescinded their prior ratifications of the ERA is not ripe for review because the Archivist, in reliance on OLC's most recent opinion, has not resolved this issue. Second, plaintiffs' demand for the Archivist to record Virginia's purported ratification is moot, because the Archivist has already recorded the purported ratification action.

*Rescissions*: Plaintiffs' claim in Count III that "[t]he Archivist correctly refused to record any rescissions of ratifications" and that these actions "to date are constitutional and consistent with the clear text of Article V," Am. Compl. ¶¶ 93, 94, to the extent it can be reviewed at all,[5] does not present a case or controversy ripe for this Court's adjudication. "In determining whether

---

[4] To the extent plaintiffs rely on cases involving pre-enforcement challenges under the First Amendment, *see* Am. Compl. ¶ 48, such cases are inapposite because the injury there "is peculiar to the First Amendment context," *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996), and such cases, by their own terms, would not apply when there is no statutory prohibition on the conduct in question.

[5] The political question doctrine bars this question from judicial review altogether. *Coleman*, 307 U.S. at 450; *White v. Hart*, 80 U.S. 646, 649 (1871); *see infra* pt. II.

a suit presents a real case or controversy or only an abstract question that is not justiciable in a federal court, the relevant inquiry is whether the 'conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Magee v. United States*, 93 F. Supp. 2d 161, 163 (D.R.I. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Because plaintiffs allege that the Archivist is acting lawfully and correctly, consistent with OLC's most recent opinion stating that "the expiration of the ERA resolution" made it "unnecessary" to reach the question of whether state rescissions were valid, *see Ratification of the ERA*, 44 Op. O.L.C. at *36–37, there is no ripe controversy that is necessary for this Court to resolve. Although plaintiffs ask this court to decide this question in the first instance, courts are without jurisdiction to render such advisory opinions. *City of Fall River, Mass. v. FERC*, 507 F.3d 1, 8 (1st Cir. 2007). To the contrary, should this Court conclude that Congress's ratification deadline is invalid, the Archivist, in consultation with OLC, should be permitted to decide this question in the first instance. His resolution of the question could obviate any need for plaintiffs' challenge or, at a minimum, "sharpen[] the presentation of issues" for this Court's review, *Katz*, 672 F.3d at 71.

*Recordings*: Plaintiffs also ask this Court for a writ "requiring the Archivist to record Virginia's ratification of the ERA." Am. Comp. at 25; *see also id.* ¶¶ 8, 97. But the Archivist *has* recorded Virginia's purported ratification in a publicly available document, *see* NARA, *ERA List of State Ratification Actions* (2020), https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf, as he and his predecessor have recorded all previous State ratification actions that occurred both before and after Congress's deadline. The Archivist's recording of Virginia's ratification action renders plaintiffs' request for a writ moot because the

Archivist has taken the step that Plaintiffs requested. Therefore, this Court cannot grant any additional relief on this request.[6] *See Am. Civil Liberties Union of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (issue mooted where "the court cannot give any effectual relief to the potentially prevailing party") (internal quotation marks omitted); *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).

## II.     Plaintiffs' claims and requested relief would require this Court to decide issues that are non-justiciable political questions.

Even if this Court were to find that plaintiffs have adequately alleged a basis for standing under Article III, this Court would still lack jurisdiction to decide the dispute. All of plaintiffs' claims derive from their assertion that the Archivist must certify the ERA as part of the Constitution. Am. Compl. ¶ 83. Accordingly, Plaintiffs ask this Court to declare that a deadline established by a supermajority of Congress for the ratification of a constitutional amendment is invalid, and to mandate that the Archivist certify the amendment as valid notwithstanding that deadline and the objection of States that have sought to rescind their prior authorizations. Am. Compl. at 25; *id.* ¶¶ 79–81, 91-94. But these two issues are best left to the political branches to resolve. *See Coleman*, 307 U.S. at 447–56; *see also Baker v. Carr*, 369 U.S. 186, 214 (1962) (In *Coleman*, "this Court held that the questions of how long a proposed amendment to the Federal Constitution remained open to ratification, and what effect a prior rejection had on a subsequent ratification, were committed to congressional resolution."). Because plaintiffs' principal claim that the ERA is valid necessarily requires the Court to address two issues over which it lacks jurisdiction under *Coleman*, this case must be dismissed. *See Rucho v. Common Cause*, 139 S. Ct.

