**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

EQUAL MEANS EQUAL,                    |
THE YELLOW ROSES,                     |
KATHERINE WEITBRECHT,                 |
                        Plaintiffs,    |
                                       |
                                       |
v.                                     |
                                       |          Civil Action No. 20-cv-10015
                                       |
DAVID S. FERRIERO, in his official     |
Capacity as Archivist of the United States, |
                        Defendant.     |
_____|

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................. 1

**FACTS AND PRIOR PROCEEDINGS**............................................................... 2

**DEFENDANT'S MOTION** ................................................................................... 5

**LEGAL STANDARDS** .......................................................................................... 6

**ARGUMENT** ........................................................................................................... 7

I.      THE ERA IS PART OF THE CONSTITUTION BECAUSE
THREE FOURTHS OF THE STATES HAVE RATIFIED IT ...................................7

II.     THE ARCHIVIST'S DUTY TO PUBLISH THE ERA UNDER ARTICLE V
AND 1 U.S.C. § 106B IS MANDATORY, MINISTERIAL, AND
NONDISCRETIONARY ..............................................................................7

III.    THIS CONTROVERSY IS JUSTICIABLE ............................................... 18

IV.    STATES MAY NOT RESCIND PRIOR RATIFICATIONS ..................... 19

V.     PLAINTIFFS HAVE STANDING ............................................................... 23

       **A.  Injury in Fact**.............................................................................. 25

              1.   Injury To All Persons Protected By The ERA.............................. 25

              2.   Injury To Organizational Plaintiffs ............................................. 31

                    **a.  Equal Means Equal – Organizational Standing**........................... 33

                          *i.  Diversion of resources* .................................................. 33

                          *ii.  Frustration of mission*............................................................ 34

                    **b.  Equal Means Equal – Associational Standing**.............................. 36

                          *i.  EME's members have standing in their own right*................ 37

                  **c.  The Yellow Roses – Organizational Standing** .............................. 37

                  **d.  Katherine Weitbrecht** ....................................................... 38

       **B.  Traceability**................................................................................ 40

       **C.  Redressability** ............................................................................ 42

VI.    THE TENTH AMENDMENT PROHIBITS CONGRESS FROM
RESTRAINING THE STATES' POWERS UNDER ARTICLE V ........................... 42

VII.   THIS COURT HAS AUTHORITY UNDER THE ALL WRITS ACT AND THE
MANDAMUS STATUTE TO GRANT THE RELIEF REQUESTED ...................... 43

**CONCLUSION** .......................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*African Community's Together v. Trump*,

    No. 19-10432-TSH, LEXIS 184688 (D. Mass. 2019) .....................................32, 34, 37

*Allen v. Wright*,

    468 U.S. 737 (1984)....................................................................................... 25

*American Canoe Association* v. *City of Louisa Water and Sewer Commission*,

    389 F.3d 536 (6th Cir. 2004) ....................................................................... 34

*American Civ. Liberties Union of N.M. v. Santillanes*,

    546 F.3d 1313 (10th Cir. 2008) ................................................................... 26

*Amrhein v. eClinical Works, LLC*,

    954 F.3d 328 (1st Cir. 2020).......................................................................... 25

*Am. Waterways Operators v. U.S. Coast Guard*,

    --- F. Supp. 3d ---, --- 2020 WL 360493, (D. Mass. Jan. 22, 2020)............................. 41

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009)......................................................................................6

*Bell Atlantic Corp. v. Twombly*,

    550 U.S. 544 (2007)......................................................................................6

*Blum v. Holder*,

    744 F.3d 790 (1st Cir. 2014).........................................................................23

*Boston's Children First v. Boston Sch. Comm.*,

    183 F. Supp. 2d 382 (D. Mass. 2002) ...........................................................34

*Brzonkala v. Virginia Polytechnic Institute and State University*,

    132 F.3d 949 (4th Cir. 1997) ........................................................................28

*Carmen v. Idaho*, Pet. of Adm'r of Gen. Servs. for Writ of Cert.,

    No. 81-1313 (U.S. Jan. 22, 1982) .............................................................. 10

*Cheney v. U.S. Dist.Ct.,*

    542 U.S. 367 (2004) ................................................................................. 44

*City of Boerne v. Flores,*

    521 U.S. 507 (1997) ............................................................................. 8, 18

*City of Los Angeles v. Lyons,*

    461 U.S. 95 (1983) .................................................................................. 29

*Clapper v. Amnesty Int'l USA*

    568 U.S. 398 (2013) ................................................................................. 29

*Coleman v. Miller,*

    307 U.S. 433 (1939) ............................................................................passim

*Coll. Dental Surgeons P.R. v. Conn. Gen. Life Ins. Co.,*

    585 F.3d 33 (1st Cir. 2009) ..................................................................... 42

*Craig v. Boren,*

    429 U.S. 190 (1976) ............................................................................1, 30

*Dillon v. Gloss,*

    256 U.S. 368 (1921) ..........................................................................passim

*District of Columbia v. Heller,*

    554 U.S. 570 (2008) ................................................................................. 13

*Draper v. Healey,*

    827 F.3d 1 (1st Cir. 2016) ....................................................................... 36

*Dyer v. Blair*,

     390 F.Supp. 1291 (N.D. Ill. 1975) ................................................................ 18

*Fair Housing of Mann v. Combs*,

     285 F.3d 899 (9th Cir. 2002) .................................................................... 33

*Feeley v. Sampson*,

     570 F.2d 364 (1st Cir. 1978)...................................................................... 30

*Frontiero v. Richardson*,

     411 U.S. 677 (1973)......................................................................... 28, 30

*Garcia-Catalan v. U.S.*,

     734 F.3d 100 (1st Cir. 2013)........................................................................6

*Government of the Virgin Islands v. Eleventh Legislature of Virgin Islands*,

     536 F.3d 34 (3d Cir. 1976)........................................................................ 18

*Guckenberger et al., v. Boston Univ.*,

     957 F.Supp. 306 (D. Mass. 1997) ..........................................................31, 35

*Havens Realty Cop. v. Coleman*,

     455 U.S. 363 (1982)................................................................... passim

*Hollingsworth v. Virginia*,

     3 U.S. (3 Dall.) 378 (1798) ...................................................................11, 18

*Hooker v. Weathers*,

     990 F.2d 913 (6th Cir. 1993) .................................................................33, 37

*Hunt v. Washington, State Apple Advert. Comm'n*,

     432 U.S. 333 (1977)...........................................................................35–36

*Idaho v. Freeman*,

    529 F. Supp. 1107 (D. Idaho 1981) ........................................................passim

*Idaho v. Freeman*,

    625 F.2d 886 (9th Cir. 1980) ..............................................................passim

*Idaho Farm Bureau Fed'n v. Babbitt*,

    58 F.3d 1392 (9th Cir. 1995) ................................................................... 31

*In re Globe Newspaper Co.*,

    920 F.2d 88 (1st Cir. 1990) ...............................................................19, 44

*In re Justices of Superior Court Dep't of Mass. Trial Ct.*,

    218 F.3d 11 (1st Cir. 2000) ...................................................................... 44

*In re Grand Jury Proceedings of United States*,

    626 F.2d 1051 (1st. Cir. 1980) ................................................................. 44

*INS v. Chadha*,

    462 U.S. 919 (1983) ......................................................................15, 22, 44

*Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers v. Brock*,

    477 U.S. 274 (1986) ................................................................................. 35

*Jacobsen v. Massachusetts*,

    197 U.S. 11 (1905) .................................................................................. 13

*Jones v. DeSantis*,

    --- U.S.Dist.Ct. N.D.Fla. Case No. 4:19cv300-RH/MJF (N.D. Fla. 2020).............. 33, 34

*Katz v. Pershing, LLC*,

    672 F.3d 64 (1st Cir. 2012) ...................................................................5, 40

*Kerin v. Titeflex Corp.*,

    770 F.3d 978 (1st Cir. 2014) .............................................................................5, 28–29

*Laird v. Tatum*,

    408 U.S. 1 (1972) ................................................................................................ 26

*Leser v. Garnett*,

    258 U.S. 130 (1922) ............................................................................................8

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992) .................................................................................6, 23–24

*Magee v. U.S.,*

    93 F. Supp. 2d 161 (D.R.I. 2000) ...................................................................... 21

*Marbury v. Madison,*

    5 U.S. (1 Cranch) 137 (1803) ...........................................................................9

*Massachusetts v. United States HHS*,

    923 F.3d 209 (1st Cir 2019) .............................................................................. 32

*Mississippi v. Hogan*,

    458 U.S. 718 (1982) ......................................................................................... 30

*Nat'l Council of La Raza v. Cegavske,*

    800 F.3d 1032 (9th Cir. 2015) .......................................................................... 33

*Nat'l League of Cities v. Usery,*

    426 U.S. 833 (1976) ......................................................................................... 42

*Nat'l Org. for Women, Inc. v. Idaho*,

    459 U.S. 809 (1982) ....................................................................................9, 19

*Nat'l Org. for Women, Inc. v. Idaho*, Pet. for Writ of Cert.,

    No. 81-1283 (U.S. Jan. 8, 1982) ................................................... 10

*Nat'l Org. for Women, Inc. v. Idaho*, Mem. For Adm'r of Gen. Servs.,

    Nos. 81-1282 et al. (U.S. July 9, 1982)........................................ 10

