**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                             )
                             )

**EQUAL MEANS EQUAL,**          )
**THE YELLOW ROSES and**    )
**KATHERINE WEITBRECHT,**   )
                             )

         **Plaintiff,**     )
                             )

        **v.**        )
                             )    **Case No. 20-cv-10015-DJC**
                             )

**DAVID S. FERRIERO, in his Official**  )
**Capacity as Archivist of the United States,**  )
                             )

         **Defendant.**    )
                             )
                             )
_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                   **August 6, 2020**

## I.    Introduction

Plaintiffs Equal Means Equal, The Yellow Roses (together, the "Organizational Plaintiffs") and Katherine Weitbrecht ("Weitbrecht" or "Individual Plaintiff") have filed this lawsuit against David S. Ferriero in his official capacity as Archivist of the United States ( "Defendant" or the "Archivist") alleging constitutional violations and seeking, among other things, an order compelling the Archivist to record all states' ratification of the Equal Rights Amendment (the "ERA") and otherwise prohibiting removal of previously recorded ratifications and an order declaring the Equal Rights Amendment ratified.  D. 5 at 3, 25.  The Archivist has moved to dismiss for lack of jurisdiction and failure to state a claim under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

1

D. 11.  For the reasons stated below, namely that Plaintiffs lack standing, the Court ALLOWS the motion to dismiss, D. 11.

## II.    Standard of Review

Pursuant to Fed. R. Civ. P. 12(b)(1), a defendant may move to dismiss an action for lack of subject matter jurisdiction.  "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence."  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)).  To determine if the burden has been met, the Court "take[s] as true all well-pleaded facts in the plaintiffs' complaints, scrutinize[s] them in the light most hospitable to the plaintiffs' theory of liability, and draw[s] all reasonable inferences therefrom in the plaintiffs' favor."  Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009).

A defendant may also move to dismiss for a plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007).  Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011).

III.    **Background**[1]

Unless otherwise noted, the following factual summary is taken from the allegations in the operative complaint and the Court assumes them to be true for the purposes of resolving the motion.  McCloskey v. Mueller, 446 F.3d 262, 265 (1st Cir. 2006) (noting that under either rule applicable here that the court "accept[s] the plaintiffs' well-pleaded facts as true and indulging all reasonable inferences in their behoof").

A.    **The Parties**

David S. Ferriero is the Archivist of the United States and as such is responsible for the National Archives and Records Administration including the recording of states' ratification of constitutional amendments and the amendments themselves.  D. 5 ¶ 9; 1. U.S.C. §106b.  Equal Means Equal is a national 501(c)(4) organization whose sole purpose is to advocate for women's equality, ratification of the ERA and equal rights for women and girls.  D. 5 ¶ 10.  Specifically, its goal "is to eradicate sex/gender inequality and advocate for sex/gender equality and fully equal rights for women and men."  D. 5 ¶ 59.  In 2016, Equal Means Equal produced a documentary film titled "Equal Means Equal" which examined the status of American women who experienced discrimination and considered whether the ERA would mitigate this pattern of discrimination.  D. 5 ¶ 60.  Equal Means Equal's executive director, Kamala Lopez ("Lopez"), testified in front of the Illinois legislature in support of the ERA.  D. 5 ¶ 61.  Equal Means Equal has been advocating for state and federal officials to begin the process of examining their laws and regulations, and to take steps "to repair all sex discriminatory provisions," but officials have declined, citing the

---

[1] The Court ALLOWS *nunc pro tunc* the Plaintiffs' motion to take judicial notice of the States' Amicus Brief filed in Virginia v. Ferriero, 1:20-cv-00242 (D.D.C.), D. 27, and the Court further ALLOWS amici curiae motions, D. 24; D. 28, to file briefs in support of Plaintiffs.  The Court has considered the briefs, D. 25, as amended by D. 30; D. 27-1, D. 29, herein but notes that none of them concern the legal issue of standing.

Archivist's refusal to recognize the ERA as ratified.  D. 5 ¶ 62.  Equal Means Equal further alleges that because the Archivist has refused to recognize the ERA as ratified, women attorneys and other advocates have been reluctant to demand repair work and Equal Means Equal has had to expend significant resources educating its members and members of the general public about why the ERA is duly ratified despite the Archivist's opinion to the contrary.  D. 5 ¶ 63.  The diversion of these resources, Equal Means Equal asserts, has reduced the amount of resources available to Equal Means Equal that would otherwise be used to assist in the repair work of sex discrimination provisions in anticipation of the ERA taking effect.  D. 5 ¶ 63.

The Yellow Roses is an organization of Massachusetts high school students, founded in 2016, for the sole purpose of advocating for ratification of the ERA.  D. 5 ¶ 11.  The Yellow Roses' mission is to advocate for and raise public awareness about the ratification of the ERA.  D. 5 ¶ 66. The Yellow Roses engages in numerous activities including circulating a petition for the ratification of the ERA, interviewing and being interviewed by the media, meeting with state and federal officials to advocate for the equal treatment of women and ratification of the ERA, collaborating with activists and making public appearances to advocate for and teach young people to be activists in their communities.  D. 5 ¶ 67.  The Yellow Roses asserts that its mission is impaired by the refusal of government officials to begin the process of examining and repairing sex discriminatory laws, regulations and policies and because they cannot effectively advocate on behalf of the ERA so long as the ERA is perceived by government officials as not valid.  D. 5 ¶ 69.