---

[6] Of course, the act of recording a State's ratification action, which is not specifically mandated by 1 U.S.C. §106b, is separate from the act of certifying an amendment as adopted. That is why only this particular demand by Plaintiffs is moot and not the other relief that they seek in connection with the Archivist's decision not to certify the ERA as adopted. *See* Am. Compl. at 25.

2484, 2494, 2508 (2019) (when a "claim is said to present a 'political question' and to be nonjusticiable" the claim is "beyond the courts' jurisdiction" and the court must "dismiss [the case] for lack of jurisdiction.").

*Time Interval for Ratification*. Plaintiffs claim that the deadlines Congress imposed for states to ratify the ERA in both 1972 and 1978 are invalid. Am. Compl. ¶ 16. But regardless of whether a ratification deadline is placed in a joint resolution's proposed amendment text, the joint resolution's proposing clause, or the joint resolution itself, the deadline represents Congress's judgment as to how much time was necessary and appropriate to ratify the ERA. And under *Coleman,* "the question, what is a reasonable time [for ratification of a constitutional amendment], lies within the Congressional province." 307 U.S. at 454. The "decision by Congress, . . . of the question whether the amendment had been adopted within a reasonable period of time [is] not subject to review by the courts." *Id*.

To be sure, the precise question that the Court in *Coleman* held to be a political question was the appropriate the time period for ratification "in the absence of a limitation by the Congress." *Id*. at 452. But whether the question is the appropriate time for ratification in the absence of a deadline set by Congress, or whether a deadline once set should be ignored due to the manner in which Congress structured the proposed amendment, the principles underlying the decision in *Coleman* remain the same. *See id*. at 454 ("If it be deemed that such a question is an open one when the limit has not been fixed in advance, we think that it should also be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment."); *see also Rucho*, 139 S. Ct. at 2494 (2019) (internal citations omitted) (political questions do not raise an issue "of a Judiciary nature.").

Congress determined how much time was need to ratify the ERA after considering "a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice[.]" *Coleman*, 307 U.S. at 453; *see* H.R. Rep. No. 95-1405, at 11 (1978). "The questions [that setting a deadline] involve[s] are essentially political and not justiciable." *Coleman*, 307 U.S. at 454. Were this Court to accept plaintiffs' invitation to hold Congress's undisputed deadline invalid due to its placement in a different portion of the legislative action at issue, it would give this Court a pivotal role in the Amendment process, which Article V places in the hands of Congress. *See id*. at 453. Indeed, to rule for the plaintiffs this Court would have to upend the last sixty years of constitutional amendments, during which time Congress has routinely placed deadlines for ratification in the proposing clause. *See supra*, at 3.

***Effect of State Ratification Redeterminations***. In order to find that the ERA has been ratified by the required number of States, the Court not only would have to set aside the deadline for ratification imposed by Congress, but also find invalid the actions several States have taken over the years to rescind their prior ratifications. Indeed, plaintiffs claim that "recent attempts by several states to rescind their ratifications are without legal support." Am. Comp. ¶ 26. But even assuming the court may properly proceed to this question when it has not even been addressed by the Archivist, *see supra* at 17-18, the Supreme Court has determined that this precise question too is non-justiciable. As it explained, "in accordance with th[e] historic precedent" of the Fourteenth Amendment's ratification process, "the question of the efficacy of . . . attempted withdrawal [of a state's prior ratification], should be regarded as a political question pertaining to the political departments[.]" *Coleman*, 307 U.S. at 450; *see also White v. Hart*, 80 U.S. 646, 649 (1871) (A state's "den[ial] of the validity of her ratification of [a] constitutional amendment" presents a case

that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."). Thus, not only would this Court be required to invalidate the prior actions of Congress, the remedy requested by plaintiffs would also necessarily invalidate the actions of States that have sought to rescind their prior ratifications. As the Supreme Court held in *Coleman*, this Court has no judicial basis to make such a decision, which should be left to the political branches to decide. *See Coleman*, 307 U.S. at 450.