*Nat'l Prohibition Cases*,

    253 U.S. 350 (1920)................................................................. 18

*Nev. Dep't of Human Res. v. Hibbs*,

    538 U.S. 721 (2003)................................................................. 29

*N.H. Right to Life Political Action Comm. v. Gardner*,

    99 F.3d 8 (1st Cir. 1996)......................................................... 39

*Northland Family Planning Clinic, Inc. v. Cox*,

    487 F.3d 323 (6th Cir. 2007) .................................................. 31

*Nulankeyutmonen Nkihtaqmikon v. Impson*,

    503 F.3d 18 (1st Cir. 2007).................................................24, 42

*Osediacz v. City of Cranston*,

    414 F.3d 136 (1st Cir. 2005)................................................... 24

*Parent/Professional Advocacy League v. City of Springfield*,

    934 F.3d 13 (1st Cir. 2019)..................................................... 35

*Pharm. Care Mgmt. Ass'n v. Rowe*,

    429 F.3d 294 (1st Cir. 2005)................................................... 36

*Playboy Enterprises v. Publi. Service Comm'n of Puerto Rico*,

    906 F.2d 25 (1st Cir. 1990)..................................................... 36

vii

*Plyer v. Doe*,

      457 U.S. 202 (1982) ................................................................................... 30

*Pollard v. Law Office of Mandy L. Spaulding*,

      756 F.3d 98 (1st Cir. 2014) ....................................................................... 24

*Professional Real Estate Investors, Inc., v. Columbia Pictures Ind., Inc.*

      508 U.S. 49 (1993) ..................................................................................... 39

*Reddy v. Foster*,

      845 F.3d 493 (1st Cir. 2017) ....................................................................... 23

*R.I. Comm'n for Human Rights v. Graul*,

      120 F. Supp. 3d 110 (D.R.I. 2015) ................................................... 33–34, 37

*Sagebrush Rebellion, Inc. v. Watt*,

      713 F.2d 525 (9th Cir. 1983), *aff'd*, 790 F.2d 760 (9th Cir. 1986) .............. 31

*Sampson v. United States,*

      724 F.3d 150 (1st Cir. 2013) ....................................................................... 44

*Sandusky County Democratic Party v. Blackwell*,

      387 F.3d 565 (6th Cir. 2004) ...................................................................... 26

*Sexual Minorities Uganda v. Scott Lively*,

      960 F. Supp. 2d 304 (D. Mass. 2013) ......................................................... 35

*Sierra Club v. Marsh*,

      872 F.2d 497 (1st Cir.1985) ........................................................................ 27

*Sistersong Women of Color Reprod. Justice Collective v. Kemp*,

      410 F. Supp. 3d 1327 (N.D.Ga. 2019) .................................................. 29, 32

*Smith v. Pac. Props. & Dev. Corp.*,

    358 F.3d 1097 (9th Cir. 2004) ....................................................... 33

*Spokeo v. Robins*,

    136 S. Ct. 1540 (2015)................................................................... 24

*Susan B. Anthony List v. Driehaus*,

    573 U.S. 149 (2014)...............................................................23–24

*Strahan v. Coxe*,

    127 F.3d 155 (1st Cir. 1997).......................................................... 43

*Trades v. Spellman*,

    684 F.2d 627 (9th Cir. 1982), *cert denied,* 461 U.S. 913 (1983)................................. 31

*Tinsley v. Methodist Hosp. of Indiana*,

    70 F.3d 1275 (7th Cir. 1995) ........................................................ 13

*Trenkler v. U.S.,*

    536 F.3d 85 (1st Cir. 2008).......................................................... 44

*Trombetta v. Florida*,

    353 F. Supp. 575 (M.D. Fla. 1973) ............................................... 18

*United Mine Workers v. Illinois State Bar Ass'n*,

    389 U.S. 217 (1967)..................................................................... 39

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,

    647 F.3d 377 (1st Cir. 2011).........................................................6

*United States ex. rel. Widenmann v. Colby*,

    265 F. Supp. 998 (D.C. Cir. 1920)..................................................8

*United States v. Green*,

    407 F.3d 434 (1st Cir. 2005) ........................................................................ 43

*United States v. Horn*,

    29 F.3d 754 (1st Cir. 1994) ...................................................................... 43–44

*United States v. New York Telephone Co.*,

    434 U.S. 159 (1977) ................................................................................. 43, 45

*United States v. Sprague*,

    282 U.S. 716 (1931) .................................................................................. passim

*United States v. Virginia,*

    518 U.S. 515 (1996) ........................................................................................ 30

*Virginia v. American Booksellers Ass'n, Inc.*,

    484 U.S. 383 (1988) ........................................................................................ 32

*Virginia et al., v. Ferriero*,

    1:20-cv-242-RC (D.D.C. 2020) ............................................................... passim

*Warth v. Seldin*,

    422 U.S. 490 (1975) ................................................................................. passim

*White v. Hart*,

    80 U.S. 646 (1871) ......................................................................................... 23

*Zabala Clemente v. United States*,

    567 F.2d 1140 (1st Cir. 1977) ................................................................. 39–40

**United States Constitution**

U.S. CONST. art. I ................................................................................................. 13

U.S. CONST. art. III ........................................................................................ passim

U.S. CONST. art. V ................................................................................................passim

U.S. CONST. amend. I ...........................................................................................passim

U.S. CONST. amend. XVIII ...................................................................................passim

U.S. CONST. amend. XIX ............................................................................... 14, 15, 19

U.S. CONST. amend. XX ...................................................................................... 15

U.S. CONST. amend. XXI ................................................................................ 15, 21

U.S. CONST. amend. XXII .................................................................................... 15

U.S. CONST. amend. XXIV .................................................................................. 15

U.S. CONST. amend. XXV ................................................................................... 15

U.S. CONST. amend. XXVI .................................................................................. 15

U.S. CONST. amend. XXVII ...........................................................................passim

U.S. CONST. amend. XXVIII ..........................................................................passim

**Statutes**

1 U.S.C. § 106b ....................................................................................................passim

28 U.S.C. § 1361 .....................................................................................................43

28 U.S.C. § 1651 .....................................................................................................43

Mass.G.L.c.265, §39 ................................................................................................ 5

**Rules**

Federal Rule of Civil Procedure 12(b)(1) .................................................................. 5

Federal Rule of Civil Procedure 12(b)(6) ...............................................................5–6

**Other Authorities**

15 Stat. 706 (1868) ..................................................................................................20

86 Stat. 1523 (1972) ................................................................................................. 6

92 Stat. 3795 (1978).........................................................................................15

10 Cong. Rec. 6628 (1955) ............................................................................. 15

40 Cong., 2d Sess. 4266 (1868) ..................................................................... 19

75 Cong. Rec. 3856 (1932) ............................................................................. 13

118 Cong. Rec. 9419 (1972) ........................................................................... 32

Amar, A.R., *Philadelphia Revisited: Amending the Constitution Outside Article V*,

    55 U. CHI. L. REV. 1043 (1988)................................................................ 18

Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27ᵗʰ Amendment*,

    61 FORDHAM L. REV. 497 (1992)................................................................ 20

Clarke, J., *Fronteirs of Sex Discrimination Law*,

    115 MICH. L. REV. 809 (2017)................................................................... 28

Congressional Pay Amendment, *Opinions of the Office of Legal Counsel of the Dep't of Justice*,

    16 Op. O.L.C. 85 (May 13, 1992)............................................................... 11

Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*,

    97 HARV. L. REV. 386 (1983)  .............................................................13, 20

Farrand M., THE RECORDS OF THE FEDERAL CONVENTION OF 1787,

    Yale University Press 1911 ....................................................................... 12

Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy or State Ratifications of the Equal Rights Amendment*,

    49 IND. L.J. 147 (1973)......................................................................... 19–20

THE FEDERALIST NOS. 21, 43 (Alexander Hamilton), NO. 39 (James Madison) ..................... 14

Ginsburg, R.B., *Ratification of the Equal Rights Amendment: A Question of Time*,

    57 TEX. L. REV. 919 (1979)...................................................................... 18

H.B. 1401, 190th Leg. (Ma. 2019) .................................................................8

H. Con. Res. 120–102nd Congress (1991-1992) .................................. 11

H.R. conf. rep. no. 103–711 (1994) ..................................................... 28

Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*,

    99 AM. J. PUB. HEALTH (12) 2275 (2009) ..................................... 27

*Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights*

*of the H. Comm. On the Judiciary,*

    95th Cong. 57 (1978) ...........................................................13, 20

Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*,

    2017 UTAH L. REV. 463 (2017) .................................................... 27

Jackson, V., *Constitutional Dialogue and Human Dignity: States and Transnational Constitutional Discourse*,

    65 MONT. L. REV. 15 (2004) ....................................................... 27

JAMESON, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS

    (4th ed., Riverside Press 1887) ................................................... 20

Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*,

    66 U. CHI. L. REV. 437 (1999) .................................................... 12

Kreiger, N., *Discrimination and Health Inequities*,

    44 INT'L J. HEALTH SERV. (4) 643 (2014) ..................................... 27

Kreiger, N., et al., *Breast Cancer Estrogen Receptor Status According to Biological Generation: US Black and White Women Born 1015-1979*,

    187 AM J. EPIDEMIOL. (5) 960 (2018) ........................................ 27

Kreiger N. *Methods for the Scientific Study of Discrimination and Health: From Societal Injustice to Embodied Inequality-an Ecosocial Approach,*

    102 AM J. PUB. HEALTH (5) 936 (2012) ...................................................................... 27

Letter from David S. Ferriero, Archivist of the United States, to Hon. Carolyn Maloney (October 25, 2012),

    (htttps://www.congress.gov/116/meeting/house/109330/documents/ HHRG-116-JU10-20190430-SD007.pdf).............................................................passim

Letter from State Attorneys General to U.S. Congress (February 22, 2020),

    https://portal.ct.gov/-/media/AG/Press_Releases/2019/2112020 Multistate-LT-to Congress-re-ERA.pdf?la=en ......................................................................passim

Meyer, I.H. *Prejudice, Social Stress, and Mental Health in Lesbian, Gay, and Bisexual Populations: Conceptual Issues and Research Evidence,*

    129 PSYCHOL. BULL. (5) 674 (2003).......................................................................... 27

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS,

    https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions -03-24-2020.pdf ..................................................................................... 16, 21

*National Organization for Women, An Intersectional Approach to the ERA,*

    https://now.org/wp-content/uploads/2017/04/The-ERA_-An-Intersectional-Approach-8.pdf ...........................................................................................1

NEALE, T., CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES (2018) ......................................... 30

Paulsen, M.S., *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment,*

    103 YALE L.J. 677 (1993)............................................................................. 19

Press Statement, NARA, Statement on the Equal Rights Amendment (January 8, 2020),

    https://www.archives.gov/press/press-releases-4 ...................................................passim

Ratification of the Equal Rights Amendment, *Opinions of the Office of Legal Counsel of the Dep't of Justice,*

    44 Op. O.L.C. __ (released January 8, 2020) .........................................................passim

S. Con. Res. 120-102nd Congress (1991-1992) ...................................................................... 11

S.J. Res. 2, 79th Leg. (Nev. 2017) ........................................................................................ 16

S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018)............................................. 16

SENATE JUDICIARY COMMITTEE,

    *The Response to Rape: Detours on the Road to Equal Justice* (May 1993)................. 28

*Suffolk University/USA Poll*, October 2018,

    https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-
    suffolk/suprc/polls/national/2018/10_25_2018_marginals_pdftxt.pdf?la=en&
    hash=7303DAC9B701D7E65632FEDDF60B260C8 983B994................................... 10

SUTHERLAND STATUTORY CONSTRUCTION, § 33:7 ................................................................. 32

U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women:*
*Report of the Secretary General,*

    A/61/122/Add.1 (6 July, 2006) .................................................................................... 27

U.N. Women, *Investing in Gender Equality and Women's Empowerment* (Oct. 31, 2010),

    https://www.endvawnow. org/en/articles/314-investing-in-gender-equality-
    and-womens-empowerment-.html .............................................................................. 27

## INTRODUCTION

After enduring second-class legal status for centuries, women finally achieved their rightful place as fully equal persons under the United States Constitution when Virginia became the last necessary State to ratify the Equal Rights Amendment on January 27, 2020.

The American people have declared their will that our nation's foundational legal document be changed, yet Defendant Archivist of the United States has refused to publish the ERA as a duly ratified amendment, declaring it invalid. The same Archivist promised the American public in 2012 that he would publish the ERA once three-fourths of the States ratified it.

Defendant has caused cognizable, indeed catastrophic, legal injury to Plaintiffs and all who care about equality. His actions have deprived the people of their bedrock right to amend *their* constitution, and have undermined the integrity of American Democracy.

Plaintiffs seek relief from this Court, including a declaration that the ERA is valid, and all persons[1] are now equal under the law.

---

[1] The Equal Rights Amendment ("ERA") protects males as well as females, though males "have not been the victims of the kind of historic pervasive discrimination that has disadvantaged other groups." *Craig v. Boren*, 429 U.S. 190, 214 (1976) (Stevens, J., concurring). It also protects LGBTQ+ persons. *National Organization for Women, An Intersectional Approach to the ERA* (available at https://now.org/wp-content/uploads/ 2017/04/The-ERA_-An-Intersectional-Approach-8. pdf). Although the Supreme Court is currently considering whether the word "sex" in Title VII protects LGBTQ+ persons, the ERA provides much broader protections, and was written decades before Title VII, thus will continue to protect LGBTQ+ persons irrespective of the Court's ruling. *See Bostock v. Clayton County*, 17-13801 (docketed June 1, 2018).

## FACTS AND PRIOR PROCEEDINGS

The Equal Rights Amendment ("ERA") was proposed by Congress in 1972 and sent to the States for ratification. It provides, "Equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex." (Am.Com.4).

A proposed amendment become law when three-fourths of the States ratify it. The Archivist of the United States ("Archivist") is obligated to publish a constitutional amendment once three-fourths of the States have ratified it. (Am.Com.7–8).

When Congress proposed the ERA, it included a seven-year ratification deadline in an introductory preamble ("challenged deadline"). As the challenged deadline neared and fewer than three-fourths of the States had ratified, it was extended to 1982. No States ratified between 1979 and 1982. (Am.Com.4–5).

In 2012, Defendant issued an opinion letter stating that he would record States' ERA ratification votes if they occurred after expiration of the challenged deadline, and publish the ERA if three-fourths of the States voted to ratify it. (Ex. A).[2] In the wake of his statement and other events, including adoption of the 27th Amendment in 1992, some *203 years* after its proposal by Congress, ERA advocates persisted in their work toward ratification of the ERA in ungratified states. They succeeded in Nevada in 2017, Illinois in 2018, and Virginia in 2020. (Am.Com.4–5, 17).

---

[2] Letter from David S. Ferriero*,* Archivist of the United States, to Hon. Carolyn Maloney (October 25, 2012) (available at https://www.congress.gov/116/meeting/house/109330/documents/HHRG-116-JU10-20190430-SD007.pdf) (Ex. A). Exhibit A exists at an official government website, but is part of a larger document. Thus, it is attached here as a two-page exhibit for the Court's convenience.