Individual Plaintiff Katherine Weitbrecht is a female resident of Norfolk County, Massachusetts.  D. 5 ¶ 12.  Weitbrecht personally suffered a violent act because she is female when she was strangled in Massachusetts for wearing a rape whistle.  D. 5 ¶ 71.  Weitbrecht reported the

perpetrator to law enforcement and he was charged with a single count of assault and battery, but Plaintiffs allege that he could not be charged under the Massachusetts hate crime statute, Mass. Gen. L. c. 265 § 39, because sex is not a protected class under that statute.  D. 5 ¶¶ 72-73 (citing Mass. Gen. L. c. 265 § 39).  Weitbrecht is now reluctant to report any sex-based criminal activity because of that experience.  D. 5 ¶ 74.  She fears that reporting crimes committed against her because she is female will lead to inadequate charges and unjust treatment by law enforcement and the legal system.  D. 5 ¶ 74.  Weitbrecht alleges that her rights and well-being are threatened and violated by her lack of full constitutional equality and, as a result, she has been subjected to needless increased risk of violence because of her sex.  D. 5 ¶¶ 75, 77.

### B.    The ERA

In March 1972, Congress approved a resolution proposing an Amendment to the Constitution, the Equal Rights Amendment, by a supermajority of each house and submitted it for ratification to the state legislatures.  H.J. Res. 208, 86 Stat. 1523 (1972).  The resolution includes the text of the proposed amendment and set a seven-year deadline from the date of submission for ratification.  The resolution states:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

> Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
> "ARTICLE-
> "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

5

"SEC. 2. The Congress shall have the power to enforce, by
appropriate legislation, the provisions of this article.
"SEC. 3. This amendment shall take effect two years after
the date of ratification.

H.J. Res. 208, 86 Stat. 1523 (1972).  States considered the ERA and thirty-five states ratified it,

including Massachusetts, before the seven-year deadline passed.  D. 5 ¶ 18.  Five states also passed

resolutions seeking to rescind their prior ratification, see Ratification of the Equal Rights

Amendment, U.S. Dep't of Justice, Office of Legal Counsel, 44 Op. O.L.C. at *18–21 (Jan. 6,

2020).

In 1978, as the seven-year deadline approached, Congress passed a joint resolution by the

majority of both houses extending the ERA's deadline to June 30, 1982.  H.R.J. Res. 638, 95th

Cong., 2d Sess., 92. Stat. 3799 (1978).  No new states ratified the ERA between 1979 and 1982.

D. 5 ¶ 18.  One of these five states attempting to rescind the ERA was Idaho, whose rescission,

along with Congress's 1978 extension, became the subject of a lawsuit, Idaho v. Freeman, 529 F.

Supp. 1107, 1146-50 (D. Idaho 1981).  The district court in Freeman held that Congress's 1978

extension was unsuccessful and states may rescind their ratification. Id. at 1146-54.  The Supreme

Court stayed the district court's judgment and granted certiorari before the Ninth Circuit ruled on

the appeal, Nat'l Org. for Women, Inc. v. Idaho, 455 U.S. 918, 102 S. Ct. 1272 (1982) (mem.), but

vacated and remanded the case to the district court with instructions to dismiss it as moot after

Congress's June 30, 1982 extension of the ratification deadline passed.  Nat'l Org. for Women,

Inc. v. Idaho, 459 U.S. 809, 103 S. Ct. 22 (1982) (mem.).

C.    **Recent Developments with the ERA**

In 2012, Defendant issued an opinion letter stating that he would record States' ERA

ratification votes if they occurred after expiration of the challenged deadline and publish the ERA

if three-fourths of the States voted to ratify it.  See Letter from David S. Ferriero, Archivist of the

United States, to Hon. Carolyn Maloney (October 25, 2012), https://www.congress.gov/116/meeting/house/109330/documents/HHRG-116-JU10-20190430-SD007.pdf.  In 2017, the ERA regained national attention when Nevada passed a resolution intent on ratifying the ERA.  S.J. Res. 2, 79th Leg. (Nev. 2017).  Illinois followed suit the following year.  S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018).  The Archivist recorded both Nevada and Illinois's ratifications.  D. 5 ¶ 28.  Because following Illinois's efforts, thirty-seven states in total had passed resolutions seeking to ratify the ERA, certain members of Congress wrote to the Archivist requesting information as to what actions he would take in the event that a 38th state, the last necessary vote for ratification, attempted to the ratify the ERA.  See Letter from Gary M. Stern, General Counsel, Nat'l Archives and Records Admin., to Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018), https://www.archives.gov/files/press/press-releases/2020/olc-letter-re-era-ratification-12-12-2018.pdf.  Following the inquiry from Congress, on December 12, 2018, the general counsel to the National Archives wrote the Department of Justice, Office of Legal Counsel ("OLC") requesting guidance on the Archivist's  responsibilities to record state's efforts to ratify the ERA after the congressional deadlines.  Id.  On January 6, 2020, the OLC issued a memorandum opinion (the "OLC ERA Opinion") that the "deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress' authority to set a deadline on ratification" and regardless of whether the 1979 Congressional Extension was valid, the ERA deadline has come and gone and, therefore, advised the Archivist not to certify the ERA as ratified if any state subsequently attempted to ratify the ERA.  See Ratification of the ERA, 44 Op. O.L.C. at *12, *24.  On January 8, 2020, the Archivist issued a statement that he "defers to DOJ on this issue and will abide by the

[OLC ERA Opinion] unless otherwise directed by a final court order."  NARA Press Statement on

the Equal Rights Amendment (Jan. 8, 2020), https://www.archives.gov/press/press-releases-4.

A week later, the Virginia General Assembly passed a joint resolution intending to ratify

the ERA. H.R.J. 1, 2020 Sess. (Va. 2020).  As of the date of the filing of the amended complaint

in this action, the Archivist had not recorded Virginia as having ratified the ERA, D. 5 ¶ 41, but

the Archivist subsequently recorded Virginia's ratification.  D. 12 at 30; see Nat'l Archives and

Records Admin., Equal Rights Amendment: List of State Ratification Actions (Mar. 24, 2020),

https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf.