### III.     The Amended Complaint should be dismissed in its entirety for failure to state a claim.

In addition to its jurisdictional defects, the Amended Complaint fails to state a claim upon which relief may be granted. The Constitution vests Congress with the authority to determine the mode of ratification, which, as the Supreme Court has concluded, includes the duration of the ratification period for States. *Dillon*, 256 U.S. at 375–76. Consistent with the Supreme Court's recognition of this authority, Congress has included ratification deadlines in the proposing clause of every amendment submitted to the States since the Twenty-Third Amendment in 1960. Accordingly, as OLC recognized, the Archivist cannot, consistent with the Constitution and binding Supreme Court precedent, certify the adoption of a constitutional amendment based upon state ratification actions that took place after the expiration of the deadline set by Congress. *See Ratification of the ERA*, 44 Op. O.L.C. at *24 ("Because the deadline lapsed without ratifications from the requisite thirty-eight States, the ERA Resolution is no longer pending before the States . . . .").

#### A.     *The Supreme Court has upheld the authority of Congress to impose deadlines on the States to ratify a proposed constitutional amendment.*

Although plaintiffs have asserted four counts in their Complaint, they all derive from the first, which principally alleges that the Archivist's "refusal to record ratification of the ERA . . . is

illegal and not consistent with the clear test of Article V." Am. Compl. ¶ 83. Here, Congress's ERA resolution specified the mode of ratification for the States and included a ratification deadline in its proposing clause, which stated that the amendment "shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress." 86 Stat. at 1523. Plaintiffs' purely legal claim seeks to erase Congress's deadline for the ERA's ratification and runs headlong into Supreme Court precedent upholding Congress's authority to impose such a deadline. *See Dillon*, 256 U.S. at 375–76.

The Framers sought to ensure that amendments to the Constitution were no simple matter, and the ERA's own history demonstrates that they were successful. The Constitution requires supermajorities in Congress (or of state legislatures) to propose an amendment. U.S. Const. art. V. It raises the bar for ratification even higher by requiring three-fourths of the States—acting through either their legislatures or through ratifying conventions—to approve the amendment. *See id.* The Framers favored broad consensus in designing the ratification process to "guard[] . . . against that extreme facility which would render the Constitution too mutable," while at the same time "avoiding that extreme difficulty which might perpetuate its discovered faults." *The Federalist* No. 432, at 296 (James Madison) (Jacob E. Cooke ed., 1961); *see also Ratification of the ERA*, 44 Op. O.L.C. at *12.

The Framers further granted Congress the authority to specify "one or the other Mode of Ratification" in the States, either by the state legislatures or by state conventions chosen for that purpose, "as the one or the other . . . may be proposed by the Congress." U.S. Const. art. V; *see also* 4 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 177 (2d ed. 1836) (statement of James Iredell) ("Any amendments which

either Congress shall propose, or which shall be proposed by such general convention, are afterwards to be submitted to the legislatures of the different states or conventions called for that purposes, as Congress shall think proper[.]"). Congress therefore exercises discretion in determining not just the substance of the amendment, but which of the two modes of ratification is to be used. *See Ratification of the ERA*, 44 Op. O.L.C. at *14.

The Supreme Court has consistently recognized these principles by deferring to Congress's broad authority to determine the parameters for ratification. *See, e.g.*, *United States v. Sprague*, 282 U.S. 716, 732–33 (1931) ("the choice of mode rests solely in the discretion of Congress"). In *Dillon*, the Court considered the argument that the Eighteenth Amendment was invalid "because the congressional resolution proposing the amendment declared that it should be inoperative unless ratified within seven years," 256 U.S. at 370–71 (citation omitted), the same time frame that Congress gave States in its ERA joint resolution, 86 Stat. 1523 (1972).

As to what an appropriate ratification deadline would be, the Court concluded that "[w]hether a definite period for ratification may be fixed so that all may know what it is . . . a matter of detail which Congress may determine" as "an incident of its power to designate the mode of ratification" under Article V. *Id.* at 376. In light of this express language and holding, OLC concluded that "the deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress's authority to set a deadline on ratification." *Ratification of the ERA*, 44 Op. O.L.C. at *24. And the Archivist sensibly decided to follow this opinion. *See* NARA Press Statement, *supra*.