When Virginia became the last necessary State to ratify the ERA on January 27, 2020, Defendant refused to publish it, claiming it was not a constitutionally valid amendment because the challenged deadline expired before three-fourths of the States ratified it. (Am.Com.7–8).[3]

On January 7, 2020, this action was filed by Plaintiffs Equal Means Equal, The Yellow Roses, and Katherine Weitbrecht. (Doc.1).

On January 27, 2020 Virginia ratified the ERA. (Am.Com.1).

On February 29, 2020, Plaintiffs filed an Amended Complaint. (Doc.5).

On March 24, 2020, Defendant recorded Virginia's ratification of the ERA. (D.Mem.17).

On April 14, 2020, Defendant filed a Motion to Dismiss. (Doc.11).

**The Plaintiffs**

Equal Means Equal

Equal Means Equal ("EME") is a national 501(c)(4) non-profit organization whose sole mission and purpose is to advocate for the ERA and eradicate sex inequality. In 2016, EME released an award-winning documentary entitled *Equal Means Equal*, which examined sex inequality, and concluded that ratification of the ERA would mitigate the problem in American society. EME has been instrumental in raising awareness about the ERA and helping to ensure its ratification in Nevada, Illinois, and

---

[3] Defendant declared his intention not to publish the ERA on January 8, 2020, (backdated to January 6, 2020) before Virginia ratified on January 27, 2020. In defense of his actions, Defendant stated that he "defers to DOJ on this issue," and cited a memorandum opinion from the Office of Legal Counsel ("OLC") at the Department of Justice, which opined that the ERA is not valid because the challenged deadline expired. Press Statement, NARA, Statement on the Equal Rights Amendment (January 8, 2020) (available at https://www.archives.gov/press/press-releases-4), (citing Ratification of the Equal Rights Amendment, *Opinions of the Office of Legal Counsel of the Dep't of Justice*, 44 Op. O.L.C. __ (released January 8, 2020)).

Virginia. EME's president, Kamala Lopez, testified in front of the Illinois legislature in support of their ERA ratification bill. EME has engaged in direct political action and educational campaigns in many states. EME has over twenty-thousand active supporters and members. EME engages with its members and supporters who donate funds and volunteer their services, which enable EME to carry out its mission. (Am.Com.16–17).

Defendant's refusal to publish the ERA and his dissemination of misinformation about its validity have interfered with EME's interest in the ERA's continued vitality. EME has observed reluctance among government officials and others to act in accordance with the ERA, and an unwillingness of people to advocate for its enforcement. As a result, EME's mission has been frustrated, and it has had to divert resources toward training, education and advocacy to identify and counteract Defendant's actions. (Am.Com.12, 17-18).

The Yellow Roses

The Yellow Roses ("Roses") is a volunteer student organization, founded in 2016 by a group of female students who were surprised and disappointed to learn in middle school that women were not yet equal under the U.S. Constitution. The organization's sole mission is to advocate for and raise public awareness about the importance of sex equality, and the need for ratification of the ERA. (Am.Com.19).

The Roses have engaged in numerous advocacy and educational activities, such as circulating a Petition for ratification of the ERA; being interviewed by local and national publications; meeting with government officials to advocate for the ERA; collaborating with activists; and teaching young people how to be activists for the ERA. Defendant's

actions have injured the Roses' interest in the ERA's continued vitality, and have caused a diversion of their resources, and frustration of their mission. (Am.Com.20).

Katherine Weitbrecht

Katherine Weitbrecht suffered a violent attack because she is female. A man strangled her because she was wearing a rape whistle on the campus of Stonehill College. The man had a history of making derogatory comments about women. Ms. Weitbrecht reported the strangulation to law enforcement, but no hate-crime charge could be filed because, as a female, she is excluded from protection under the Massachusetts hate crime statute. Mass.G.L.c.265, §39. Had she suffered the exact same crime based on a different protected class category, such as ethnicity, a hate-crime charge could have been filed by her or by law enforcement. The offender was charged with a single misdemeanor count of assault and battery and his case was continued without a finding; he suffered no serious consequences. (Am.Com.21).

As a female, Ms. Weitbrecht faces a disproportionately high risk of sex-based harm, yet she is now reluctant to report it because she fears it will lead to inadequate charges and unjust treatment by law enforcement and the legal system. Defendant's actions interfere with Ms. Weitbrecht's interest in the ERA's continued vitality, and unlawfully perpetuate the societal and social conditions that produce her suffering. *Id*.

**DEFENDANT'S MOTION**

Defendant has filed a motion to dismiss Plaintiffs' complaint under Rule 12(b)(1) (lack of jurisdiction) and 12(b)(6) (failure to state a claim).

## LEGAL STANDARDS

In deciding a motion to dismiss under Rule 12(b)(1), the court must "accept as true all well-pleaded fact[s] . . . and indulge all reasonable inferences in the plaintiff[s'] favor." *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, and it is presumed that "general allegations embrace those specific facts that are necessary to support the claim." *Warth v. Seldin,* 422 U.S. 490, 508 (1975). At the motion to dismiss stage, plaintiffs shoulder a lighter burden to support factual allegations of injury in fact and causation. As such, plaintiffs need not set forth evidence that would be required at the summary judgment phase. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

To survive a motion to dismiss under Rule 12(b)(6) the factual allegations need only be plausible, and sufficient to support a reasonable inference that the defendant is liable for the misconduct alleged. *Garcia-Catalan v. U.S.*, 734 F.3d 100, 103 (1st Cir. 2013). The court must "accept as true all well-pleaded facts, and analyze those facts in the light most hospitable to the plaintiff's theory, and draw all reasonable inferences for the plaintiff." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). A claim is plausible on its face when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, (2007). There need only be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

**ARGUMENT**

I.      THE ERA IS PART OF THE CONSTITUTION BECAUSE THREE-FOURTHS
        OF THE STATES HAVE RATIFIED IT

In 1972, the ERA was proposed by Congress and sent to the States for ratification.

86 Stat. 1523 (1972). Under Article V of the U.S. Constitution ("Article V"), when a

proposed amendment is "ratified by the legislatures of three fourths of the several states,"

it "shall be valid to all intents and purposes, as part of this Constitution…." U.S. CONST.

art. V; *Dillon v. Gloss*, 256 U.S. 368, 376 (1921) (an amendment automatically becomes

law when the last of three-fourths of the States ratifies it).

On January 27, 2020, Virginia became the 38th and last necessary State to ratify

the ERA. Therefore, the ERA is now the 28th Amendment to the U.S. Constitution.

II.     THE ARCHIVIST'S DUTY TO PUBLISH THE ERA IS MANDATORY,
        MINISTERIAL, AND NONDISCRETIONARY

In furtherance of Article V's express purpose of ensuring that amendments

become valid the moment the last necessary state ratifies, 1 U.S.C. § 106b requires the

Archivist to publish amendments under precisely those conditions:

> Whenever official notice is received at the National Archives and Records
> Administration that any amendment proposed to the Constitution of the
> United States has been adopted, according to the provisions of the
> Constitution, the Archivist of the United States shall forthwith cause the
> amendment to be published, with his certificate, specifying the States by
> which the same may have been adopted, and that the same has become
> valid, to all intents and purposes, as part of the Constitution of the United
> States.

Despite the plain language of Article V and § 106b, Defendant refuses to publish the ERA claiming it is not constitutionally valid. His actions have created nationwide confusion as to whether the ERA has, in fact, been ratified.[4] (Am.Com.15–22).

Defendant asserts that he need not comply with § 106b because he has authority to determine an amendment's constitutionality as a precondition to its publication. Yet § 106b only authorizes him to "specify" and certify which states have ratified. When three-fourths have done so, he must "forthwith cause the amendment to be published." Under the statute's plain language, Defendant must publish the ERA.[5]

---

[4] On February 11, 2020, a month after Defendant announced that he would not publish the ERA, twenty Attorneys General released a letter expressing confusion as to the ERA's validity. Letter from State Attorneys General to U.S. Congress (February 22, 2020) (available at https://portal.ct.gov/-/media/AG/Press_Releases/2019/2112020 Multistate-LT-to-Congress-re-ERA.pdf?la=en) ("Attorneys General Letter"). Their confusion was obviously caused by Defendant's actions as they declared confidence that the challenged deadline was not valid. Massachusetts Senator William Brownsberger confirmed the same in an email to undersigned counsel, "We in Massachusetts feel that the Equal Rights Amendment is a given and we should follow it. However, we do not know if it has actually been ratified." In addition, a specific proposal to repair the Massachusetts hate crime statute by adding sex as a protected class category is currently in a study, and has not moved forward despite the ERA's ratification by thirty-eight states, indicating that lawmakers feel no compulsion to bring that statute into compliance with the ERA. H.B. 1401 (Ma. 2019). These facts are part of the public record, but are not necessary to defeat a motion to dismiss. *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

[5] While denying any obligation to publish the ERA despite a clear duty to do so, Defendant appears to simultaneously maintain that he *does* have a compulsory duty to publish individual States' ratification votes, despite the absence of any duty to do so. The only duty set forth in § 106b is the duty to publish amendments and certify which states have ratified. Yet Defendant posits that he is somehow compelled to record States' ratification votes, but not publish amendments.

Defendant's duty to publish an amendment is ministerial; it has no effect on an amendment's validity. *Dillon,* 256 U.S. at 376 ("That the [Archivist][6] did not proclaim ratification until January 29, 1919, is not material, for the date of its consummation, and not that on which it is proclaimed, controls."); *see Leser v. Garnett*, 258 U.S. 130, 137 (1922) (Archivist merely "authenticates" a state's documents). The Archivist has no discretion not to publish. *U.S. ex. Rel. Widenmann v. Colby*, 265 F. Supp. 998, 999 (D.C. Cir. 1920) ("No discretion is lodged in [the Archivist].").

Even if Congress wanted to give the Archivist authority to determine an amendment's constitutionality, it could not do so as the power to adjudicate constitutionality rests exclusively with the courts. *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78 (1803). Moreover, Congress clearly did not intend by § 106b to give the Archivist such authority. If it had, it would have stated that the Archivist must determine whether an amendment "*has been adopted according to the provisions of the Constitution.*" Instead, Congress inserted a comma after the word "adopted," making clear that the purpose of that phrase is to emphasize that the Archivist's duties, such as acting "forthwith," are constitutionally mandatory. If Congress wanted to give the Archivist authority to "certify" the constitutionality of an amendment, § 106b would state that he must not only "specify" in his "certificate" which of the States have ratified, but also "specify" or "certify" that a proposed amendment is constitutional. Nothing in § 106b or Supreme Court precedent

---

[6] In *Dillon v. Gloss,* 256 U.S. 368 (1921), the Court refers to the Secretary of State rather than the Archivist because the Secretary of State was responsible for publishing amendments before the Archivist assumed the task.

creates such a duty or authority. Unsurprisingly, no Archivist in the past has issued such a "certificate."[7]

By declining to publish the ERA, Defendant acted unlawfully. He should have published it and allowed objectors to file suit if they chose to do so.

Even if Defendant has authority to determine an amendment's constitutionality, his claim that the ERA is invalid because of the challenged deadline fails.[8]

Article V nowhere allows Congress to impose ratification deadlines on the States. As noted above, Article V provides that amendments become law when the last necessary

---

[7] When the 27th Amendment was published by the Archivist in 1992, he did not "certify" its constitutionality, despite serious doubts about its validity in light of the 203-year gap between congressional proposal and state ratification. He simply published it. In his publication document, he nowhere states that he, or anyone else, determined the amendment's constitutionality — or needed to. To the contrary, he merely quoted the language of Article V and § 106b, and *specified* which states ratified.