## IV.    Procedural History

Plaintiffs instituted this action on January 1, 2020, D. 1, and amended the complaint on

February 29, 2020, D. 5.  Defendants has now moved to dismiss.  D. 11.  The Court heard the

parties on the pending motion and took the matter under advisement.  D. 17.

## V.    Discussion

### A.    Standing

Article III of the Constitution limits federal courts to deciding cases or controversies.  See

U.S. Const. art. III § 2; Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 52 (1st Cir. 2014).

The justiciability doctrines of standing and ripeness are rooted in Article III and must be addressed

as a threshold inquiry prior to adjudication of the merits of the underlying case.  See Reddy v.

Foster, 845 F.3d 493, 499-500 (1st Cir. 2017).  Standing doctrine reflects both prudential and

constitutional limitations.  Conservation Law Found. of New England, Inc. v. Reilly, 950 F.2d 38,

40 (1st Cir. 1991).

The constitutional requirement of standing necessitates that a plaintiff show "a concrete

and particularized injury in fact, a causal connection that permits tracing the claimed injury to the

defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 92 (1st Cir. 2008) (internal quotation marks omitted) (quoting Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006)).  As the standing requirement is rooted in the principal that courts should only decide cases and controversies, plaintiffs must allege more than a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens," must assert "his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975).  The prudential limitations prevent courts from "adjudicating 'questions of broad social import where no individual rights would be vindicated and . . . limit access to the federal courts to those litigants best suited to assert a particular claim.'" Conservation Law Found. of New England, Inc., 950 F.2d at 41 (alterations in original) (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985)).  Plaintiffs identify several theories of standing for both organizational and individual plaintiffs.  D. 13 at 41-58. Because the Defendant disputes the Plaintiffs' standing to bring these claims, D. 12 at 19-29, this Court turns to this threshold issue.

### 1.    *Standing to All Persons Protected by the ERA*

Most broadly, Plaintiffs assert that all persons protected under the ERA have standing to bring suit.  D. 13 at 41-47.  Specifically, Plaintiffs argue that all persons that would be protected under the ERA are injured by the Archivist's actions because they have a legal interest in the "continued vitality of the ERA."  D. 13 at 41.  Plaintiffs also argue that the Archivist's failure to publish the ERA perpetuates the status of women as unequal resulting in disproportionately higher rates of harm because of that inequality.  D. 13 at 43.  But cognizable injuries must be both concrete and particularized. Spokeo, Inc. v. Robins, ___U.S. ___, 136 S. Ct. 1540, 1548 (2016) (reiterating

that the Court has "made it clear time and time again that an injury in fact must be both concrete and particularized").  These generalized injuries to all those protected by the ERA fail in both respects.

a)    <u>Injury to All Persons Protected by the ERA is Not Particularized</u>

As an initial matter, Plaintiffs appear to suggest that since the members of the Organizational Plaintiffs and the Individual Plaintiff are female, they have standing to bring this complaint.  D. 13 at 41-42.  Such a nation-wide standing principal has been squarely rejected.  <u>See</u> <u>Allen v. Wright</u>, 468 U.S. 737, 755-56 (1984), <u>abrogated on other grounds</u>, <u>Lexmark Int'l, Inc. v.</u> <u>Static Control Components, Inc.</u>, 572 U.S. 118, 134 (2014).  In <u>Allen</u>, the Court rejected the plaintiffs' standing argument by reasoning that "[i]f the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school."  <u>Id.</u> at 755-56.  Plaintiffs' theory here is no different.  It embraces standing to "all individuals protected by the ERA."  D. 13 at 41.

Plaintiffs argue that this case is distinguishable because unlike in <u>Allen</u>, the Plaintiffs here are not merely concerned bystanders.  D. 13 at 42.  Rather, according to Plaintiffs, "in this unprecedented case where our nation's foundational governing document has been changed, there can be no bystanders" and because women and others protected by the ERA should be guaranteed a "place in the Constitution as fully equal persons, [and] Defendant's actions have denied them that status," they have suffered injury.[2]  D. 13 at 42.  This argument asserts that because the

---

[2] Plaintiffs cite the Ninth Circuit's ruling on intervenor's rights in <u>Freeman</u> holding that the interest in the vitality of the ERA was sufficient to allow a women's group to intervene to support their proposition that such a generalized interest is sufficient to confer standing.  <u>Idaho v. Freeman</u>, 625 F.2d 886, 887 (9th Cir. 1980).  Although the circuits are split on this issue, <u>Mangual v. Rotger-</u>

Plaintiffs' challenge is rooted in the constitution, it is distinguishable from the tax related challenge in <u>Allen</u>.  First, the Supreme Court's jurisprudence regarding the requirement that standing be individualized is not limited to its holding in <u>Allen</u>.  <u>See</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 573-74 (1992) (explaining that an injury which "no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy"); <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 40 n.20 (1976) (standing requires that plaintiffs "show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (internal quotations omitted) (quoting <u>Warth</u>, 422 U.S. at 502).  This is because "[a]t bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" <u>Massachusetts v. E.P.A.</u>, 549 U.S. 497, 517 (2007) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)).  Accordingly, Article III jurisdiction requires that the "party bringing suit must show that the action injures him in a concrete and personal way." <u>Lujan</u>, 504 U.S. at 581 (Kennedy, J., concurring).  Second, standing does not exist on a sliding scale in relation to the gravity of the legal issue.  The individual is either injured or not, it does not matter how deeply felt the individual's interest in the problem may be.  The test "requires more than an