Plaintiffs make two arguments in an attempt to avoid *Dillon*'s reasoning, neither of which has merit. The first is to ask this Court to overrule *Dillon* on the basis that "the United States is a much more complex country today than it was when *Dillon* was decided . . . ." Am. Compl. ¶ 35.

But at a minimum, such requests are properly addressed not to this Court, but to the Supreme Court.[7] *See United States v. Ivery*, 427 F.3d 69, 75 (1st Cir. 2005) ("It is not our place to anticipate the Supreme Court's reconsideration of its prior rulings . . . .").

The second argument advanced by plaintiffs is that Congress lacks the authority to impose a deadline in the proposing clause of the joint resolution submitting the proposed amendment to the States, as opposed to the text of the proposed amendment itself. Am. Compl. ¶ 24. Unlike the Eighteenth Amendment at issue in *Dillon*, Congress placed the ratification deadline for the ERA Resolution in the proposing clause, rather than in the text of the proposed amendment. But that decision is entirely consistent with the reasoning of the Supreme Court's decision in *Dillon* that setting a deadline is incident to the power to select the mode of ratification, which has always been included in the proposing clause. *See* 256 U.S. at 370–71 (framing the issue as whether a deadline was invalid "because the congressional *resolution* (40 Stat. 1050) proposing the amendment declared that it should be inoperative unless ratified within seven years").

It is also consistent with congressional practice. Congress included the deadline for ratification in the proposing clause of the last several constitutional amendments proposed to the States. *See* 74 Stat. at 1057 (the Twenty-Third Amendment's resolution, which proclaimed that "the following article is hereby proposed . . . which shall be valid to all intents and purposes as part of the Constitution only if ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by Congress"); 76 Stat. at 1259 (Twenty-Fourth Amendment); 79 Stat. at 1327 (Twenty-Fifth Amendment); 85 Stat. at 825 (Twenty-Sixth

---

[7] Plaintiffs also assert that the ratification and certification of the Twenty-Seventh Amendment, which occurred more than two hundred years after first being proposed, demonstrates that *Dillon* is no longer good law. Am. Compl. ¶ 36. But contrary to the express ratification deadline in the ERA, or the ratification deadline at issue in *Dillon*, Congress simply declined to impose a ratification deadline for the Twenty-Seventh Amendment. 1 Stat 97 (1789).

Amendment). It is true that Congress, in the prior three amendments, had placed the deadline in the text of the amendment itself. *See* U.S. Const. amends XX, § 6, XXI, § 3, XXII, § 2; *Ratification of the ERA*, 44 Op. O.L.C. at *19–20. But that difference has no import for the merits of the constitutional question presented. To the contrary, Congress's decision to place the ratification deadline in the proposing clause of the Twenty-Third Amendment merely reflects the sensible desire to declutter the text of an amendment by removing extraneous sections imposing conditions on ratification that had no prospective effect. *See* 10 Cong. Rec. 6628 (1955) (Sen. Kefauver) ("The general idea was that it was better not to make the 7-year provision a part of the proposed amendment itself. It was felt that it would clutter up the Constitution . . . So the intention of the preamble is that it must be ratified within 7 years . . . to be effective."); *see also Ratification of the ERA*, 44 Op. O.L.C. at *20–22.

Given that Congress has specified the mode of ratification in the proposing clause of every resolution proposing a constitutional amendment since the first, *see* 1 Stat. 97, it is clear that Congress may exercise its integrally related authority to set a deadline in precisely the same manner. The Supreme Court indicated as much when it observed that the Child Labor Amendment did not include a ratification deadline "either in the proposed amendment or in the resolution of submission" without any suggestion that the latter approach would have rendered the deadline invalid. *Coleman*, 307 U.S. at 452. Indeed, to reach a contrary conclusion would be to render a portion of the proposing clause meaningless, even though it was adopted by a supermajority of Congress and is therefore undeniably a valid expression of congressional intent. *See* 86 Stat. 1523 (1972); *Ratification of the ERA*, 44 Op. O.L.C. at *7–8.