[8] Defendant's reliance on *Nat'l Org. for Women v. Idaho*, 459 U.S. 809 (1982), for the proposition that the Supreme Court has already ruled that the ERA is no longer valid because of the challenged deadline, is incorrect. That case was before the Court on a petition for certiorari from a district court decision where a single judge ruled that Congress had no authority to extend the ERA deadline. *Idaho v. Freeman*, 529 F. Supp. 1107, 1155 (D. Idaho 1981). The federal government and others involved in that case sought review in the Supreme Court. *See, e.g.*, Pet. of Adm'r of Gen. Servs. for Writ of Cert., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982); Pet. for Writ of Cert., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982). The Court granted probable certiorari, but the challenged deadline expired on June 30, 1982, before the Court could hear argument. The government then urged the Court to dismiss the case as moot on the grounds that the ERA had "failed of adoption no matter what the resolution of the legal issues presented." Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982). The Court dismissed the case as moot, but nowhere adopted the government's language that the case was moot because it "failed of adoption." The Supreme Court has never ruled that the time for ratification of the ERA has passed, or that the challenged deadline is valid. The Court simply remanded with instructions "to dismiss the complaints as moot." No court should or could construe a dismissal on mootness as a decision on the merits where the dismissal order provides no analysis of, or explanation for, the grounds on which mootness was ordered.

state ratifies. *Dillon*, 256 U.S. at 376. It says nothing about deadlines. And although *Dillon* also provides that Article V implies congressional authority to impose ratification deadlines on the States, that aspect of *Dillon,* which is plainly dictum as it was not necessary to the Court's adjudication of the case, can no longer stand as it is premised on the arcane notion that States must ratify amendments contemporaneously with congressional proposal to ensure national consensus.[9] *Id*. at 375.

    *Dillon's* requirement of contemporaneity as proof of consensus has not withstood the test of time. In 1992, the Archivist published the 27th Amendment,[10] and Congress voted to validate it,[11] some *203 years* after its proposal. Neither executive nor legislative branch officials rejected the amendment's constitutionality on the grounds that its

---

[9] Contemporaneous ratification does not ensure national consensus. The 18th Amendment was ratified contemporaneously with congressional proposal but did not accurately reflect consensus as it was repealed a few years later by the 21st Amendment. And although it took 48 years to ratify the ERA, an arguably non-contemporaneous amount of time, national polling in 2018 demonstrates clear consensus in support of the ERA. *Suffolk University/USA Poll*, October 2018 (national survey of people in all fifty states found 75% were more likely to vote for a candidate that supports the ERA) (available at https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/national/2018/10_25_2018_marginals_pdftxt.pdf?la=en& hash=7303DAC9B701D7E65632FEDDF60B260C8 983B994).

[10] Notably, Defendant readily performed his duty to publish the 27th Amendment when the last of three-fourths of the States ratified it, despite the passage of 203 years since congressional proposal. He published the Amendment on May 7, 1992, *before* the Office of Legal Counsel ("OLC") of the Department of Justice advised him that, "the effective date of the amendment is the date on which it was ratified by the 38th State to do so." Congressional Pay Amendment*, Opinions of the Office of Legal Counsel of the Dep't of Justice*, 16 Op. O.L.C. 85 (May 13, 1992). This 1992 OLC letter *requiring* publication of the 27th Amendment *because* it was ratified by 38 states stands in stark contrast to the OLC's January 8, 2020 letter *forbidding* publication of the ERA *despite* it being ratified by 38 states. Ratification, 44 O.L.C., *supra* note 3.

[11] Congress, like the Archivist, has no authority to adjudicate constitutionality, but that is effectively what it did with the 27th Amendment on May 21, 1992. S. Con. Res. 120–102nd Congress (1991–92); H. Con. Res. 120–102nd Congress (1991–92).

ratification was not contemporaneous with its proposal by Congress. Nor did they defer

to the *Dillon* Court's dual admonitions that a proposed amendment may not remain "open

for all time," *Dillon*, 256 U.S. at 374, and that the 27th Amendment in particular was

already too old, in 1921, to ratify. *Id.*, at 375. Either *Dillon* is no longer good law, or the

27th Amendment is not part of the Constitution.[12]

This Court should rule that the challenged deadline is not valid because whether

*Dillon* remains good law, thus whether Congress may impose ratification deadlines at all,

is in doubt. Furthermore, ratification deadlines disrupt the Article V balance of power,

and "shift power granted to the States — and the people — to the Congress … [t]he

possibility that Congress could deprive the States of an amendment the States demanded

was of utmost concern to the framers." Kalfus, M., *Why Time Limits on the Ratification

of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437, 452–53 (1999)

(citing FARRAND, M., THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 202–03

(Yale University Press 1911)).

Even if Congress may impose deadlines, it must do so in a constitutional manner,

which did not happen with the ERA. The challenged deadline is a constitutional nullity

---

[12] That the 27th Amendment was embraced by Congress despite the passage of 203 years from proposal to ratification is reason enough for this Court to invalidate the challenged deadline. Congress' acceptance of the 27th Amendment is effectively a declaration that deadlines do not matter, which contradicts *Dillon*. It also means that Congress sees the uniquely serious nature of the amendatory process as no different than ordinary lawmaking in that a technicality, such as the absence of a deadline, should control whether an obviously invalid amendment becomes law. The framers were clear that amending the Constitution is not ordinary lawmaking. *Hollingsworth v. Virginia,* 3 U.S. (3 Dall.) 378, 381 (1798) (President has no role in approving a constitutional amendment despite his right to do so in the case of ordinary lawmaking, because the amendment process is "unconnected with the ordinary business of legislation.") Congress' handling of the 27th Amendment has led to constitutionally intolerable results. The only way to protect the integrity of the Constitution moving forward is for the courts to reassert their authority as the ultimate arbiter of how Article V works.

12

because, among other reasons, it exists only in a preambulatory clause rather than in the text of the amendment itself. As such, it violates Article V because Article V only gives Congress authority to propose amendments and determine the mode of ratification.[13] While Congress may include anything it wants in a proposed amendment's text; it may not, under Article V, enact adjunctive laws.[14]

While no court has addressed the significance of placing a deadline in the preamble rather than in the text of an amendment,[15] persuasive legal authority and congressional records strongly suggest that this violates Article V because it denies the States the right to decide whether to have their amendatory powers constrained by the National government.[16] *See Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978) (states were "ratifying the text of the Amendment and not the

---

[13] "Mode" of ratification refers to the choice between ratification and convention. *United States v. Sprague*, 282 U.S. 716, 732–33 (1931) ("the choice of mode rests solely in the discretion of Congress"). It does not give Congress unfettered authority to control all aspects of the ratification process.

[14] *Dillon* provides no such authority as the deadline in that case had been placed in the text of the amendment.

[15] In comparable circumstances, courts have declined to enforce language from preambles on the grounds that they "have never been regarded as the source of any substantive power conferred…." *Jacobsen v. Massachusetts*, 197 U.S. 11, 22 (1905); *see District of Columbia v. Heller*, 554 U.S. 570, 578–79 (2008) (apart from "a clarifying function, a prefatory clause does not limit or expand the scope of the operative clause"); *see also Tinsley v. Methodist Hosp. of Indiana*, 70 F.3d 1275 (7th Cir. 1995).

[16] Just as Congress cannot simply pass a law abridging the President's presentment powers under Article I, it cannot pass a law abridging the States' amendatory powers under Article V. It must instead propose a constitutional amendment to change Article V, thus allowing the States to decide for themselves whether they want their Article V powers to be changed.

preliminary language of the resolution").[17] When Congress was proposing to add a deadline to the preamble of the 20th Amendment, members of Congress objected on the grounds that placing it in the preamble would be "of no avail" as it would not be "part of the proposed constitutional amendment." 75 Cong. Rec. 3856 (1932). Congress thus placed deadlines in the text of the next three amendments. Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386, 408–09 (1983).

If this Court rules that Congress may lawfully impose extra-textual ratification deadlines on the States, it will be declaring for the first time in history, with retroactive effect, that the National government has unilateral authority to determine whether the Constitution will be amended. Such authority would mean that Congress may impose short deadlines on amendments preferred by the States, for the purpose of defeating them, and long deadlines or none at all on amendments preferred by Congress.[18] This cannot be tolerated under Article V, as the framers were clear that the States' amendatory powers should be *equal* to those of the National government. THE FEDERALIST NO. 43 (Alexander Hamilton) ("Article V equally enables the general and the States governments"); THE FEDERALIST NO. 39 (James Madison) (the balance struck in Article V makes the amendment process "neither wholly national nor wholly federal.") THE FEDERALIST NO.

---

[17] *See also* Attorneys General Letter, *supra* note 4 ("Neither the Constitution nor the language of the ERA [ ] contain a time limit for state ratification … [R]ather than including any [deadline] in the ERA's text, Congress relegated a seven-year deadline to the joint resolution that proposed the ERA … No court has found that such an external limit is at all binding" on the States).

[18] Short deadlines can also cause states *to* ratify, by subjecting them to undue pressure, as happened with the 18th Amendment, which was quickly repealed. The point is not whether short rather than long deadlines always cause certain results; it is that deadlines allow the National government to put pressure on the States in ways that undermine the States' autonomy and equal constitutional powers under Article V.

21 (Alexander Hamilton) (framers were concerned with the potentially harmful effects that a strong national government could have on the autonomy of the States). This Court should decline to usurp the careful balance of powers set forth in Article V.

This Court should also decline to grant such authority to the National government because Congress' handling of ratification deadlines has been arbitrary at best. No deadlines were included in any amendments for the first 130 years of our nation. Congress began imposing deadlines relatively recently with the 18th Amendment in 1917, and has done so only a handful of times, without consistency. A deadline was imposed on the 18th but not the 19th Amendment, and when deadlines were imposed, some were placed in the text of the amendment, while others were placed in a preamble. (Am.Com.10-11).

Clearly aware, at least initially, that the States have a right to decide for themselves whether to be subjected to a ratification deadline, Congress placed deadlines in the text of amendments 18, 20, 21, and 22. It was not until 1960 that Congress first placed a deadline in a preamble, claiming a need to "declutter" the text.[19] This began with the 23[rd,] and continued with the 24th, 25th and 26th Amendments. (Am.Com.10–11). Then in 1978, effectively conceding that placing deadlines in preambles was constitutionally problematic, Congress placed a deadline in the text *and* the preamble of a proposed amendment. 92 Stat. 3795 (1978). Stranger still, in 1992, Congress voted to approve the

---

[19] 10 Cong. Rec. 6628 (1955). If placing a deadline in a preamble were truly about decluttering, why would Congress "clutter" the ERA with procedural matters such as delaying the effective date of the amendment for two years after ratification? Preventing the States from deciding whether to be subjected to a ratification deadline dramatically tips the balance of Article V powers against the States, while delaying the enforcement date of an amendment does not, yet the States were permitted to vote on the two-year delay, but not whether they should be forced to ratify within seven years.

27th Amendment, and the Archivist published it, 203 years after congressional proposal, belying the idea that ratification deadlines serve a legitimate constitutional purpose.

Such arbitrary treatment of ratification deadlines reflects a lack of due regard for the important role of the States in the amendatory process. It also ignores the importance of ensuring that the Constitution's processes are predictable and consistent. *INS v. Chadha*, 462 U.S. 919, 945 (1983) (discussing the value of "explicit and unambiguous" constitutional provisions).

In the aftermath of Congress' erratic treatment of Article V, Defendant issued a letter in 2012 in which he stated that he was duty bound to record state ERA ratifications, regardless of the challenged deadline, which is exactly what he did. In this same letter, he stated that he would publish the ERA as soon as 38 states ratified it.[20]

Ratification of the 27th Amendment in 1992, alongside Defendant's 2012 letter guaranteeing that he would publish the ERA when the 38th state ratified it, inspired advocates, including EME and The Roses, to devote more resources to advocating for the ERA. No doubt relying on the same factors, States that had not yet ratified determined that the challenged deadline posed no barrier, and in 2017, Nevada ratified (S.J. Res. 2, 79th Leg.) (Nev. 2017), followed by Illinois in 2018 (S.J. Res. Const. Amend. 0004, 100th Gen. Assemb.) (Ill. 2018), and Virginia in 2020. Needless to say, if, as Defendant now argues, the challenged deadline is a barrier to the ERA's ratification, Defendant

---

[20] *See* Ex. A. This letter was issued in response to a question from Congresswoman Carolyn Maloney about the ratification status of the ERA and the role of the Archivist. Defendant replied, "Once NARA receives at least 38 state ratifications of a proposed Constitutional amendment, NARA publishes the Amendment along with a certification of the ratifications and it becomes part of the Constitution." Nowhere did Defendant indicate a concern about the ERA's validity, though he did state "a later recission of a state's ratification is not accepted as valid." *Id*.

himself would not have issued a contrary opinion letter in 2012, and public officials in three different states would not have wasted public resources enacting a legal nullity.