---

Sabat, 317 F.3d 45, 61 (1st Cir. 2003) (acknowledging a circuit split); <u>see</u> <u>Cotter v. Mass Ass'n of Minority Law Enf't Officers</u>, 219 F.3d 31, 34 (1st Cir. 2000) (acknowledging that there may be "unusual cases" where an intervenor could satisfy the interest requirement of Rule 24(a)(2) without having a stake in the controversy needed to satisfy Article III), some have held that Article III standing is not required to intervene, <u>see e.g.</u>, <u>Utah Ass'n of Ctys. v. Clinton</u>, 255 F.3d 1246, 1251-52 & n. 4 (10th Cir. 2001).  Indeed, the Ninth Circuit has explained that "the Article III standing requirements are more stringent than those for intervention under rule 24(a)." <u>Yniguez v. State of Ariz.</u>, 939 F.2d 727, 735 (9th Cir. 1991).  Given this distinction and that this Court is not otherwise convinced Plaintiffs' interest in the vitality of the ERA demonstrate an individualized and concrete stake in the outcome here, the Court does not accept the ruling in  <u>Freeman</u> as persuasive authority on this issue.

injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).

> b)   Nor Have Plaintiffs Identified a Concrete Injury Suffered by All Those Protected by the ERA

Although the fact that an injury is widely shared does not defeat a plaintiff's claim to injury, it must nonetheless be sufficiently concrete and individualized.  Plaintiffs may plausibly allege standing regardless of "how many persons have been injured by the challenged action" if they plausibly allege that their individual rights have been or will be infringed in some "concrete and personal way."  Massachusetts v. E.P.A., 549 U.S. at 517 (quoting Lujan, 504 U.S. at 581 (Kennedy, J., concurring)).  In Fed. Election Com'n v. Akins, 524 U.S. 11, 20-25 (1998), the Supreme Court held that voters had standing to challenge the Federal Election Commission's refusal to compel the American Israel Public Affairs Committee to register as a "political committee."  Id.  The Court identified the injury as a failure to obtain relevant information that was mandated by statute and explained that "the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts."  Id. at 24-25.

This is not the case, as was in Akins, where parties have identified a concrete injury—such as a lack of information that is related to their right to vote.  Here, the Plaintiffs have not identified a particular injury suffered by all people protected by the ERA generally that concretely or tangibly harms them.  Instead, Plaintiffs assert that all individuals that would be protected under the ERA are denied that status of equal person.  This theory suffers from two flaws.  First, it is not the case that because the constitution does not affirmatively protect rights, it impinges on them.  Indeed, some state constitutions protect rights beyond the floor the federal constitution sets, yet courts do

not understand federal constitutional omissions in regard to what states protect to impede or burden those rights.  See Am. Legion v. Am. Humanist Ass'n, __U. S__, 139 S. Ct. 2067, 2094 (2019) (Kavanaugh, J., concurring) (recognizing that "the Constitution sets a floor for the protection of individual rights," one that "is sturdy and often high, but it is a floor" and that  "other federal, state, and local government entities generally possess authority to safeguard individual rights above and beyond the rights secured by the U. S. Constitution").   Second, the injury plaintiffs allege, is that if the ERA were to be fully recognized, individuals would be afforded more protection under the law than they would be without the ERA.  This amounts to no more than an injury flowing from the application of the law and the Supreme Court has made clear that plaintiffs who claim only a harm related to the "proper application of the Constitution and laws. . . [that] no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."  Lujan, 504 U.S. at 573-74.

Plaintiffs attempt to ground their injury arguments in the concrete harm they allege women face as a result of the ERA not being recognized.  D. 13 at 43-44.  In doing so, Plaintiffs point to several harms women face from society at large.  For example, Plaintiffs explain that women face increased and disproportional levels of violence, are subject to bias in education and "offenders of violence against women are less likely to be held responsible compared to offenders of other types of violence."  D. 5 ¶¶ 51-58.  But these generalized injuries are not cognizable injuries to the class of persons protected by the ERA as a whole.  Simon, 426 U.S. at 40 n.20; United Presbyterian Church in the U.S.A. v. Reagan, 738 F.2d 1375, 1378-81 (D.C. Cir. 1984) (finding no standing for a large group of plaintiffs who alleged a "chilling effect" resulting from an Executive Order establishing the framework of foreign intelligence and counterintelligence operation).

Moreover, even assuming these injuries conferred standing upon all women, but see Equal Means Equal et al. v. Dep't of Educ. et al., No. 17-cv-12043-PBS, 2020 WL 1284149, at *7 (D. Mass. Mar. 18, 2020) (rejecting plaintiffs' standing argument that plaintiffs established injury by alleging the denial of equal treatment by the challenged discriminatory conduct), it cannot be said that these injuries are fairly attributable to the Archivist's action.  Injuries that stem from independent acts of third parties are ordinarily not cognizable because they are neither fairly traceable to the defendant nor likely to be redressed by the requested relief.  See Katz v. Pershing, LLC, 672 F.3d 64, 71-72 (1st Cir. 2012) (explaining that "[b]ecause the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party"); NAACP, Boston Chapter v. Harris, 607 F.2d 514, 519 (1st Cir. 1979) (agreeing that a federal court can only redress "injury that can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court") (quoting Simon, 426 U.S. at 41-42).  The disproportional levels of violence women face, bias in education and the fact gender-based offenders of violence are less likely to be held responsible compared to offenders of other types of violence, all relate to independent acts of third parties:  the perpetrators of violence, education systems and those policing violence, not the Archivist.