Ignoring the deadline established by Congress for ratification would also disrupt the settled expectations of States that took action (or decided not to take action) before the deadline. The "fair

implication" that ratification "must be sufficiently contemporaneous in that number of states to reflect the will of the people in all sections at relatively the same period," *Dillon*, 256 U.S. at 375, is only strengthened by the existence of an actual deadline, which was known and relied upon by States, advocates, litigants, and courts when deciding how to proceed before its expiration, *see, e.g.*, 86 Stat. 1523 (1972); *see also, e.g.*, S.J. Res. 2, 54th Leg. (S.D. 1979) (adopting a resolution that South Dakota's prior ratification would be withdrawn if the requisite number of States failed to ratify the ERA within the seven-year period).

And if there remained any doubt about this question, it was resolved by the Supreme Court in 1982 when the Court found that the legal controversy over whether Congress could extend the ERA's ratification deadline became moot when the (extended) deadline expired. After the district court in *Freeman* held that Congress could not extend the deadline, 529 F. Supp. at 1150–54, the federal government and others sought review in the Supreme Court. *See, e.g.*, Pet. of Adm'r of Gen. Servs. for Writ of Cert. Before J., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982); Pet. for Writ of Cert. Before J., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982). Although the Court accepted review, the June 1982 deadline expired before it could hear argument. The government then urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented." Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982). The Court remanded with instructions "to dismiss the complaints as moot." *Nat'l Org. for Women*, 459 U.S. at 809. In so doing, the Court necessarily adopted the view that Congress had validly imposed a ratification deadline that expired. *See id.*

Against this wealth of precedent and historical practice, plaintiffs rely on the absence of any express statement about timelines in Article V. *See* Am. Compl. ¶ 24. But even though the

27

"article says nothing about the time within which ratification may be had," *Dillon*, 256 U.S. at 371,

there is also nothing "in the article which suggests that an amendment once proposed is to be open

to ratification for all time," *id.* at 374.

Congress's ratification deadline comports with Supreme Court precedent and longstanding

practice. And the Archivist, following OLC's careful legal analysis, properly declined to certify

the ERA as adopted following Virginia's belated ratification action because the deadline had long

since expired.[8] Count I must therefore be dismissed.

### B. The Tenth Amendment provides no authority for States to ignore Congress's ratification deadline for the ERA.

Count II's claim that "Congress cannot limit the amount of time that States have to ratify

a constitutional amendment because the Tenth Amendment . . . provides that all rights not

specifically granted to the federal government are reserved to the States," Am. Compl. ¶ 85, flies

in the face of Supreme Court precedent. "As Justice Story recognized, 'the states can exercise no

powers whatsoever, which exclusively spring out of the existence of the national government,

which the constitution does not delegate to them. . . . No state can say, that it has reserved, what it

never possessed.'" *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995) (quoting 1 Story

§ 627). *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to

Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that

power to the States[.]"). How to ratify a federal constitutional amendment necessarily "exclusively

springs[] out of the existence of the national government," 1 Story § 627, and the Supreme Court

has concluded that "[t]he Tenth Amendment . . . added nothing to the instrument as originally

---

[8] *See* Remarks of Justice Ruth Bader Ginsburg, Georgetown University Law Center (Sept. 12, 2019) ("[T]he ERA fell three States short of ratification. I hope someday it will be put back in the political hopper, starting over again, collecting the necessary number of States to ratify it.").

ratified and has no limited and special operation . . . upon the people's delegation by [A]rticle 5 of certain functions to the Congress." *United States v. Sprague*, 282 U.S. 716, 733–34 (1931); *cf. Leser v. Garnett*, 258 U.S. 130, 137 (1922) ("[T]he function of a state Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution; and it transcends any limitations sought to be imposed by the people of a state."). For that reason alone, Count II must be dismissed.