If the challenged deadline is valid, and Defendant is authorized to determine an amendment's constitutionality, Defendant could not have lawfully recorded the ERA ratification votes of Nevada and Illinois in 2017 and 2018, respectively, as they would have been no more subject to official recording than junk mail.[21] That Defendant recorded their votes without assessing their constitutionality demonstrates Defendant's awareness that he likewise has no authority to determine the constitutionality of the ERA.

Because Defendant has no authority to determine whether an amendment is constitutional, it is axiomatic that he has no authority to delegate such authority to the Department of Justice. Yet, on December 12, 2019, Defendant announced that he would not publish the ERA until he received legal advice from the OLC. On January 8, 2020, the OLC issued a memorandum opinion declaring the ERA invalid because of the challenged deadline. *See supra* note 2. The OLC also declared, "the ERA's adoption [can]not be certified under 1 U.S.C. § 106b." *Id*. at 37. On January 8, 2020, Defendant issued a statement declaring that he would "abide by the OLC opinion." NARA Press Statement, *supra* note 3. Defendant's unauthorized delegation of his non-authority animates this litigation.

---

[21] Interestingly, Defendant recorded the ratification votes of Nevada and Illinois when they happened, but he recently added the qualifying statement "ratification actions occurred after Congress's deadline expired." NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, (available at https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf) (citing the OLC letter released January 8, 2020, *supra* note 3). Defendant should have similarly published the ERA, adding a qualifying comment about the OLC letter if he felt compelled to do so.

III.    THIS CONTROVERSY IS JUSTICIABLE

Defendant argues this case is not justiciable under *Coleman v. Miller*, 307 U.S. 433 (1939), because the issues presented are political questions that may not be adjudicated by the judicial branch. (D.Mem.21-22). Defendant is wrong. While *Coleman* states that timeliness of ratifications is not justiciable, the Court did not hold that all Article V issues raise only political questions, not subject to judicial review. Indeed, that the Court in *Dillon* imposed a restriction on congressional power to impose deadlines by requiring that they be reasonable, presupposes the Court's authority to determine the scope of Congress' Article V powers in other ways, such as forbidding them to deprive the States of their equal role in the amendatory process by subjecting to them to extra-textual ratification deadlines.

Nor did *Coleman* expressly overturn prior case law where Article V issues were adjudicated by courts, i.e., *United States v. Sprague*, 282 U.S. 716, 730 (1931); *Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378, 381 (1798); *National Prohibition Cases*, 253 U.S. 350 (1920). Moreover, nothing in *Coleman* overruled long-established precedent that only the judicial branch can declare what the Constitution means. *City of Boerne,* 521 U.S. at 524; *Marbury,* 5 U.S. at 177–78. *See also* Ginsburg, R.B., *Ratification of the Equal Rights Amendment: A Question of Time*, 57 TEX. L. REV. 919, 942–43 (1979) ("High Court decisions both before and after *Coleman* tend against a conclusion that the issues are nonjusticiable 'political question'".… [and] I suspect … that the Court might well hold the validity of the ERA time extension justiciable"); Amar, A.R., *Philadelphia Revisited: Amending the Constitution Outside Article V*, 55 U. CHI. L. REV. 1043, 1046

n.3 (1988) (rejecting language in *Coleman* that all issues involving the amendment process are nonjusticiable).

In any event, Article V questions have been adjudicated since *Coleman*. *See e.g.*, *Government of the Virgin Islands v. Eleventh Legislature of Virgin Islands*, 536 F.3d 34 (3d Cir. 1976) (*Coleman* should not be read to bar all Article V claims as nonjusticiable); *Dyer v. Blair*, 390 F. Supp. 1291, 1299-1330 (N.D. Ill. 1975) (three judge court); *Idaho v. Freeman*, 529 F. Supp. 1107, 1126, 1150-54 (D.Idaho 1981); *Trombetta v. Florida*, 353 F. Supp. 575 (M.D. Fla 1973) (court found justiciable whether Florida law violates Article V by requiring an election before the legislature votes on ERA ratification).

In addition, the standards for justiciability used in *Coleman* have been modified in modern jurisprudence. In fact, scholars have questioned whether *Coleman* is "authoritative at all." Paulsen, M.S., *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 YALE L.J. 677, 717 (1993).

Perhaps most importantly, Defendant himself concedes that the issues before this Court are justiciable as he has stated publicly, "NARA … will abide by the OLC opinion, unless otherwise directed by a final court order." NARA Press Statement, *supra* note 3.

IV.    STATES MAY NOT RESCIND PRIOR RATIFICATIONS

Although South Dakota, Tennessee, Idaho, Nebraska and Kentucky purport to have rescinded their prior ratifications of the ERA, those actions are legal nullities because Article V nowhere permits rescissions. Recognizing this, Defendant publicly stated in 2012 that those purported rescissions were "not accepted as valid." (Ex. A). No

authorized decision-maker has ever recognized a purported rescission as valid, and only one court has done so, though the ruling was later vacated as moot.[22]

Notably, the Fourteenth Amendment was adopted when three-fourths of the States ratified it, even though two of those States, New Jersey and Ohio, had voted to rescind their ratifications. 15 Stat. 706 (1868). Without their votes, the Fourteenth Amendment lacked a sufficient number of states to support adoption, but the Amendment was adopted nonetheless. Cong. Globe, 40th Cong., 2d Sess. 4266, 4295-96 (1868); *see Coleman*, 307 U.S. at 448–49. Attempted rescissions of the Fifteenth and Nineteenth Amendments were also not accepted. Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147, 150 (1973).

Scholars have agreed for a very long time, and with near-uniformity, that States may not rescind prior ratifications. *See* JAMESON, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 629-33 (4th ed., Riverside Press 1887); Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27th Amendment*, 61 FORDHAM L.REV. 497, 548 (1992); Dellinger, 97 HARV. L. REV., *supra*, at 421-27 ("A state has the right to reject ratification as many times as it likes, but once an amendment is ratified, the state is committed. Otherwise, think of the constitutional chaos … An amendment process that conditions adoption of an amendment proposed by Congress on affirmative acts of assent by thirty-eight legislatures is stringent enough. We need not make the adoption of amendments still more difficult by extending official recognition to resolutions of rescission"); *Equal Rights Amendment Extension Hearings,* 95th Cong., *supra*, at 138

---

[22] *Idaho v. Freeman*, 529 F. Supp. at 1150 (rescissions of prior ERA ratifications constitutionally valid), *vacated as moot, N.O.W., Inc. v. Idaho*, 459 U.S. 809 (1982).

(testimony of Prof. William Van Alstyne) (noting that permitting rescissions would be "profoundly ill-advised constitutional policy … No state ought to consider an amendment to the Constitution under the misimpression … that it may do it with some sort of celerity or spontaneity because it will always have this interval of additional years while other States are looking at it to reconsider. That, in my view, is an atrocious way to run a Constitution. The policy that the States may consider [ratification] at several times … but that when done, it is done irrevocably, is terribly important … to the integrity of the role of Congress and the States.")[23]

In any event, rescissions serve no purpose as Article V already provides a remedy for situations where the States change their minds about an amendment; they can initiate a new amendment to repeal the undesirable one, which is exactly what happened with the 18th and 21st Amendments. *See* U.S. CONST. amend. XVIII; U.S. CONST. amend. XXI.

Defendant also argues the rescission issue should not be adjudicated by this Court because there is no adversity between the parties. He claims Plaintiffs agree that he properly declined to record the purported rescissions *because of* the OLC opinion. (D.Mem.17–18). This is a misstatement of the record. The OLC declined to address the rescission issue on the grounds that it was not necessary *because* the challenged deadline expired. (D.Mem.18). Plaintiffs obviously do not agree. They assert that Defendant acted properly in not recording the purported rescissions *because* rescissions are not permitted under Article V. (Am.Com.7–8). Defendant's position is that he need not decide whether purported rescissions are valid in light of his view that the challenged deadline expired.

---

[23] If the States may rescind their prior ratification votes, then Congress could no doubt do the same and rescind their proposals. Article V must be insulated from such instability.

This plainly conflicts with Plaintiffs' dual allegations that the challenged deadline *and* the purported rescissions are invalid under Article V.

Nonetheless, it appears Defendant recently *did* record the purported rescissions, denoting them with asterisks and referencing the January 8, 2020 OLC letter. *See* LIST OF STATE RATIFICATION ACTIONS*, supra* note 21.[24]

This is ample controversy between the parties to justify this Court's consideration of the issue. *Magee v. U.S.,* 93 F. Supp. 2d 161, 163 (D.R.I. 2000) ("conflicting contentions of the parties … present a real, substantial controversy"). In any event, as Defendant's argument rests wholly on his misstatement that Plaintiffs agree with the OLC as to *why* the rescissions are not valid, his argument fails.

It should be noted that three states purporting to have rescinded their ERA ratifications, South Dakota, Nebraska, and Tennessee, have filed a motion to intervene in a lawsuit similar to this one, filed after this case was filed, in the United States District Court for the D.C. District. *Virginia et al., v. Ferriero*, 1:20-cv-242-RC (D.D.C. 2020) ("D.C. Lawsuit"). They assert a right to intervene so that they may argue the ERA is invalid because their purported rescissions are valid. Whether or not their intervention motion is granted, the Court there, as here, must necessarily determine the validity of purported rescissions in the ordinary course of deciding whether the ERA is now the 28th Amendment to the U.S. Constitution. Put another way, whether three-fourths of the States have ratified requires adjudication of whether the purported rescissions must be counted.

---

[24] Defendant nowhere explains his decision to record the purported rescissions despite his 2012 letter stating that they were "not … valid." (Ex. A). Nor does he explain why, if he may record invalid rescissions so long as he denotes them with an asterisk, he has not similarly published the ERA.

That none of the purported rescission states are involved in this litigation, and two, Kentucky and Idaho,[25] are not involved in this case or the D.C. case, is of no moment. This Court can, if it deems it appropriate, invite them to file briefs on the issue to advance their States' interests. *Chadha*, 462 U.S. at 940 (case or controversy existed on the constitutionality of the one-House veto despite agreement of the parties on the issue; court solicited briefs from interested non-parties).

Relying on *Coleman*, Defendant also argues that whether purported rescissions are valid is a non-justiciable issue. (D.Mem.19–20). Although *Coleman* involved an amendment where there had been a purported rescission, the Court did not address justiciability. Defendant also cites *White v. Hart*, 80 U.S. 646, 649 (1871), but that case is also inapt, as it nowhere discusses justiciability of rescissions.

Only one court has squarely addressed the justiciability of purported rescissions. In *Idaho v. Freeman*, 529 F. Supp. at 1142, the court found the issue justiciable, but the decision was later vacated. *See supra* note 22.

In sum, whether states may rescind prior ratifications is adequately in controversy, is a justiciable issue, and the overwhelming weight of authority holds that rescissions are not valid.

V.    PLAINTIFFS HAVE STANDING

Standing is established when a plaintiff shows (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *Lujan*, 504 U.S. at 560–61. A plaintiff has suffered an injury-in-fact if she has experienced "an invasion of a legally protected

---

[25] That Kentucky and Idaho did not seek to intervene in the D.C. lawsuit may indicate their awareness that their purported rescissions are invalid.

interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)). A plaintiff need not allege specific facts to establish injury at the pleading stage. General allegations will suffice, unlike at summary judgment when specific facts are required. *Lujan*, 504 U.S. at 561.[26]

As plaintiffs also allege procedural injury, all that is required for redressability and immediacy is "some possibility that the requested relief will cause the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 28 (1st Cir. 2007). Plaintiffs receive "special treatment" in procedural injury cases, and can assert their rights "without meeting all the normal standards for redressability and immediacy." *Lujan* at 572, n.7. Even an allegation of future injury may suffice if the threatened injury is "certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158.[27]

---

[26] Defendant argues the standing inquiry should be "especially rigorous" at this stage because "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," citing *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014). *Blum* is inapt. It involved a challenge to the legitimacy of a statute, and required the judicial branch to impose on and potentially usurp the core functioning of one of the other branches of government. This case asks the Court not to usurp, but rather, to cure usurpation.