### 2. *Individual Plaintiff*

Defendant also challenges the standing of the Individual Plaintiff, Weitbrecht, to bring suit in this instance. D. 12 at 27-29.  Plaintiffs assert that Weitbrecht has standing in this action because she "has personally suffered violence and unequal protection and enforcement of the laws based on sex." D. 13 at 54.  Weitbrecht experiences heightened vigilance and concern about being less safe because she is female and further alleges a reluctance to seek redress for sex-based harm due

to fear that this will lead to inadequate charges and unjust treatment by law enforcement.  D. 13 at 54.

Although Weitbrecht has alleged such harm, that harm does not confer standing in this suit. The injury must be tied to the relief requested to confer standing.  Conservation Law Found. of New England, Inc., 950 F.2d at 43 (explaining that the alleged injury was of particular concern because "plaintiffs seek relief far beyond any injury they have established").  The relief requested here, namely the declaration and injunctive relief concerning the ERA, cannot remedy the violence Weibrecht faced and the fact that Weibrecht suffered violence in the past does not establish that she is likely to suffer violence in the future.  See Asociación de Periodistas de Puerto Rico v. Mueller, 680 F.3d 70, 85 (1st Cir. 2012).[3]

Weitbrecht's other alleged injuries also do not confer standing in this instance.  Weitbrecht also asserts that her "rights and well-being are threatened and violated by her lack of full Constitutional equality because she is not equally protected by the United States Constitution, or Massachusetts law."  D. 5 ¶ 75.  But as explained above, this type of generalized injury cannot be the basis for a plaintiff's standing because it is neither particularized nor concrete.  Indeed, another session of this Court has rejected the assertion that persons denied generalized equal treatment by anticipated discriminatory conduct, alleges injury in fact.  Equal Means Equal et al., 2020 WL 1284149, at *7 (holding that such injuries were "merely speculative").  Next, Weitbrecht claims a chilling effect on her speech namely that she is reluctant to seek redress for any sex-based harm

---

[3] Nor can this relief remedy any alleged unequal treatment Weibrecht faced by virtue of the allegation that she is not a member of a protected class under Massachusetts hate crime statute, Mass. Gen. L. c.  265 § 39.  D. 5 ¶¶ 72-73.  This harm stems from the independent act of a third party—the Massachusetts legislature, and, therefore, is not fairly attributable to the Archivist.  See Katz, 672 F.3d at 71 (explaining that "[b]ecause the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party").

she may endure due to fear that the charges or crimes will be inadequate and she will receive unjust treatment by law enforcement and the legal system. D. 13 at 54-55.  To the extent this injury is premised on a First Amendment chill injury, such an injury is "peculiar to the First Amendment context," N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996), and despite apparent contentions to the contrary, D. 13 at 55, injuries must be related to the claim brought to assert standing—Plaintiffs bring no First Amendment claim here.[4]  In any event, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13-14 (1972). "The mere allegation of a 'chill,' . . . will not suffice to open the doors to federal court." Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 47 (1st Cir. 2011).  Here, Weitbrecht has alleged only that she has been personally chilled by the Archivist's action, not that this chill was objectively reasonable or that she has suffered any other harm.[5]   Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (reiterating that mere allegations of subjective chill are insufficient to state an Article III injury).  For these reasons, the Individual Plaintiff, Weitbrecht, has failed to establish that she has standing to bring this suit.

### 3.    Organizational and Associational Standing

Organizational plaintiffs may demonstrate standing by:  (1) showing associational standing, i.e., that the member of the organization would have standing to sue as an individual and

---

[4] To the extent this chill injury asserts that Weitbrecht has been denied access to the courts, D. 13 at 55, this injury cannot be said to be attributable to the Archivist as it involves the independent acts of third parties. Katz, 672 F.3d at 71-72.

[5] Weitbrecht's chill arguments suffer from an additional deficiency—they are not fairly attributable to the Archivist.  The fact that Weitbrecht fears that she will receive unjust treatment by law enforcement or the legal system if she reports a crime is not fairly attributable to the Archivist's failure to certify the ERA because it relies on independent acts of third parties. See Katz, 672 F.3d at 71-72.

the interests the organization seeks to protect are germane to its purposes; or (2) by showing that the organizational plaintiffs have standing to sue on their own.  See Equal Means Equal et al., 2020 WL 1284149, at *3.  In either instance, the organization must demonstrate more than a "mere interest in a problem."  Sierra Club, 405 U.S. at 739 (internal quotations omitted).  As such, they must make the same showing as is required in the case of an individual:  injury, causation and redressability.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982) (explaining that the court "conduct[s] the same inquiry as in the case of an individual" to assess organizational standing).  Defendants assert that neither Equal Means Equal nor the Yellow Roses have standing. D. 12 at 20-27.  Since Equal Means Equal asserts its basis for standing on both theories (and Yellow Roses asserts standing on the basis of organizational standing), the Court addresses both.

a)      Associational Standing

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances."  Camel Hair & Cashmere Inst. Of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth, 422 U.S. at 511). To meet the Constitution's standing requirement the associations must demonstrate that (1) its members have an injury "that would make out a justiciable case had the members themselves brought suit," Warth, 422 U.S. at 511, and (2) the "interests served by the suit are pertinent to the mission of the organization . . . ."  Town of Norwood v. F.E.R.C., 202 F.3d 392, 406 (1st Cir. 2000).  Moreover "[r]epresentative standing is inappropriate for prudential reasons, for example, if 'the nature of the claim and of the relief sought' requires the participation of individual members."  Parent/Prof'l Advocacy League v. City of Springfield, 934 F.3d 13, 33-34 (1st Cir. 2019).