### C. *Plaintiffs plead no plausible claim for relief regarding how the Archivist has treated State rescissions of their ERA ratifications.*

Count III likewise fails to state a claim upon which relief may be granted. Count III alleges that the five States that voted to rescind their prior ratifications of the ERA could not do what they did, because "[a] State cannot rescind its ratification of a constitutional amendment." Am. Compl. ¶ 91. However, the Amended Complaint then appears to absolve the Archivist of any responsibility for this claim, alleging that "[t]he Archivist correctly refused to record any [State] rescissions of prior ratifications," Am. Compl. ¶ 93, and that "[t]he Archivist's actions to date are constitutional and consistent with the clear text of Article V," *id.* ¶ 94. Indeed, the Amended Complaint is devoid of any statements that even suggest that the Archivist has acted unlawfully with respect to the five States' rescission actions—an issue that OLC declined to reach in light of its conclusion about the effect of the deadline. *Ratification of the ERA* at 36–37. As the Amended Complaint fails to plead a plausible claim against any action regarding rescissions taken by the Archivist, this Court should dismiss this Count. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011) (where "the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint" is unreasonable, a complaint fails to state a claim under Rule 12(b)(6)).

### D. Plaintiffs have no basis to seek the extraordinary relief provided in the All Writs Act or the mandamus statute.

Finally, Count IV, which seeks relief under the All Writs Act, 28 U.S.C. § 1651, also fails. Plaintiffs allege that the Archivist is "mandated to record Virginia's ratification of the ERA," Am. Compl. ¶ 97, and appear to also allege that he is mandated to record the ERA "as a duly ratified amendment to the U.S. Constitution," Am. Compl. ¶ 100. Plaintiffs request relief under the All Writs Act because they purportedly "have no plain, speedy, and adequate remedy at law, other than the remedies requested by this action," *id.* ¶ 99. Specifically, they seek "[a] writ requiring the Archivist to record all states' decisions to ratify the ERA, regardless of the deadline;" "[a] writ prohibiting the Archivist from removing previously recorded ratifications of the ERA;" and "[a] writ requiring the Archivist to record Virginia's ratification of the ERA." Am. Compl. at 25. Plaintiffs also identify the federal mandamus statute, 28 U.S.C. § 1361, as one of the bases on which they contend the Court has jurisdiction, *see* Am. Compl. ¶ 13, though they only plead this claim under the All Writs Act, *id.* ¶¶ 95–100. But they fail to satisfy any element of either claim.[9]

The All Writs Act is not a statute plaintiffs may claim that the defendant has violated; it instead "constitutes 'a residual source of authority [authorizing courts] to issue writs that are not otherwise covered by statute.'" *Trenkler v. United States*, 536 F.3d 85, 97 (1st Cir. 2008) (quoting *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985)). To obtain a writ under the

---

[9] Defendant has not located any First Circuit case law on whether the elements of an All Writs Act claim are jurisdictional (and thus subject to dismissal under Rule 12(b)(1)) or non-jurisdictional (and thus subject to dismissal under Rule 12(b)(6)). The elements are similar to those required to obtain relief under the federal mandamus statute, 28 U.S.C. § 1361, which courts have found to be jurisdictional. *See Davis Assocs., Inc. v. Sec'y, Dep't of Hous. & Urban Dev.*, 498 F.2d 385, 388 (1st Cir. 1974); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). It is Defendant's view that the elements of an All Writs Act claim likewise are jurisdictional, but given the lack of controlling authority, Defendant moves for dismissal of this claim under both Rule 12(b)(1) and 12(b)(6).

All Writs Act, three elements must be met. First, the petitioner must "have 'no other adequate means to attain the relief he desires.'" *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 150 (D.C. Cir. 2015) (quoting *Cheney, v. U.S. Court for D.C.*, 542 U.S. 367, 380–81 (2004)). Second, the petitioner must "show that its right to the writ is 'clear and indisputable." *Kellogg Brown & Root*, 796 F.3d at 150 (quoting *Cheney*, 542 U.S. at 380–81). Third, "the court, "in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Kellogg Brown & Root*, 796 F.3d at 150 (quoting *Cheney*, 542 U.S. at 380–81). The requirements for obtaining mandamus under 28 U.S.C. § 1361 are similar. *See Hoever v. Dep't of Homeland Sec.*, 637 F. App'x 565, 566 (11th Cir. 2016); *see also In re City of Fall River, Mass.*, 470 F.3d 30 (1st Cir. 2006).