[27] As this case also involves a First Amendment challenge to the validity of Defendant's actions, conventional standing doctrine requirements are relaxed. *See Osediacz v. City of Cranston*, 414 F.3d 136, 140 (1st Cir. 2005) (When certain types of facial challenges to statutes, ordinances, regulations, or governmental policies are premised on First Amendment grounds, they invite a lowering of conventional standing barriers because the traditional *jus tertii* ban on litigating the rights of third parties is arguably inapplicable).

### A. Injury in Fact

All Plaintiffs amply establish standing because they have a protectable legal interest in the continued vitality of the ERA, and Defendant's actions have interfered with their interest. *Idaho v. Freeman*, 625 F.2d 886, 887 (9th Cir. 1980).

All Plaintiffs also have standing because Defendant violated a statute that "conferred [on them, a] procedural right [designed to] to protect [their] concrete interests." *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2015). Even intangible injuries are concrete. *Id*. Plaintiffs have standing under *Spokeo* because their concrete interest in publication of the ERA has been injured by Defendant's violation of § 106b.

The dissemination of misinformation is also sufficient to establish Plaintiffs' standing "even in the absence of other harms" because they have a right to the dissemination of correct information. *Pollard v. Law Office of Mandy L. Spaulding*, 756 F.3d 98, 102 (1st Cir. 2014). Defendant's duty to publish the ERA necessarily includes a duty not to misinform the public about its validity. Thus, his dissemination of misinformation gives Plaintiffs standing to challenge his actions.

All Plaintiffs further have standing because they were denied "information which must be publicly disclosed pursuant to a statute." *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 332 (1st Cir. 2020). As Defendant is mandated by § 106b to "publicly disclose" the ERA's ratification, Plaintiffs have standing to challenge his failure to do so.

### 1. Injury to All persons Protected by the ERA

Plaintiffs and all persons protected by the ERA have standing because they have a cognizable legal interest in the continued vitality of the ERA. *Freeman*, 625 F.2d at 887.

Plaintiffs also suffer a heightened risk of harm, including violence, because they are female, so long as the ERA is not recognized as valid. (Am.Com.12–14). Defendant dismisses these facts as inadequate to establish injury on the grounds that they allege only general complaints about potentially discriminatory government action, *citing Allen v. Wright,* 468 U.S. 737, 755-56 (1984). Defendant's reliance on *Allen* is misplaced.

First, unlike in *Allen*, Plaintiffs here do not allege that Defendant's actions or policies are discriminatory. Second, in *Allen*, Plaintiffs asserted only general claims asking the court to prohibit the IRS from using certain guidelines to determine whether a school was entitled to tax exempt status on the grounds that said guidelines could result in a failure of government to fulfill a promise of anti-discrimination laws. The court rejected plaintiffs' argument that this highly attenuated fact pattern established injury beyond allegations of "value interests" as "concerned bystanders." *Allen*, 469 U.S. at 753-55. This case is nothing like *Allen*. Plaintiffs do not allege that women suffer only abstract injuries or "value interests" as "concerned bystanders."

To the contrary, in this unprecedented case where our nation's foundational governing document has been changed, there can be no bystanders. After enduring second-class legal status for centuries, women and others protected by the ERA have finally achieved their rightful place in the Constitution as fully equal persons, but Defendant's actions have denied them that status. This is a cognizable, indeed catastrophic, legal injury. *Freeman*, 625 F.2d. at 887; *see American Civ. Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008) ("The injury in fact is the denial of equal treatment"); *see also Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

Defendant argues this injury is no more than a mere "subjective chill," citing *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). *Laird* is not controlling. It addresses whether fear that the government might in the future "take some other and additional actions" detrimental to the plaintiff constitutes injury sufficient to establish standing. *Id*. at 11. Plaintiffs make no such claim here. They allege *actual infringement* of currently valid constitutional rights because Defendant has wrongfully declared those rights invalid. What more could be required to show injury to an entire class of people than a government official unlawfully relegating them to a status of constitutional inequality?

Defendant also claims Plaintiffs' allegations that they suffer disproportionate rates of harm based on sex are insufficient to make any assumptions about whether the risk of such harm has increased "as a result of the Archivist's actions." (D.Mem.13). Defendant could not be more wrong. That he did not *originally* cause sex inequality is not the issue. His refusal to publish the ERA *now* and his dissemination of misinformation regarding its validity unlawfully perpetuate the inferior legal status of persons who have long suffered disproportionately high rates of harm *because of their inequality.*[28] *See Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir.1985) (injury "consists of the added risk").

Inequality under the Constitution is state-sanctioned discrimination.[29] It injures people in their dignity, autonomy, and humanity,[30] and causes a plethora of other

---

[28] U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1 (6 July 2006) (inequality is the root cause of violence against women); U.N. Women*, Investing in Gender Equality and Women's Empowerment* (Oct. 31, 2010) (available at https://www.endvawnow.org/en/articles/314-investing-in-gender-equality-and-womens-empowerment-.html).

[29] Kreiger, N., *Discrimination and Health Inequities*, 44 INT'L J. HEALTH SERV. (4) 643, 650 (2014).

measurable harms.[31] Researchers have even found a specific correlation between higher

rates of violence against persons who are not protected under a state's hate crime law,

compared to those who are.[32]

Persons subjected to sex inequality also experience harm in the courts when they

seek redress of grievances. *Brzonkala v. Virginia Polytechnic Institute and State*

*University*, 132 F.3d 949, 971 (4th Cir. 1997) ("Study after study has concluded that

crimes disproportionately affecting women are often treated less seriously than crimes

affecting men ... [T]hese reports provide overwhelming evidence that gender bias

permeates the court system and that women are most often its victims."). Indeed,

Congress enacted the Violence Against Women Act specifically to confront "existing

bias and discrimination in the criminal justice system." H.R. conf. rep. no. 103–711, at

385 (1994); *see* SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the*

---

[30] Jackson, V., *Constitutional Dialogue and Human Dignity: States and Transnational Constitutional Discourse*, 65 MONT. L. REV. 15 (2004); Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017) (discussing philosophical and legal foundations of dignity, autonomy, and humanity in American law).

[31] Kreiger, *supra* note 29 (meta-analysis of studies showing discrimination's negative health consequences through multiple pathways); Kreiger, N., et al., *Breast Cancer Estrogen Receptor Status According to Biological Generation: US Black and White Women Born 1915-1979*, 187 AM J. EPIDEMIOL. (5) 960 (2018); Kreiger N., *Methods for the Scientific Study of Discrimination and Health: From Societal Injustice to Embodied Inequality-an Ecosocial Approach,* 102 AM J. PUB. HEALTH (5) 936 (2012); Meyer, I.H., *Prejudice, Social Stress, and Mental Health in Lesbian, Gay, and Bisexual Populations: Conceptual Issues and Research Evidence*. 129 PSYCHOL. BULL. (5) 674 (2003) (LGBTQ+ individuals are exposed to excess stress due to their minority position and … this stress causes an excess in mental disorders").

[32] Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009) (higher rates of psychiatric disorders among LGBTQ+ persons who resided in states that did not extend protections against hate crimes and discrimination based on sexual orientation, compared to states that did).

*Road to Equal Justice* (May 1993); *see also* Clarke, J., *Frontiers of Sex Discrimination Law*, 115 MICH. L. REV. 809, 836 (2017) (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003) for the proposition that discrimination threatens people's ability to "choose a life free of predetermined roles," and "creates a self-fulfilling cycle" that "reinforces their subordinate status").

Defendant cites *Kerin*, 770 F.3d at 982, for the proposition that Plaintiffs' allegations of enhanced risk "require greater caution and scrutiny because the assessment of risk is both less certain, and whether the risk constitutes injury is likely to be more controversial." (D.Mem.13). *Kerin* is a products liability case that involved allegations of only speculative potential future injury from a defective product. It has nothing to do with a government official's unlawful refusal to abide by his statutory duty to publish a constitutional amendment. To the extent *Kerin* establishes a legal standard requiring greater caution when a court is analyzing injury based on risk, that standard is inapt here because *Kerin* provides that caution is required only when there is no present injury. *Id.* Plaintiffs allege present injury, as well as enhanced risk. Thus, the more rigorous standard is not applicable.

Defendant also argues that Plaintiffs have failed to establish that any enhanced risk of future injury[33] to women is "certainly impending." (D.Mem.13) citing *Clapper*, 568 U.S. 398, 410 (2013). In fact, as set forth above, Plaintiffs have established that such injury is not merely impending; it is ongoing, chronic, debilitating, and intolerable.

---

[33] Plaintiffs also suffer the risk of future additional harm if this Court does not provide a remedy because, inter alia, they will be forced to file other litigation directly seeking enforcement of the ERA. *See Sistersong Women of Color Reprod. Justice Collective v. Kemp*, 410 F. Supp. 3d 1327 (N.D. Ga. 2019).

Defendant's reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) is also misplaced. *Lyons* involved a claim of injury based on enhanced risk because of the plaintiff's fear that, having suffered violence by a police officer in the past, he would likely suffer the same harm by police in the future. *Id*. at 102. The court ruled he faced no impending risk of injury. Plaintiffs make no such claim. They allege present and ongoing harm, including increased risk of future harm, because of their inequality. Increased risk injuries are necessarily "impending" when inequality is ongoing.

Defendant also advances the curious argument that Plaintiffs have failed to allege injury because it is "far from clear what impact the ERA's certification[34] by the Archivist would have on States, let alone on plaintiffs." (D.Mem.14–15). As argued repeatedly above, Plaintiffs and all persons protected by the ERA have been injured by Defendant's actions. Thus, when this Court rules that Defendant's actions are unlawful, and grants Plaintiffs' requested remedies, Plaintiffs will no longer suffer those injuries.

Plaintiffs have also pled that publication of the ERA will alleviate the current reluctance of government officials to identify and repair sex discriminatory laws and policies, including the Massachusetts hate crime statute. (Am.Com.13).

In addition, without the ERA, sex-based classifications are subjected to only intermediate judicial scrutiny, while other categories are reviewed under the more rigorous standard of strict scrutiny. Strict scrutiny requires the government to prove that a discriminatory law or policy serves a "compelling government interest." *Plyer v. Doe*, 457 U.S. 202, 215–21 (1982). The government must also demonstrate that each measure taken is the "least restrictive alternative." *Feeley v. Sampson*, 570 F.2d 364, 371 (1st Cir.

---

[34] Plaintiffs do not argue that Defendant can or should "certify" the ERA, though he certainly must publish it.

1978). If a law can be rewritten to have less discriminatory impact, it must be rewritten.

Under intermediate scrutiny, by contrast, the government need only show an "important"

rather than a "compelling" interest, and no "least restrictive means" test is applied. *U.S. v.

Virginia,* 518 U.S. 515, 532 (1996). Validation of the ERA by this Court will require the

replacement of intermediate judicial scrutiny for sex-based classifications with the more

rigorous standard of strict scrutiny.[35]

Publication of the ERA will repair intolerable inequities, and have enormous

positive impact on the lives of all persons protected by the ERA.

2.   Injury to Organizational Plaintiffs

The organizational Plaintiffs have standing to challenge Defendant's actions

because they have been actively involved in working toward ratification of the ERA, and

Defendant's actions have interfered with their activities. *Idaho Farm Bureau Fed'n v.