17

Plaintiffs assert that Equal Means Equal,[6] has associational standing in this instance because two of its members, Lopez and Weitbrecht, had a cognizable interest in the validity of the ERA.  D. 13 at 52-53.  The Archivist asserts that it is not apparent from the amended complaint that Equal Means Equal has members at all, much less that Lopez and Weitbrecht were members. Indeed, it does not appear from the amended complaint that Equal Means Equal alleges that it has members that have standing to sue in their own right (although it asserts in its opposition that Lopez and Weitbrecht are members), as the operative pleading does not individually identify any of Equal Means Equal's members.  See generally, D. 5.  Equal Means Equal alleges that it has "over twenty-thousand active supporters including members of the entertainment and media community," D. 5 ¶ 65, and otherwise alleges that it "engages with its members/supporters who donate funds and volunteer," D. 5 ¶ 61, and that its involvement in this litigation is intended to represent its own interests and the interests of its members/supporters and women at large,  D. 5 ¶ 64.  Associational standing, however, requires that the organization "at the very least, 'identify [a] member[ ] who ha[s] suffered the requisite harm.'"  Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)) (alteration in original).  Equal Means Equal's failure to allege facts in this regard is alone fatal to its associational standing theory. See Equal Means Equal, 2020 WL 1284149, at *4 (holding that Equal Means Equal's allegations that "they have supporters who 'voluntarily associate[ ] themselves with [Equal Means Equal] . . . is not sufficient to establish standing").

---

[6] Other than a single line in their surreply brief, D. 22 at 12 n.9, Plaintiffs have not endeavored to argue that the Yellow Roses have associational standing.  See D. 13 at 53-54; D. 20 at 6 n.2; D. 22 at 11-12.  To the extent that they do make this contention, the Court concludes that they have not made sufficient showing of same.

Even considering the additional facts alleged in its opposition, Equal Means Equal has not established standing. Equal Means Equal asserts in its briefing that Weitbrecht and Lopez are both members and both have standing in their own right. D. 13 at 53. As this Court discussed above, Weitbrecht has not alleged a cognizable injury attributable to the Archivist's action and, therefore, does not have standing in this instance. Nor does Lopez's alleged injury—that she has devoted personal resources and funds to conduct training sessions, produce educational material and communicate with government officials around the country, urging them to disregard Defendant's actions—amount to a concrete injury. D. 13 at 53. As an interest in a problem is insufficient to confer standing, Sierra Club, 405 U.S. at 739 (quotations omitted), Equal Means Equal's associational standing argument fairs no better with respect to Lopez.

b)      Organizational Standing

"It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members." Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 44 n.7 (1st Cir. 2012). Organizational standing is analyzed under the same inquiry as individual standing. That is to say, for an organization to allege standing in its own right, it must allege "(1) an injury in fact, which is (2) fairly traceable to the defendant's misconduct, and which can be (3) redressed through a favorable decision of the court." Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 324 (D. Mass. 2013). Especially germane to the organizational injury inquiry is whether the injury is sufficiently concrete or merely an abstract social interest. See Havens Realty Corp., 455 U.S. at 378-79; Abigail All. For Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C. Cir. 2006) (explaining that "[t]he court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised"). This is because although

organizations may be formed to remedy certain problems or advance certain goals, mere interest in a problem is insufficient to support standing.  See Sierra Club, 405 U.S. at 739.

The Supreme Court in Sierra Club addressed the standing of the Sierra Club, a membership corporation group with a special interest in conservation, to bring suit enjoining federal officials from approving an extensive skiing development in the Mineral King Valley.  Id. at 729-30. Recognizing that "[t]he Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations," the Supreme Court held that this "special interest" in the problem did not satisfy Article III's standing requirements.  Id. at 739.  This is because if "'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived.  And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so."  Id. at 739-40.  Accordingly, Sierra Club is understood as rejecting the idea that lobbyist or advocacy groups had standing when they assert no injury other than an injury to its advocacy.  Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1162 n.4  (D.C. Cir. 2005) (explaining that "in Sierra Club, the Supreme Court recognized that to hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement"); Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 288 (3d Cir. 2014) (summarizing that "it is clear that a nonprofit entity cannot create standing in a lawsuit in which it has no direct economic interest by having its representatives attend meetings regarding the issue that the entity intends to raise in the suit, or by making expenditures to 'educate' the public on what it regards as the factual or legal

20

basis for its agenda"); Pa. Prison Soc. v. Cortés, 508 F.3d 156, 163 (3d Cir. 2007) (explaining that organizations are "unable to establish standing solely on the basis of institutional interest in a legal issue").

Organizational injury, however, may also be established when the organization suffers an injury to its organizational activities. For example, in Havens Realty Corp., 455 U.S. at 379, the Supreme Court held that the organizational plaintiff had suffered a concrete injury because the defendant's action impeded the organizational purpose and consequentially caused a drain on its resources. Id. There, HOME, a nonprofit corporation whose purpose was to make equal opportunity in housing a reality in the Richmond metropolitan area, brought suit against a realty company and individual alleging discrimination in violation of the Fair Housing Act. Id. at 368-69. HOME alleged that it had been frustrated by the "defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and "has had to devote significant resources to identify and counteract" the defendant's actions. Id. at 379. The Supreme Court explained that "[if as alleged] petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home seekers, there can be no question that the organization has suffered injury in fact." Id. The Supreme Court held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." Id.