As to the first element, plaintiffs fail to explain why they lack an adequate means to otherwise obtain their sought-after relief, for example by seeking relief under the Administrative Procedure Act, 5 U.S.C. § 706(1), for the Archivist's purported failure to act. *See generally* Am. Compl. The common-law writs, codified in the All Writs Act, 28 U.S.C. § 1651, are reserved for "extraordinary causes." *Cheney*, 542 U.S. at 380. It is "a residual source of authority to issue writs that are not otherwise covered by statute." *Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985). Accordingly, this relief is only available if a claimant has "no other adequate means to attain the relief" sought. *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976); *In re Recticel Foam Corp.*, 859 F.2d 1000, 1005 (1st Cir. 1988). Where a statute "specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Penn. Bureau of Corr.*, 474 U.S. at 43. Here, because plaintiffs have in the APA an alternative statute under which they may challenge the Archivist's alleged actions or inaction, their

claim for relief under the All Writs Act must be dismissed.[10] *See Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999) (where other avenues for administrative or judicial review existed, the All Writs Act is unavailable).

Second, plaintiffs fail to allege "a clear and indisputable right to the relief sought" or show that "the responding party has a clear duty to do the specific act requested." *Kerr*, 426 U.S. at 403. Here, where Supreme Court precedent has upheld Congressional deadlines for the States' ratification of a proposed constitutional amendment, *Dillon*, 256 U.S. at 376, and has at a minimum strongly suggested that expiration of Congress's ratification deadline for the ERA effectively ended that amendment process, *Nat'l Org. for Women*, 459 U.S. at 809, there is no "clear and indisputable right" for plaintiffs to obtain a writ of mandamus for the Archivist to certify the amendment as ratified notwithstanding the expiration of the ratification deadline. *NetCoalition v. SEC.*, 715 F.3d 342, 354 (D.C. Cir. 2013) (no "clear and indisputable" right to relief where controlling law holds otherwise); *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002) (Where "no precedent of this court or of the Supreme Court even suggest[ed]" that plaintiffs were entitled to mandamus relief, no "clear and indisputable" right to relief found).

Third, plaintiffs fail to establish a need for this Court to exercise its discretion to grant mandamus relief. *Cheney*, 542 U.S. at 381 ("[T]he issuing court, in the exercise of its discretion,

---

[10] What is more, until the federal mandamus statute was enacted, 28 U.S.C. § 1361, "mandamus was available against federal officials, but only in the District Court for the District of Columbia" under the predecessor of Section 1651. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005) (citing *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 619–22 (1838)); *see also Leonhard v. Mitchell*, 473 F.2d 709, 713 n.3 (2d Cir. 1973) ("Persons seeking judicial review of federal administrative action who could not assert an independent basis for jurisdiction–such as 28 U.S.C. § 1331 (general federal question jurisdiction)–were required to travel to the Nation's capitol to seek relief.").The All Writs Act, therefore, may not provide a mechanism for plaintiffs to seek mandamus against the Archivist in this district at all.

must be satisfied that the writ is appropriate under the circumstances."); *Kellogg Brown & Root*, 796 F.3d at 150. Given the substantial separations-of-powers concerns with the judiciary intervening in the process to propose, ratify, and certify a constitutional amendment, *see supra* pt. II, Plaintiffs fail to articulate why this Court should exercise its discretion to issue any such writ here.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint.

Dated: April 14, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANDREW E. LELLING
United States Attorney

RAYFORD A. FARQUHAR
(B.B.O. # 560350)
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Phone: (617) 748-3100
Fax: (617) 748-3971
E-mail: rayford.farquhar@usdoj.gov

DAVID M. MORRELL
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ERIC R. WOMACK
Assistant Branch Director
Civil Division

/s/ *Liam C. Holland*
LIAM C. HOLLAND B.B.O. #704799
VINITA B. ANDRAPALLIYAL
(*Admitted in New York*)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0845
Fax: (202) 616-8470
E-mail: vinita.b.andrapalliyal@usdoj.gov

*Attorneys for Defendant*