Babbitt,* 58 F.3d 1392, 1397 (9th Cir. 1995) (public interest group has standing to

challenge the listing of a snail under the Endangered Species Act because they were

active in getting the snail listed); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th

Cir. 1983), *aff'd*, 790 F.2d 760 (9th Cir. 1986) (Audubon Society's interest in the

---

[35] In 1973, a plurality of the Supreme Court extended strict scrutiny review to sex-based classifications. *Frontiero v. Richardson*, 411 U.S. 677 (1973). Three concurring justices objected to the "strictest test of judicial scrutiny" for sex-based classifications on the grounds that ratification of the Equal Rights Amendment was pending before the States, and "if adopted will resolve the substance of this precise question." *Id*. at 692. Interestingly, ratification in the States slowed after 1973. NEALE, T., CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018). Three years later, the Court replaced strict scrutiny with less protective middle-tier scrutiny. *Craig*, 429 U.S. at 217 (Rehnquist, J. dissenting) ("The only redeeming feature of the Court's opinion … is that it [ ] signals a retreat by those who joined the plurality opinion in *Frontiero* … from their view that sex is a 'suspect' classification for purposes of equal protection analysis"); *See Mississippi v. Hogan*, 458 U.S. 718 (1982) (legitimizing use of intermediate scrutiny the day after the ERA ratification extension deadline expired).

protection of birds and other animals and its active participation in proceedings to establish a wildlife sanctuary gave them standing to challenge the validity of that sanctuary); *Trades v. Spellman*, 684 F.2d 627 (9th Cir. 1982), *cert denied*, 461 U.S. 913 (1983) (public interest group has standing in lawsuit challenging legal measure the group had supported).[36]

Furthermore, a group has organizational standing when it suffers injury to its organizational goals. *Warth*, 422 U.S. at 511; *Guckenberger et al., v. Boston Univ.* 957 F. Supp. 306, 320 (D. Mass. 1997). Standing is demonstrated when an organization suffers injury by diversion of organizational resources to identify or counteract the unlawful action, or frustration of the organization's mission. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Only broad allegations of injury are required at the pleading stage. *Id.* at 379 ("diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged'"). In addition, "a relatively small economic loss — even an identifiable trifle — is enough to confer standing." *Massachusetts v. United States HHS*, 923 F.3d 209, 222 (1st Cir. 2019).[37]

---

[36] It is particularly appropriate for public interest groups to have standing where, as here, the legal challenge is to the government's procedures used to enact a new law, rather than the government's enforcement of it. *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 345 (6th Cir. 2007) (public interest group has standing to challenge procedures by which legal requirement was enacted).

[37] EME has plainly established standing under the economic injury rule as it has been forced to spend fiscal resources countering Defendant's actions, including the cost of corresponding with government officials. (Am.Com.18).

### a. Equal Means Equal – Organizational Standing

#### i. Diversion of resources

As noted above, Defendant's actions have caused significant confusion regarding the ERA's validity, which in turn has caused government officials and others not to act in accordance with it. This has forced EME to divert resources from its core mission, toward education and advocacy, to identify and counteract Defendant's actions. For example, EME has provided lectures and developed informational materials, and has sent correspondence to government officials around the country, informing them that Defendant's actions are unlawful, and urging them to act in accordance with the ERA.[38] This diversion of resources is sufficient to establish injury. *Havens*, 455 U.S. at 369; *African Cmtys Together v. Trump*, No. 19-10432-TSH, 2019 U.S. Dist. LEXIS 184688, at 11–12 n.5 (D. Mass. Oct. 25, 2019) (organizational plaintiff forced to divert funds toward advocacy efforts to address Defendant's announced plan to enforce new deportation policy adequately established diversion of resources and frustration of mission injuries because "[t]he pivotal inquiry is [ ] not whether the organization has diverted resources from one priority to another, but whether its activities have been directly impeded by defendant's activities, thus necessitating the diversion of resources") (citation omitted); *see R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 131 n.32 (D.R.I. 2015)

---

[38] Section 3 of the ERA states that it takes effect "two years after the date of ratification." This is to ensure that government officials have time to bring laws and policies into compliance with the ERA. 118 Cong. Rec. 9419 (1972) (two-year delay in enforcement of ERA is necessary to give federal and state officials adequate time to repair their laws); Sutherland Statutory Construction, § 33:7 ("purpose of the future effective date is to inform people of the provisions of a [law] before it becomes effective so they may protect their rights and discharge their obligations.") While the ERA is not enforceable until January 27, 2022, it is valid now, and is subject to pre-enforcement lawsuits. *Virginia v. American Booksellers Ass'n, Inc.* 484 U.S. 383 (1988); *Sistersong*, 410 F. Supp. 3d at 1327.

(citing *Fair Housing of Mann v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) for the proposition that investigation and prosecution of defendant's conduct constitutes diversion of resources sufficient to support standing for organizational plaintiff); *see also Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (diversion of resources to educate the public regarding the challenged policy sufficient to establish standing); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (applying *Havens* and holding that diversion of resources is sufficient to establish organizational standing where plaintiff had to investigate the existence of discriminatory policies); *Jones v. DeSantis*, --- U.S. Dist. Ct. Case No. 4:19-cv-300-RH/MJF at 26 (N.D. Fla. 2020) (expenditure of resources to address confusion caused by government is sufficient diversion of resources and frustration of mission injury to establish standing).

### ii. *Frustration of mission*

As an organization whose sole purpose is to advocate for sex equality and ratification of the ERA, EME's mission is frustrated by Defendants' actions. His refusal to publish the ERA and dissemination of misinformation about its validity have obstructed EME's ability to carry out its core mission. Put another way, EME cannot advocate for sex equality under the ERA where the Defendant has declared the ERA invalid despite its ratification.

Defendant argues that EME's mission is not frustrated because it asserts as injury only an inability to "lobby state legislatures." (D.Mem.9). This claim is obviously incorrect. EME is not a registered lobbyist; its advocacy is broad-based. In furtherance of its mission, it produced an award-winning film, which it has used to educate the general

public and advocate in all branches of government, not just the legislative branch. EME has had to spend significant resources not "lobbying" but rather, educating, advocating, and communicating with the public and government officials around the country to counteract Defendant's unlawful actions. This has frustrated EME's mission. *See Graul*, 120 F. Supp. 3d at 131 n.32 (education and outreach to the public about defendant's conduct constitutes frustration of mission injury sufficient to support standing for organizational plaintiff); *see African Cmtys*, No. 19-10432-TSH, *supra; American Canoe Association v. City of Louisa Water and Sewer Commission*, 389 F.3d 536 (6th Cir. 2004) (agency's failure to comply with reporting and monitoring requirements sufficient to establish standing because lack of access to such information impairs organization's mission); *see also Jones v. DeSantis*, No. 4:19-cv-300, *supra*.

Defendant cites *Boston's Children First v. Boston Sch. Comm.*, 183 F. Supp. 2d 382, 403 (D. Mass. 2002) for the proposition that EME cannot establish organizational standing because spending money on advocacy and education efforts "does not give rise to Article III standing." *Boston's Children's* is inapposite. There, the court ruled that the organizational plaintiff suffered no injury because they had only a "mere interest in an event" which did not constitute actual injury under Article III. *Id*. at 403. Unlike EME, the plaintiff there suffered no diversion of resources or frustration of mission as a result of the Defendant's actions. Defendant also relies on *Guckenberger*, 957 F. Supp. at 320, yet *Guckenberger*, too, is inapt because the plaintiff's complaint in that case nowhere pled actual injury to the organization in the form of frustration of mission. An argument *about* such injury was made in their opposition to defendant's motion to dismiss, but because no such injuries were pled in the complaint, standing was denied.

### b.  Equal Means Equal – Associational Standing

A membership organization has associational standing to bring suit "solely as the representative of its members … [e]ven in the absence of injury to itself." *Warth*, 422 U.S. at 511; *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 33 (1st Cir. 2019). Associational standing is particularly apt in matters where, as here, the group seeks only equitable relief, rather than money damages. *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Brock*, 477 U.S. 274, 290 (1986). Associational standing claims are especially well-suited to be brought by a representative organization. *See Sexual Minorities Uganda v. Scott Lively,* 960 F. Supp. 2d 304, 328 (D. Mass. 2013).

EME is a membership organization that advocates for the equality rights of its members, and ratification of the ERA.[39] Donors and supporters choose to become members, and regularly receive information and educational materials. Thus EME has associational standing so long as a.) its members would otherwise have standing to sue in their own right; b.) the interests it seeks to protect are germane to the organization's purpose; and c.) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[40] *Hunt*, 432 U.S. at 343. While the organization must identify [a] member who ha[s] suffered the requisite harm," *Draper v.*

---

[39] Even if EME were a nontraditional membership organization, it possesses all the indicia of membership because only members of EME may elect/appoint and serve on the Board of the Directors. EME is financed exclusively by members and supporters, and EME clearly "represents the interests of its members and provides the means by which they express their collective views and protect their collective interests." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977).

[40] Defendant does not argue that the interests EME seeks to protect are not germane to the organization's purpose, or that participation by an individual member is required.

*Healey*, 827 F.3d 1, 3 (1st Cir. 2016), members need not be parties. *Playboy Enterprises v. Public Service Comm'n of Puerto Rico*, 906 F.2d 25, 35 (1st Cir. 1990). Where there is no request for monetary damages, there is no need for participation by individual members. *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005).

### i.   *EME's members have standing in their own right*

EME's members include its president, Kamala Lopez, and Plaintiff Katherine Weitbrecht. For reasons addressed above, including that they have an interest in the ERA's continued vitality, they have standing to sue in their own right. Ms. Weitbrecht asserts additional grounds for individual standing below.

Furthermore, in addition to resources expended by EME to counteract Defendant's actions, Ms. Lopez has devoted personal resources and funds to conducting training sessions, producing educational materials, and communicating with government officials around the country, urging them to disregard Defendant's actions.[41]

### c.   **The Yellow Roses – Organizational Standing**

The Yellow Roses ("Roses") is a Massachusetts-based volunteer student organization, founded in 2016 by a group of middle school girls who were surprised to learn that women were not yet equal under the U.S. Constitution. The organization's sole mission is to advocate for and raise public awareness about sex equality and the ERA.

The Roses have engaged in numerous advocacy and educational activities, including circulating a petition in support of the ERA; interviewing and being interviewed by local and national publications; meeting with government officials to advocate for the ERA; collaborating with activists; and teaching young people to be

---

[41] Inevitably, facts regarding Plaintiffs' efforts to counteract Defendant's actions have evolved since Plaintiffs' Amended Complaint was filed.

activists in their communities. Like EME, the Roses have suffered a diversion of resources and frustration of mission. Defendant's refusal to publish the ERA and dissemination of misinformation about its validity have obstructed the Roses ability to carry out their core mission because they cannot advocate for sex equality under the ERA where the Defendant has declared the ERA invalid despite its ratification. *Havens*, 455 U.S., *supra*; *Graul*, 120 F. Supp., *supra*; *African*, No. 19-10432, *supra*; *Smith*, 358 F.3d, *supra*; *Hooker*, 990 F.2d, *supra*; *Jones*, No. 4:19-cv-300, *supra.*

### d. Katherine Weitbrecht

Defendant argues that Plaintiff Katherine Weitbrecht lacks standing because she has alleged only generalized claims of injury. Defendant is incorrect.

In addition to injuries established above suffered by all Plaintiffs, Ms. Weitbrecht has also personally suffered violence and unequal protection and enforcement of the law based on sex. She now has heightened vigilance and concern about being less safe because she is female. Ms. Weitbrecht's injuries are thus caused by the Defendant because if he had performed his duty, recorded the ERA, and refrained from declaring the ERA invalid, she would be experiencing less fear and lower risk because she would no longer be subjected to inequality under the Constitution.

Ms. Weitbrecht has also alleged reluctance to seek redress for "any sex-based harm she may endure" due to fear that "reporting crimes committed against her because she is female will lead to inadequate charges and unjust treatment by law enforcement and the legal system." (Am.Com.21). Defendant claims this injury has no causal connection to his actions. Defendant is wrong. As argued above with regard to the causal relationship between Defendant's actions and injuries to Plaintiffs and all women, it is

irrelevant that Defendant is not the original cause of sex inequality. He has caused Ms. Weitbrecht's injuries by unlawfully perpetuating the societal and legal conditions that produce her suffering. Contrary to Defendant's argument, this is not a mere "subjective chill." (D.Mem.17). As a member of a class of people who live under constant threat of disproportionately high rates of violence, Ms. Weitbrecht has already suffered a sex-based attack, followed by unequal protection of law and unjust treatment because she is female. As set forth above, this is objectively very real harm that she would not be enduring if Defendant had published the ERA and refrained from declaring it invalid.