The Supreme Court differentiated the injury suffered—having to devote significant resources to combat discrimination and thereby impeding its ability to provide counseling services—from the abstract social interest in combatting racial discrimination that the Supreme Court previously found insufficient to state standing in Sierra Club. Id. (citing Sierra Club, 405

U.S. at 739).  In <u>Havens</u>, it was not enough that the plaintiff organization was generally interested in combating racial discrimination, rather it was that its activities of providing housing counseling and referral services had been impeded that gave rise to its standing.  <u>Id.</u>  <u>Havens</u> and <u>Sierra Club</u> together require organizations to have an injury distinct from an interest in the problem.  Courts, therefore, do not find standing when the organizational goal is one in the same with the injury because those organizations have only a "mere interest" in a problem.  <u>See</u> <u>Lane v. Holder</u>, 703 F.3d 668, 674-75 (4th Cir. 2012) (ruling that a second amendment group whose goal was to promote the exercise of the right to keep and bear arms, educate and research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms did not have standing to challenge firearm law based on its diversion of resources to educate and litigate based on the law); <u>Pa. Prison Soc.</u>, 508 F.3d at 162-64 (holding that a group interested in prison rights did not have standing to challenge amendment to Pennsylvania's constitution regarding recommendations of pardons).  This is because "[a]n organization's expenses in the pursuit of its agenda are self-effectuating and claiming them as injury-in-fact would allow any advocacy group to manufacture standing by choosing to expend resources to advocate against policy decisions made by the federal government."  <u>Blunt</u>, 767 F.3d at 288 (quoting <u>Ctr. For Law and Educ. v. U.S. Dep't of Educ.</u>, 315 F. Supp. 2d 15, 24–25 (D.D.C. 2004)).

Yellow Roses and Equal Means Equal are both advocacy organizations.  Equal Means Equal's "sole purpose is to advocate for sex equality and ratification of the ERA."  D. 13 at 50; D. 5 ¶¶ 10, 59.  Yellow Rose's mission is to advocate for and raise public awareness about sex equality and the ERA.  D. 13 at 53; D. 5 ¶¶ 11, 66.  Both organizations allege that their missions have been frustrated because they assert that the Archivist's refusal to publish the ERA and dissemination of misinformation about its validity has obstructed the organizations' ability to advocate for sex

equality under the ERA.  D. 13 at 50, 54.  Because the Archivist has not declared the ERA valid, they cannot effectively advocate for equality under it.  D. 13 at 49-51, 53-54.  The organizations argue that they have had to divert funds away from their advocacy efforts and instead have had to dedicate funds to educating the public about the Archivist's actions.  D. 13 at 49-51, 53-54.  If these allegations were sufficient to claim standing, an organizational plaintiff would have standing anytime a defendant's action interfered with their organizational goal of advocacy.  This is precisely the principal the Supreme Court rejected in Sierra Club when it held that the Sierra Club's special interest in the "[n]ational natural heritage from man's depredations" were not enough to entitle Sierra Club to commence [that] litigation.  Sierra Club, 405 U.S. at 739.  Undisputedly, the Organizational Plaintiffs are dedicated advocates to women's rights, "but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy."  Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 486 (1982).

Other courts reviewing similar organizational injuries have been reluctant to find standing because such injuries are not distinct from the organizations' mere interest in the problem.  For example, the D.C. Circuit has explained that courts do not find standing where "the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities)."  Ctr. For Law & Educ., 396 F.3d at 1161.  Similarly, the Seventh Circuit has explained that "finding it difficult to advocate and educate on home-sharing in Chicago before a court rules on the individual plaintiffs' challenges to the constitutionality" of an ordinance does not amount to constitutional standing.  Keep Chicago Livable v. City of Chicago, 913 F.3d 618, 625 (7th Cir. 2019).  Here, the Organizational Plaintiffs allege similarly policy and advocacy based injuries explaining that both had to expend significant resources educating, advocating and "communicating with the public around the country to counteract

Defendant's unlawful actions," D. 13 at 51, and "[t]his has frustrated [the organization's] mission because [they] unable to advocate at all for the repair work that should be already underway, and would already be underway, if the Archivist had not stated his refusal to recognize the ERA."  D. 5 ¶ 62; see D. 5 ¶ 63.  This interference with organizational advocacy goals is insufficient to confer standing.  See Ctr. For Law and Educ., 396 F.3d at 1161; Keep Chicago Livable, 913 F.3d at 625; Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (citing cases and explaining that "[o]ur precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury").

Nor are the organizations' efforts to educate members of the public/supporters sufficient to sustain standing.  The Organizational Plaintiffs argue that they have devoted resources "to educate and inform members and the general public about why the ERA is duly ratified" despite the Archivist's actions.  D. 5 ¶ 63.  Essentially, these resources have been devoted to educate the public about the legal status of the ERA, but an organization may not establish "Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law."  Fair Elections Ohio v. Husted, 770 F.3d 456, 460 (6th Cir. 2014); see Boston's Children First v. Boston Sch. Comm., 183 F. Supp. 2d 382, 403 (D. Mass. 2002) (rejecting the standing argument that plaintiff "has 'expended considerable resources in providing counseling and information to its members and general public about the challenged . . . policy'").[7]

---

[7] Plaintiffs argue that Boston's Children First is inapplicable because they argue that the plaintiffs there alleged no diversion of resources or frustrated its mission.  D. 13 at 51.  As a preliminary matter, it appears that the plaintiffs in Boston Children First did allege a diversion of resources as its argument was based on the "sunk costs" injury the organization sustained as a result of the

To hold otherwise and decide that the Organizational Plaintiffs here, whose purpose is to advocate for the ERA, have standing to assert the constitutional validity of the ERA would be in tension with this Court's obligation to decide only actual cases and controversies.  "At bottom the Article III standing limitation prevents a plaintiff from bringing a federal suit to resolve an issue of public policy if success does not give the plaintiff (or one of an associational plaintiff's members) some relief other than the satisfaction of making the government comply with the law." Fair Elections Ohio, 770 F.3d at 460.  The Organizational Plaintiffs here ultimately assert that the ERA is the law and advocate for compliance with it.  Undoubtedly, the relief the organizations seek would allow them to focus their efforts toward advocacy to state legislatures and may well make their advocacy efforts more effective, but that does not confer standing for these Plaintiffs to bring this suit.  See Akins, 524 U.S. at 20 (explaining that the cases and controversies limitation of Article III ensures that "courts will not pass upon. . . . abstract, intellectual problems but adjudicate concrete, living contest[s] between adversaries") (alterations in original) (citations omitted).  "Otherwise, the implication would be that any individual or organization wishing to be involved in a lawsuit could create a[n organization] for the purpose of conferring standing, or could adopt [a mission] so that the [organization] expressed an interest in the subject matter of the case, and then spend its way into having standing."  Blunt, 767 F.3d at 288.