Lastly, Defendant claims that neither Ms. Weitbrecht nor the other Plaintiffs may allege a chilling-effect injury because this is not a First Amendment case. (D.Mem.17). Defendant is incorrect. The right to seek redress of grievances is guaranteed by the First Amendment, which states, "Congress shall make no law … abridging … the right of the people … to petition the Government for a redress of grievances." U.S. CONST. amend. I. It is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). Plaintiffs adequately allege injury to their First Amendment rights because Defendant's actions have undermined their ability to persuade government officials to act in accordance with the ERA. Ms. Weitbrecht in particular is reluctant to report and seek redress of sex-based harm because of Defendant's actions. These are First Amendment chilling-effect injuries. *See N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996).

Defendant's reliance on *N.H. Right to Life* for the proposition that there can be no chilling effect-injury unless the First Amendment issue involves a statute that prohibits protected speech is wrong. Whether the government causes a chilling-effect by enactment

of a statute or by some other official act is of no moment. Any government action that chills First Amendment rights causes cognizable injury. *See Professional Real Estate Investors, Inc., v. Columbia Pictures Ind., Inc*. 508 U.S. 49, 55–58 (1993) (citing the *Noerr-Pennington* doctrine and explaining that First Amendment rights include the right to influence a governmental body, which extends to judicial, administrative, and legislative entities, and discussing the importance of anti-SLAPP laws as an important tool to prevent the chilling-effect caused by the abridgement of such rights).

## B. Traceability

Defendant asserts that Plaintiffs fail to allege Defendant's actions have interfered with their interests. (D.Mem.11). In fact, Plaintiffs plainly allege that they have been injured by Defendant's failure to carry out his duty to publish the ERA, which itself is sufficient to establish traceability. *Zabala Clemente v. United States*, 567 F.2d 1140, 1146 (1st Cir. 1977) (traceability arises from the existence of a clear duty to act, and the wrongful refusal to carry out that duty).

Further, Plaintiffs' complaint is replete with allegations of how and why Defendant has caused their injuries.[42] His actions have interfered with the ERA's vitality;

---

[42] See e.g., (Am.Com.18) ("EME has had to divert resources to educate and inform its members, supporters and the general public about why the ERA is duly ratified despite the Archivist's opinion to the contrary, why the Archivist's view is incorrect as a matter of law, and why government officials should already be taking steps to repair sex discriminatory laws, regulations, and policies"); (Am.Com.18) ("EME has personally witnessed the reluctance on the part of women, attorneys, and other advocates to demand that such repair work begin, because of the Archivist's refusal to record the ERA…"); (Am.Com.12) (because of Defendant's actions, "…Government officials are refusing to identify and repair sex discriminatory provisions in laws, regulations, and policies …. thus exposing [plaintiffs] to an unnecessary risk of harm…"); (Am.Com.13) ("women as a class are currently excluded from protection under the state's hate crime statute, which means they are being denied equal protection from sex/gender-based hate crimes, and associated deterrence of gender-based hate crimes.")

frustrated the missions of and caused diversion of resources from the organizational plaintiffs; deterred government officials and others from acting in accordance with the ERA; and exposed Plaintiffs and all persons protected by the ERA to an increased risk of harm, including sex-based violence.

Defendant cites *Katz*, 672 F.3d at 76-77, for the proposition that Plaintiffs' allegations of traceability are inadequate. *Katz* is unavailing. The Plaintiff there suffered injury because of the actions of a party not before the court, and the Plaintiff specifically pled that her injuries were attributable to that third-party. Plaintiffs here allege that only the Defendant is responsible for their injuries.[43]

Relying on *Am. Waterways Operators v. U.S. Coast Guard*, --- F. Supp. 3d --- 2020 (D. Mass. Jan. 22, 2020), Defendant also argues that Plaintiffs fail to identify specific government officials who have declined to comply with the ERA because of Defendant's actions. (D.Mem.11). Such specificity is not required at the motion to dismiss stage. *Warth*, 422 U.S. at 508. *Am. Waterways* does not hold otherwise as it is a summary judgment case where more specific facts are required.

Moreover, specific government officials who have declined to comply with the ERA because of Defendant's actions can be identified. In connection with the D.C. lawsuit,[44] several Attorneys General who oppose the ERA filed pleadings alleging that if

---

[43] While the failure of government officials to identify and repair sex discriminatory laws and policies could be seen as an additional cause of some of Plaintiffs' injuries, their failure is the direct result of Defendant's actions, as demonstrated by the fact that several Attorneys General are suing Defendant in response to the confusion he created about the ERA's validity. *Virginia et al., v. Ferriero*, 1:20-cv-242-RC (D.D.C. 2020), and many more have expressed similar uncertainty. *See* Attorneys General Letter, *supra* note 4.

[44] *Virginia v. Ferriero*, *supra* note 43. The Attorneys Generals' lawsuit makes the same legal arguments that Plaintiffs make here, but they cannot adequately represent Plaintiffs' interests as they speak only for their constituents, and may make litigation decisions that

the Archivist is ordered by the court to publish the ERA, they will be "forced to spend substantial resources defending their duly enacted laws from this new line of constitutional task." (Ex. B. at 1). If Attorneys General will not comply with the ERA unless Defendant publishes it, it is axiomatic that they are not currently acting in accordance with the ERA *because* Defendant did not publish it.

## C. Redressability

Plaintiffs' injuries will be redressed by a favorable ruling from this Court because there is at least "some possibility that the requested relief" will cause Defendant to reconsider his decision that caused harm to the Plaintiffs. *Nulankeyutmonen*, 503 F.3d at 18. Indeed, Defendant has explicitly stated that he will publish the ERA if directed to do so by a final court order. NARA Press Statement, *supra* note 3. Thus, the relief requested, if granted, will cause Defendant to reconsider his decision that harmed the Plaintiffs. *See Coll. Dental Surgeons P.R. v. Conn. Gen. Life Ins. Co.*, 585 F.3d 33, 41 (1st Cir. 2009).

## VI.   THE TENTH AMENDMENT PROHIBITS CONGRESS FROM RESTRAINING THE STATES' ARTICLE V POWERS

As argued above, Congress may not limit States' rights under Article V. Nor does Article V delegate *all* amendatory powers to Congress. Rather, it provides that such powers are to be shared between the National government and the States. Because the States have been granted powers in Article V, Congress may not, under the Tenth Amendment, deprive them of those powers. *Nat'l League of Cities v. Usery*, 426 U.S.

---

conflict with the interests of persons protected by the ERA, such as choosing not to appeal an adverse ruling. If that were to occur, Plaintiffs would have no remedy, or even opportunity to hold the Attorneys General accountable through the political process. *Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980) (National Organization for Women allowed to intervene as a matter of right because it represented interests of women, thus had a protectable legal interest in the "continued vitality of the ERA," which was not adequately represented by the government).

833, 843 (1976) (Tenth Amendment "expressly declares the constitutional policy that the Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively, in a federal system").

Contrary to Defendant's argument, the States' authority under Article V does not "exclusively spring out of the existence of the national government." (D.Mem.28–29) citing *Sprague*, 282 U.S. at 733–34. Rather, the States' authority is affirmatively granted to them in Article V. Defendant's reliance on *Sprague* is misplaced. *Sprague* speaks to the States' participation in the ratification process as a "federal" rather than a state law function only in the sense that the amendment process was created by the federal Constitution. *Sprague* does not stand for the proposition that because the Constitution is a federal document, the National government may control the rights of the States reserved to them in that federal document. *See Strahan v. Coxe*, 127 F.3d 155, 167 (1st Cir. 1997) ("It is certainly true that, while Congress may regulate the conduct of individuals, it may not generally regulate the conduct of the States.").

VII.  THIS COURT HAS AUTHORITY UNDER THE ALL WRITS ACT AND THE MANDAMUS STATUTE TO GRANT THE RELIEF REQUESTED

Plaintiffs ask this Court to, inter alia, declare the ERA valid; declare the challenged deadline a constitutional nullity; declare that States may not rescind prior ratifications; and order Defendant to publish the ERA. (Am.Com.25). Defendant claims Plaintiffs have no authority to seek such relief under mandamus or the All Writs Act. Defendant is incorrect.

The mandamus statute, 28 U.S.C. § 1361, gives district courts "original jurisdiction" of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. The

All Writs Act, 28 U.S.C. § 1651, gives courts even broader authority to issue "all writs necessary or appropriate in aid of their respective jurisdictions, and agreeable to the usages and principles of law," to ensure the "proper administration of justice." *U.S. v. New York Telephone Co.*, 434 U.S. 159, 174 (1977).

Mandamus actions may be supervisory or advisory. *United States v. Horn*, 29 F.3d 754, 769 n.19 (1st Cir. 1994). Advisory mandamus is used in cases like this one that present "novel questions of great significance," *United States v. Green*, 407 F.3d 434, 439 (1st Cir. 2005), or when settling such questions "would give needed guidance to lawyers, litigants, and lower courts." *Sampson*, 724 F.3d 150, 159 (1st Cir. 2013).[45]

This case is plainly appropriate for advisory mandamus. It raises issues of first impression for the nation, and the vitality of the ERA is indisputably of paramount importance. *In re Globe Newspaper Co.*, 920 F.2d 88, 90 (1st Cir. 1990) (advisory mandamus warranted to decide "novel and important" question of press access to jury list); *Horn,* 29 F.3d at 770 (advisory mandamus appropriate to determine whether sovereign immunity bars federal court's order of attorneys' fees and costs against government in criminal case because "[t]he issue presented ha[d] never before been

---

[45] Defendant cites *Cheney v. U.S. Dist. Ct.,* 542 U.S. 367, 380–81 (2004) and *Trenkler v. U.S.* 536 F.3d 85, 90 (1st Cir. 2008) for the proposition that Plaintiffs must show they have no alterative remedy. However, those are supervisory mandamus cases. *Cheney* notes that the purpose of requiring proof of no alternative remedy is "to ensure that the writs will not be used as a substitute for the regular appeals process." *Id.* In any event, Defendant's claim that Plaintiffs have an adequate alternative remedy under the Administrative Procedure Act ("APA") is curious considering that Defendant concedes in his motion to dismiss the D.C. Lawsuit that an action under the APA would fail. *Virginia et al., v. Ferriero*, 1:20-cv-242-RC (D.D.C. 2020) (Ex. C at 24) ("If Plaintiff were to bring an APA claim … the claim would fail on the merits because the Archivist is not required to certify the ERA.") Thus, even if an APA claim were possible, it does not bar this Court's review. *See INS v. Chadha*, 462 U.S. 919, 936–37 (1983) (availability of other remedies inadequate to defeat mandamus review of constitutionality of process which led to change in respondent's residency status, where availability of such remedies, much less the likelihood of their success, was speculative).

squarely decided"). This case is also appropriate for advisory mandamus because it raises vital questions regarding greater issues of federalism. *In re Justices of Superior Court Dep't of Mass. Trial Ct.*, 218 F.3d 11, 16 (1st Cir. 2000) ("availability of pretrial federal habeas relief for 'disinterested prosecutor' claims [was] an issue of first impression" implicating "greater issues of federalism").

The All Writs Act further empowers this Court to grant the relief requested because Defendant's unlawful actions frustrate the proper administration of justice. *In re Grand Jury Proceedings of United States*, 626 F.2d 1051, 1059 (1st Cir. 1980). Power conferred by the All Writs Act extends to persons who "though not engaged in wrongdoing, are in a position to frustrate … the proper administration of justice." *Id.* quoting *New York Telephone*, 434 U.S. at 174.

It is beyond cavil that there can be no "proper administration of justice" for the millions of people protected by the ERA so long as its validity is in doubt.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion to Dismiss.

Respectfully submitted,

For the Plaintiffs,

/s/ Wendy J. Murphy
WENDY J. MURPHY
B.B.O. # 550455
Women's and Children's Advocacy Project
Center for Law and Social Responsibility
New England Law | Boston
154 Stuart Street
Boston, MA 02116
Phone: (617) 422-7410
E-mail: wmurphy@nesl.edu

On the brief: Alison Shea, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by the ECF filing system.

/s/Wendy J. Murphy

Dated: June 1, 2020