### 4. *Procedural Injury*

Plaintiffs also assert a procedural injury in their opposition.  D. 13 at 40. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all of the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 n.7.

---

defendant's action.  Id. at 403.  In any event, the mission the defendant's action impairs here is that of advocacy and "when the service impaired is pure issue-advocacy" standing is not established.  PETA v. U.S. Dep't of Agric., 797 F.3d 1087, 1093-94 (D.C. Cir. 2015).

Article III still imposes a "irreducible constitutional minimum" and although Congress is "well position to identify intangible harms" that does not mean that a plaintiff "automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Spokeo, Inc., 136 S. Ct. at 1548-49.

Although Plaintiffs do not assert a procedural injury in their complaint, in their opposition they appear to identify 1 U.S.C. § 106b and the Archivist's decision not to certify the ERA as the basis for their procedural injury.[8]  D. 13 at 23-25.  Plaintiffs argue that Section 106b creates a mandate for the Archivist to record ratified amendments because it provides that the Archivist "shall forthwith cause the amendment to be published." 1 U.S.C. § 106b.  Examples of procedural injuries include:  an agency's failure to prepare an environmental impact statement, see City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir. 1975),  adoption of a regulation without notice or comment period, United States v. Johnson, 632 F.3d 912, 920-21 (5th Cir. 2011), violation of publication and notification procedural duties prior to an eminent domain taking, Brody v. Vill. of Port Chester, 345 F.3d 103, 108-13 (2d Cir. 2003), and failure to comply with its certification procedures, Int'l Longshoremen's & Warehousemen's Union v. Meese, 891 F.2d 1374, 1379 (9th Cir. 1989).  In all these cases, plaintiffs sought to enforce a procedural requirement which could impair their separate concrete interests.

---

[8] Plaintiffs also assert a procedural right because "thirty-eight states voted to ratify the ERA, thus satisfying Article V" and, therefore, Plaintiffs also have a cognizable legal interest in ensuring compliance with the states' judgment that the ERA is now law.  D. 22 at 10-11 n. 7.  In support, Plaintiffs cite Salazar v. Buono, 555 U.S. 700, 712 (2010) for the proposition that party who obtains a judgment in his favor "acquires a 'judicially cognizable' interest in ensuring compliance with hat judgment."  Here, Plaintiffs have not obtained a judgment in their favor that the ERA is ratified and cannot use their arguments that it is ratified to assert standing to obtain that very judgment.

Even assuming there was some procedural violation here, Plaintiffs "cannot satisfy the demands of Article III by alleging a bare procedural violation." Spokeo, Inc., 136 S. Ct. at 1550. Here, Plaintiffs have not alleged any concrete interest in tandem with the Archivist's failure. It "is not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (e.g., the procedural requirement for a hearing prior to denial of their license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them)." Lujan, 504 U.S. at 572. Rather, here Plaintiffs seek to establish an injury in procedural violation—the Archivist's failure to certify the ERA—and argue that a myriad of generalized consequences (the unequal status of women, violence against women and unequal treatment) flow to all women and all those otherwise affected by the Archivist's failure to act. As this court explained above, this is not a concrete and particularized stake in the outcome. Accordingly, Plaintiffs' procedural standing argument fare no better than their class-wide, individual and organizational arguments.

5.     *The Claims Here Further Illustrate That Plaintiffs Do Not have Standing*

Plaintiffs ask, among other things, that this Court declare certain states' purported rescissions invalid and declare the ERA ratified despite the fact that several states have passed intended rescissions of these ratifications. D. 5 at 25. In short, the Plaintiffs ask this Court to adjudicate the efficacy of states ratification, which Freeman observed is "the mechanism whereby the will of the people is expressed." Freeman, 529 F. Supp. at 1128. Standing is meant to sharpen "the presentation of issues upon which the court so largely depends for illumination," Massachusetts v. E.P.A., 549 U.S. at 517 (quoting Baker, 369 U.S. at 204) (internal quotations omitted), but no states are parties in this suit. Freeman and Dyer both considered whether Idaho and Illinois had ratified the ERA. See Dyer v. Blair, 390 F. Supp. 1291, 1308-09 (N.D. Ill. 1975);

Freeman, 529 F. Supp. at 1146-50.  Both considered the process by which Idaho and Illinois had approved and rescinded their approval for the amendment.  See Dyer, 390 F. Supp. at 1308-09; Freeman, 529 F. Supp. at 1147-50.    Freeman and Dyer both considered the states' legislative actions in an attempt to determine the "will of the people of those states."    See Dyer, 390 F. Supp. at 1308-09; Freeman, 529 F. Supp. at 1150.  Here, the Court does not have before it any state as a party for this litigation but is nonetheless asked to decide their ratifications.

For all of the aforementioned reasons stated, Plaintiffs have not demonstrated standing in this suit.  Accordingly, the Court lacks jurisdiction to decide the underlying merits and, therefore, does not address the Defendant's remaining arguments for dismissal.  See United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992) (explaining that "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case").

## VI.	Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss.  D. 11.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge